## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

|  |  |
|---|---|
| ) | |
| ) | |
| In re: ) | |
| ) | **Case No. 13-13590-RGM** |
| **GRAND CENTREVILLE, LLC,** ) | **Chapter 11** |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO
## <u>FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION</u>

---

WHITEFORD, TAYLOR & PRESTON, LLP
Bradford F. Englander, Esq., VSB #36221
David W. Gaffey Esq., VSB #85088
3190 Fairview Park Drive, Suite 300
Falls Church, Virginia 22042
(703) 280-9081 (tel)
(703) 280-3370 (fax)

*Special Counsel for Raymond A. Yancey, Chapter 11 Trustee for*
*the Estates of Min Sik Kang and Man Sun Kang*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 2

I.     PLAN VOTING INSTRUCTIONS ............................................................................. 2

     A. Notice to Holders of Claims and Interests ............................................................... 2

     B. Holders of Claims Entitled to Vote ......................................................................... 4

     C. Acceptance of Plan .................................................................................................. 4

II.    HISTORY AND BUSINESS OF THE DEBTOR .................................................... 5

     A. Formation and Business of the Debtor .................................................................... 5

     B. Ownership of the Debtor .......................................................................................... 5

     C. Events Leading to Appointment of the Receiver and Bankruptcy ........................... 6

     D. Debts of the Debtor .................................................................................................. 7

     E. Assets of the Debtor ................................................................................................. 7

     F. Efforts to Sell the Shopping Center ......................................................................... 8

III.   SIGNIFICANT EVENTS IN THIS BANKRUPTCY CASE ................................... 9

     A. Petition, Claims Bar Date, and Schedules and Statements ...................................... 9

     B. Motions Regarding Authority of the Receiver ......................................................... 9

     C. Retention of Professionals ...................................................................................... 10

     D. Compensation of Professionals .............................................................................. 12

     E. Cash Collateral and Financial Management ........................................................... 12

     F. Motion to Dismiss Case ......................................................................................... 13

     G. Extensions of Exclusivity ....................................................................................... 14

     H. Adversary Proceedings ........................................................................................... 14

IV.   SUMMARY OF PLAN .......................................................................................... 16

     A. Purpose of Plan ...................................................................................................... 16

     B. Claims Classification and Treatment ..................................................................... 16

     C. Treatment of Unclassified Claims and Expenses .................................................... 19

     D. Means for Implementation of Plan ......................................................................... 20

V.     DISTRIBUTIONS ................................................................................................... 25

     A. Delivery of Distributions and Undeliverable or Unclaimed Distributions ............ 25

     B. Prepayment ............................................................................................................. 26

     C. Means of Cash ........................................................................................................ 26

D.  Interest on Claims ................................................................................................ 26

E.  Withholding and Reporting Requirements ............................................................. 26

F.  Setoffs ................................................................................................................... 27

G.  Procedure for Treating and Resolving Disputed, Contingent
and/or Unliquidated Claims ................................................................................... 27

H. Distributions to Holders of Interests .................................................................... 28

I.   Fractional Dollars ................................................................................................. 28

J.   Distribution Record Date....................................................................................... 28

VI.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 29

A.  Rejected Contracts and Leases.............................................................................. 29

B.  Bar to Rejection Damages..................................................................................... 29

C.  Assumed and Assigned Contracts and Leases ....................................................... 29

VII.   CONFIRMATION AND CONSUMMATION OF THE PLAN .................................... 30

A.  Conditions to Confirmation ................................................................................... 30

B.  Conditions to Effective Date ................................................................................. 30

C.  Waiver of Conditions ............................................................................................ 31

D.  Consequences of Non-Occurrence of Effective Date ............................................. 31

E.  Modifications and Amendments............................................................................. 31

VIII.   EFFECT OF PLAN CONFIRMATION .................................................................... 32

A.  Binding Effect ....................................................................................................... 32

B.  Discharge of the Debtor ........................................................................................ 32

C.  Injunction ............................................................................................................. 32

D.  Exculpation and Limitation of Liability................................................................. 32

E.  Term of Bankruptcy Injunction or Stays ............................................................... 33

F.  Retention of Jurisdiction........................................................................................ 33

IX.   CONFIRMATION ISSUES ...................................................................................... 33

A.  Compliance With the Bankruptcy Code ................................................................ 33

B.  Good Faith............................................................................................................ 33

C.  Court Approval of Fees and Expenses ................................................................... 34

D.  Disclosure of Management .................................................................................... 34

E.  Governmental Approval of Rates .......................................................................... 34

F.  Best Interest of Creditors ...................................................................................... 34

G.  Acceptance by Impaired Classes.................................................................. 35

H.  Priority Claims ............................................................................................. 35

I.  Impaired Accepting Class.............................................................................. 36

J.  Feasibility ..................................................................................................... 36

K. U.S. Trustee Fees .......................................................................................... 36

L.  Inapplicable Confirmation Requirements..................................................... 36

M. Cram Down ................................................................................................... 36

N.  Risk Factor ................................................................................................... 37

O.  Tax Consequences......................................................................................... 38

X.      FURTHER INFORMATION  ......................................................................... 38

A.  Further Information; Additional Copies ...................................................... 38

XI.     RECOMMENDATION AND CONCLUSION .............................................. 38

## INTRODUCTION

Raymond A. Yancey, Chapter 11 Trustee for the Estates of Min Sik Kang and Man Sun Kang (the "Proponent"), submits this *Disclosure Statement With Respect to Chapter 11 Plan of Reorganization* (the "Disclosure Statement") in the above captioned bankruptcy case of Grand Centreville, LLC (the "Debtor") pursuant to Bankruptcy Code section 1125 for use in the solicitation of votes on the Chapter 11 Plan of dated April 14, 2015 (the "Plan").

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the need to seek chapter 11 protection, and significant events that have occurred during this chapter 11 case.  This Disclosure Statement also describes terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow in order for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THIS CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE PROPONENT BELIEVES THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE PROPONENT OR ITS REPRESENTATIVES, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE PROPONENT DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

**THE PROPONENT BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND THE HOLDERS OF ALL CLAIMS.**

### ARTICLE I.        PLAN VOTING INSTRUCTIONS AND PROCEDURES

#### A.    Notice to Holders of Claims and Interests

This Disclosure Statement will be transmitted to Holders of Claims that are entitled to vote on the Plan.  A discussion and listing of those Holders of Claims that are entitled to vote on the Plan and those Holders of Claims that are not entitled to vote on the Plan is provided herein. The primary purpose of this Disclosure Statement is to provide adequate information to enable such

Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court has been asked to approve this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such Claimholders to make an informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, WHETHER OR NOT SUCH HOLDERS ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT HOLDERS RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

This Disclosure Statement contains important information about the Plan, the Debtor's business and operations, considerations pertinent to acceptance or rejection of the Plan, and developments concerning this Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after approval of and distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Proponent does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time *subsequent* to the date hereof.

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

### B.      Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests that are impaired and that are in a class that will receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a proposed chapter 11 plan.  Classes of Claims in which the holders of Claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Classes of Claims or Interests that receive no distribution on account of their Claims or Interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under Bankruptcy Code section 1124, a class of Claims or Interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such Claim or Interest entitled the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the plan cures all existing defaults.

In addition, a holder of an impaired Claim or Interest which is entitled to receive or retain property under a plan may vote to accept or to reject a plan only if the Claim or Interest is "Allowed" for purposes of voting, which means generally that no party in interest has objected to such Claim or Interest or, if no proof of Claim was filed, that such Claim or Interest has been scheduled by the Debtor on its schedules, without indicating that such Claim or Interest is contingent, unliquidated or disputed.

### C.      Acceptance of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the plan.  Acceptance of a plan by a class of Interests requires acceptance by at least two-thirds (2/3) of the number of shares in such class that cast ballots for acceptance or rejection of the plan.

Bankruptcy Code section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more impaired classes of Claims or Interests.  Under that section, a plan may be confirmed by the Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

After approval of this Disclosure Statement by the Bankruptcy Court, a copy of the Plan will be mailed to all creditors and parties-in-interest entitled to vote pursuant to section 1126 of the Bankruptcy Code, and within the manner specified by Bankruptcy Rule 3017(d), accompanied by a ballot.  Pursuant to section 1126(a) of the Bankruptcy Code, any holder of an Allowed Claim or an Allowed Interest may accept or reject the Plan.  However, approval or rejection of the Plan is measured by Classes of Claims and interests rather than by each Claim holder or interest holder.  A Class of Claims or interests which is not impaired by the Plan is conclusively

presumed to have accepted the Plan.  Accordingly, no Class of Claims that is unimpaired may
vote on the Plan.

If this Disclosure Statement is approved, then pursuant to section 1128 of the Code and
Bankruptcy Rules 2002(b), 3017 and 3018, the Court shall conduct a hearing to consider
confirmation of the Plan on at least twenty-eight (28) days' notice to creditors and parties in
interest, unless shortened by order of the Bankruptcy Court.  A party-in-interest may object to
the confirmation of the Plan.  The date by which objections must be filed to the confirmation of
the Plan and by which votes must be submitted shall be established at a date and in a manner as
determined by the Bankruptcy Court.

## ARTICLE II. <u>HISTORY AND BUSINESS OF THE DEBTOR</u>

### A.      Formation and Business of the Debtor

The Debtor is a Virginia limited liability company formed on February 4, 2004.  The Debtor
owns and operates a retail shopping center known as the Old Centreville Crossing Shopping
Center (the "Shopping Center").  The Shopping Center is a 171,631 square foot retail shopping
center located on approximately 15.9416 acres at the corner of Braddock Road and Old
Centreville Road, in Centreville, Virginia.  A legal description of the Shopping Center is
attached to this Disclosure Statement as **Exhibit B**.  The Shopping Center is the Debtor's
primary asset.

### B.      Ownership of the Debtor

Prior to March 16, 2009, the Debtor was indirectly owned 100% by Min Sik Kang and Man Sun
Kang (together, the "Kangs") through a series of affiliated limited liability companies.  The
membership interests of the Debtor were held 99.5% by Grand Equity, LLC ("Grand Equity")
and 0.5% by Grand Formation, Inc. ("Grand Formation").  Grand Equity was wholly owned by
Grand Development, LLC ("Grand Development"), which, in turn, was wholly owned by the
Kangs.  Additionally, the Kangs owned 100% of the stock of Grand Formation. The Kangs
therefore indirectly owned and controlled 100% of the interests of the Debtor and its assets prior
to March 16, 2009.

On March 16, 2009, the Kangs and Grand Equity entered into a Sale of Membership and Stock
Interest Agreement (the "Centreville Sale Agreement") with James Y. Sohn ("Mr. Sohn") and
Yohn K. Han ("Mrs. Han") as the buyers.  The Centreville Sale Agreement ostensibly provided
that Mr. Sohn would acquire 45% of the interests in the Debtor, that Mrs. Han would acquire 4%
of the interests in the Debtor, and that the Kangs (through their ownership of Grand Equity)
would retain 51% of the ownership in the Debtor.  The Centreville Sale Agreement further
provided that any cash not reasonably required for the operation of the Debtor's business would
be distributed to the parties monthly on the following basis: 51% to Mr. Sohn; 9% to Mrs. Han;
and 40% to the Kangs.   The Centreville Sale Agreement also provided for an amendment to the
operating agreement of the Debtor that imposed the same distribution scheme on distributions to
be made to the members upon the sale of assets or dissolution.

The allocation of these distributions was intended to vest Mr. Sohn with 51% and Mrs. Han with 9% of the economic value of the Debtor.  Mrs. Han and Mr. Sohn thus obtained a 49% ownership interest but 60% of the meaningful economic value of the Debtor.  The Centreville Sale Agreement was structured in this manner to avoid violating terms in the loan documents with the Pre-Petition Secured Lender, which prohibited the transfer of a majority interest in the Debtor without the consent of the bank.  The Centreville Sale Agreement further provided that Mr. Sohn would acquire 51% and Mrs. Han would acquire 9%, of the ownership of Grand Formation, and that Grand Formation would remain the managing member of the Debtor.  The transfer of the majority interest in Grand Formation to Mr. Sohn and Mrs. Han gave them complete control over the operations and finances of the Debtor.

On October 18, 2012, the Official Committee of Unsecured Creditors for Min Sik Kang and Man Sun Kang and MS Grand, Inc. (the "Kang Committee") filed an adversary proceeding in the Kangs' bankruptcy case (AP No. 12-01496-RGM) against Mrs. Han, Mr. Sohn, Grand Investment, Grand Formation, and the Debtor asserting counts of fraudulent transfer under both Virginia and federal bankruptcy law, civil conspiracy, fraud, breach of contract, and other relief (the "Grand Centreville Adversary Proceeding").  The adversary complaint subsequently was amended, and the Proponent became the party plaintiff in the Grand Centreville Adversary Proceeding.  While the Grand Centreville Adversary Proceeding was pending, the Kang Committee entered into a settlement agreement with Mr. Sohn resolving claims against that defendant (the "Sohn Settlement").  The Sohn Settlement is discussed in further detail below in Article III.E.4 of this Disclosure Statement.

Following cross motions for summary judgment, and a "mini-trial" with respect to Count VII of the Second Amended Complaint, the Bankruptcy Court entered a judgment on November 14, 2014, in favor of the Proponent, holding that the transfers through the Centreville Sale Agreement were null and void ab initio and, therefore, did not result in any transfers of the Kangs' direct and indirect interests in the Debtor.  All Interests in the Debtor thus remain with the original Holders, Grand Equity and Grand Formation.

## C.     Events Leading to Appointment of the Receiver and Bankruptcy

On May 14, 2013, the Kang Trustee and the Kang Committee filed their Emergency Motion for Order Appointing Receiver, or, In the Alternative, Preliminary Injunction (the "Receiver Motion") in the Grand Centreville Adversary Proceeding, requesting that the Bankruptcy Court appoint a receiver over the Debtor and Grand Formation to prevent the depletion of the Debtor's assets.  On June 3, 2013, the Bankruptcy Court entered an order granting the Receiver Motion and appointing Black Creek Consulting, Ltd. (the "Receiver") as the receiver over the Debtor and Grand Formation (the "Order Appointing Receiver").

Following the entry of the Order Appointing Receiver, the Receiver contacted the Pre-Petition Secured Lender to obtain copies of all of the loan documents governing the Pre-Petition Secured Debt.  On or about June 14, 2013, the Receiver received notice that LNR Partners, LLC (the "Special Servicer") would be appointed as special servicer on behalf of the Pre-Petition Secured Lender.  On July 30, 2013, counsel for the Special Servicer issued a notice of default to the Debtor (the "Default Letter") asserting several retroactive defaults going back over four (4)

years.  The Special Servicer sought to use the alleged defaults to assert retroactive remedies including a claim for approximately $4 million in default interest.

On August 2, 2013, the Debtor, through the Receiver, filed a petition under chapter 11 of the Bankruptcy Code initiating this case.

### D.    Debts of the Debtor

#### 1.    *Secured Debt*

On June 6, 2005, the Debtor entered into a promissory note in favor of the Pre-Petition Secured Lender in the original principal amount of $27,000,000 secured by a Deed of Trust, Assignment of Leases and Rents, and Security Agreement.

#### 2.    *Unsecured Debt*

The Debtor's schedules list a total of $1,792,677.47 in unsecured debt as of the Petition Date.

### E.    Assets of the Debtor

#### 1.    *Real Property*

The Debtor's sole real property asset is the Shopping Center.  As of March 5, 2014, the fair market value of the Shopping Center was appraised to be $47,000,000.00.  The Shopping Center is encumbered by a deed of trust securing the Pre-Petition Secured Debt.

#### 2.    *Leases/Tenants*

The Debtor's Schedule G identifies fifty-eight (58) leases and one rental of a shed.  According to Exhibit 1 to the Debtor's Statement of Financial Affairs, the leases and rentals of the Debtor produced a total of $411,949.61 in the month prior to the Petition Date.

#### 3.    *General Assets*

In addition to the Shopping Center and related tangible personal property, the Debtor holds cash deposits, and the Pre-Petition Secured Lender holds certain reserves.  The amount of the deposits and reserves are set forth in **Exhibit B**.  Further, the Debtor may have Causes of Action.  The Proponent presently is investigating these potential causes of action.  The Proponent reserves the right to file a Plan Supplement describing potential Causes of Action.

#### 4.    *Litigation*

##### a)    *Grand Centreville Adversary Proceeding and Sohn Settlement*

On October 18, 2012, the Kang Committee filed the Grand Centreville Adversary Proceeding against Mrs. Han, Mr. Sohn, Grand Investment, Grand Formation, and the Debtor asserting counts of fraudulent transfer under both Virginia and federal bankruptcy law, civil conspiracy, fraud, breach of contract, and other relief.

7

After the Grand Centreville Adversary Proceeding was filed, the Kang Committee and Raymond A. Yancey, Chapter 11 Trustee for the Kangs (the "Kang Trustee"), entered into the Sohn Settlement agreement with Mr. Sohn whereby Mr. Sohn agreed to purchase the Kangs' interest in the Debtor for the sum of $10,000,000 on or before October 28, 2014.  The Sohn Settlement provided that if such payment was not made on or before that date, the Kang Trustee would direct the liquidation and wind-down of the Debtor, including without limitation directing the actions of the Receiver in connection with the marketing and sale of the Debtor's assets.  The net proceeds from the disposition of all assets will be paid 90% to the Kang Trustee and 10% to Mr. Sohn, until such time as the Kang Trustee receives $10,000,000 on account of the sale.  After the Kang Trustee has realized $10,000,000 from the disposition of assets, Mr. Sohn will receive 90% of any further net proceeds, with the remaining 10% going to the Kang Trustee.  All claims against Mrs. Han, the remaining active defendant in Adversary Proceeding No. 12-01496, are preserved.

Mr. Sohn did not purchase the Kangs' interest in the Debtor prior to October 28, 2014. The Kang Trustee assumed the authority to direct the liquidation of the Debtor, including directing the actions of the Receiver in connection with the marketing and sale of the Debtor's assets, and is attempting to sell the Shopping Center as described below in Article III.F of this Disclosure Statement.

Following a trial, the Bankruptcy Court entered a judgment on November 14, 2014, in favor of the Kang Committee against the remaining defendants in the Grand Centreville Adversary Proceeding on count VII of the complaint, finding that the transfers through the Centreville Sale Agreement were made pursuant to an unauthorized sale that was null, void and without legal effect and, therefore, did not result in any transfers of the Debtor's interests.  Mrs. Han has filed a motion for leave to appeal the Bankruptcy Court's grant of partial summary judgment, which motion remains pending before the Bankruptcy Court.  A final pre-trial hearing on the remaining counts of the Grand Centreville Adversary Proceeding is scheduled to be held on May 5, 2015.

**F.      Efforts to Sell the Shopping Center**

Upon Mr. Sohn's failure timely to pay $10,000,000 to the Kang Trustee on or before October 28, 2014, the Kang Trustee assumed control of the Debtor and Grand Formation.  The Kang Trustee currently is marketing the Shopping Center to prospective buyers.  On November 19, 2014, the Debtor filed applications to employ several professionals to assist the Receiver and Kang Trustee in the effort to sell the Shopping Center.  Such applications are described further below in Article IV.C of this Disclosure Statement.

The Kang Trustee, through real estate broker KLNB, LLC, marketed the Shopping Center between January 2015, and March 2015.  KLNB, LLC contacted 267 potential purchasers.  Potential purchasers were required to submit proposals to purchase the Shopping Center on or before March 31, 2015.  The Kang Trustee received several responsive proposals.

Upon review of all responsive proposals, the Kang Trustee identified JBG Associates, LLC as having submitted the best and highest offer.  The offer submitted by JBG Associates, LLC

provides for a final purchase price of $55,500,000.00, with a deposit in the amount of $2,775,000.00.

## ARTICLE III.        SIGNIFICANT EVENTS IN THIS BANKRUPTCY CASE

### A.      Petition, Claims Bar Date, and Schedules and Statements

On August 2, 2013, the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code [Dkt. No. 1].  No Official Committee of Unsecured Creditors was appointed in this Chapter 11 Case.  Michael Schuett (the "Debtor Designee") was designated to perform the duties imposed on the Debtor by the Bankruptcy Code [Dkt. No. 11].  The Debtor, through the Receiver, continued in possession of its properties and is operating and managing its business as a Debtor-in-Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

By its *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines* dated August 8, 2013 (the "Claims Bar Date Notice"), the Bankruptcy Court established December 11, 2013, as the last date by which proofs of claim could be filed in the Bankruptcy Proceeding for all creditors except a governmental unit, and January 29, 2014, as the proof of claim filing deadline for a governmental unit [Dkt. No. 17].  The Claims Bar Date Notice was mailed by the Bankruptcy Court clerk's office to all creditors on August 10, 2013.

On September 5, 2013, the Debtor filed its *Schedules and Statement of Financial Affairs* [Dkt. No. 43].  The Schedules reflect that as of the Petition Date, the Debtor listed $40,550,045.74 in assets and $26,247,602.00 in liabilities.

### B.      Motions Regarding Authority of the Receiver

On April 1, 2014, the Kang Trustee filed his *Motion for Entry of Order Confirming and Granting Nunc Pro Tunc Authority for Black Creek Consulting, Ltd. to Remain in Possession, Custody and Control of Debtor's Property Pursuant to 11 U.S.C. § 543(d)* (the "Motion to Confirm Receiver") seeking to authorize the Receiver to remain in possession of the Debtor's property pending a resolution of the dispute over the ownership of the Debtor [Dkt. No. 154].

On April 1, 2014, the Debtor filed its *Motion for Order (i) Authorizing Receiver's Filing of this Bankruptcy Case, Nunc Pro Tunc, And (ii) Pursuant to Section 543(d) Specifically Excusing Compliance with Property Turnover Requirements and Permitting Receiver to Remain in Possession* (the "Motion to Authorize Receiver") seeking to confirm the Receiver's authority to file a Chapter 11 petition on behalf of the Debtor, to authorize *nunc pro tunc* the filing of the Petition, and to authorize the Receiver to remain in possession and operate and manage the Debtor's business as a Debtor-in-Possession [Dkt. No. 156].  An objection to the Motion to Authorize Receiver was filed by Wells Fargo Bank, N.A. ("Wells Fargo"), trustee for the Pre-Petition Secured Lender [Dkt. No. 170].

On April 1, 2014, Mrs. Han filed her *Motion to Vacate Appointment of Michael Schuett as Debtor Designee* (the "Motion to Vacate Appointment of Debtor-Designee") seeking to remove the Receiver as the Debtor-Designee [Dkt. No. 160].

9

On April 15, 2014, the Bankruptcy Court entered an order resolving the Motion to Confirm Receiver, the Motion to Authorize Receiver, and the Motion to Vacate Appointment of Debtor-Designee, holding that: (i) the Receiver is authorized to remain in possession and control of the property of the Debtor and retain the powers authorized in the Order Appointing Receiver; (ii) the Receiver shall not market or enter an agreement to sell property of the Debtor or file a plan of reorganization or liquidation pending a further order of the Bankruptcy Court; and (iii) the filing of the Chapter 11 Case by the Receiver was authorized [Dkt. No. 160].

On July 3, 2014, the Kang Trustee filed his *Motion for Entry of Order to (a) Modify Receiver Authorization Order, (b) Authorize Procedures for Conditional Dismissal of Bankruptcy Case and (c) Provide Limited Relief from the Automatic Stay* (the "Motion to Modify Receiver Order") requesting that the Bankruptcy Court enter an order authorizing the implementation of the terms of the Sohn Settlement [Dkt. No. 205]. Specifically, the Motion to Modify Receiver Order requested that the Bankruptcy Court: (i) authorize Mr. Sohn to refinance the Shopping Center to satisfy his obligations to the Kang Trustee or, if such refinancing is not accomplished within 120 days, permit the Kang Trustee to sell the Shopping Center and the Debtor's other property; (ii) grant limited relief from the automatic stay to permit the MS Grand Trustee to obtain a charging order against Mrs. Han's interest in the Debtor and Grand Formation; and (iii) permit the dismissal of the Chapter 11 Case upon the refinancing by Mr. Sohn of the Shopping Center. An objection to the Motion to Modify Receiver Order was filed by Mrs. Han [Dkt. No. 213]. On August 27, 2014, the Bankruptcy Court entered an order granting the Motion to Modify Receiver Order [Dkt. No. 226].

### C.    Retention of Professionals

#### 1.    *Tavenner & Beran, PLC*

On August 16, 2013, the Debtor filed its *Application to Retain and Employ Tavenner & Beran, PLC as its Counsel* (the "T&B Application") seeking to employ Tavenner & Beran, PLC ("T&B") as its counsel [Dkt. No. 24]. The T&B Application proposed to compensate T&B for work performed on an hourly basis. No retainer was proposed to be provided to T&B. On October 7, 2013, the Bankruptcy Court entered an order approving the employment of T&B as counsel to the Debtor [Dkt. No. 60].

#### 2.    *Lizabeth Lee Walther, Esq.*

On September 4, 2013, the Debtor filed its *Application to Retain and Employ Lizabeth Lee Walther, Esq. as its Special Counsel* (the "Walther Application") seeking to employ Lizabeth Lee Walther, Esq. ("Walther") as special counsel in the Chapter 11 Case to serve as counsel to the Receiver. The Walther Application proposed to compensate Walther for work performed on an hourly basis. No retainer was proposed to be provided to Walther. On October 7, 2013, the Bankruptcy Court entered an order approving the employment of Walther as special counsel to the Debtor [Dkt. No. 61].

### 3. *Mendelson & Mendelson, CPAs, P.C.*

On September 4, 2013, the Debtor filed its *Application to Retain and Employ Mendelson & Mendelson, CPAs, P.C. as its Accountant* (the "M&M Application") seeking to employ Mendelson & Mendelson, CPAs, P.C. ("M&M") as accountants to the Debtor [Dkt. No. 41]. The M&M Application proposed to compensate M&M for work performed on an hourly basis. No retainer was proposed to be provided to M&M.  On October 7, 2013, the Bankruptcy Court entered an order approving the employment of M&M as accountants to the Debtor [Dkt. No. 62].

### 4. *Resource International, Ltd.*

On November 19, 2014, the Debtor filed its *Second Application to Retain and Employ Resource International, Ltd. as its Consultant* (the "Resource International Application") seeking to employ Resource International, Ltd. ("Resource International") as its consultant to perform a Phase I Environmental Site Assessment of the Shopping Center [Dkt. No. 237].[1]  The Resource International Application provided that Resource International would be paid $2,800 upon the completion of its work.  On December 18, 2014, the Bankruptcy Court entered an order approving the employment of Resource International as consultant to the Debtor [Dkt. No. 253].

### 5. *KLNB, LLC*

On November 19, 2014, the Debtor filed its *Second Application to Retain and Employ KLNB, LLC as its Broker* (the "KLNB Application") seeking to employ KLNB LLC ("KLNB") as its real estate broker and marketing agent for the sale of the Shopping Center [Dkt. No. 238].[2]  The KLNB Agreement proposed to compensate KLNB at a base rate of 0.8% of the purchase price of the Shopping Center, subject to increases as set forth in the KLNB Application.  On December 18, 2014, the Bankruptcy Court entered an order approving the employment of KLNB as the real estate broker to the Debtor [Dkt. No. 254].

### 6. *Property Condition Assessments, LLC*

On November 19, 2014, the Debtor filed its *Second Application to Retain and Employ Property Condition Assessments, LLC* (the "PCA Application") seeking to employ Property Condition Assessments, LLC ("PCA") as its consultant to evaluate the general condition of the Debtor's existing facilities [Dkt. No. 239].[3]  The PCA Application provided that PCA would be paid a base amount of $6,950.00, with the option of $3,350 in additional services to be provided at the request the Debtor.  On December 18, 2014, the Bankruptcy Court entered an order approving the employment of PCA as consultant to the Debtor [Dkt. No. 252].

---

[1] A prior application to employ Resource International was filed and later withdrawn by the Debtor [Dkt. No. 126, 167].

[2] A prior application to employ KLNB was filed and later withdrawn by the Debtor [Dkt. No. 127, 168].

[3] A prior application to employ PCA was filed and later withdrawn by the Debtor [Dkt. No. 128, 169].

### D.      Compensation of Professionals

#### 1.      *Tavenner & Beran, PLC*

On July 3, 2014, T&B filed its *First Interim Application of Tavenner & Beran, PLC for Allowance of Compensation And Expense Reimbursement as Debtor's Counsel* (the "First T&B Application for Compensation") seeking the allowance of compensation in the amount of $147,093.00 and the reimbursement of expenses in the amount of $6,400.16 for the period of August 2, 2013 through May 31, 2014 [Dkt. No. 203].  On July 31, 2014, the Bankruptcy Court entered an order granting the First T&B Application for Compensation [Dkt. No. 221].

#### 2.      *Lizabeth Lee Walther, Esq.*

On April 22, 2014, Walther filed her *Attorneys' First Interim Application for Payment of Fees and Costs* (the "First Walther Application for Compensation") seeking the allowance of $56,280.00 in fees and $816.55 in costs for the period of August 2, 2013, through April 21, 2014 [Dkt. No. 185].  On June 12, 2014, the Bankruptcy Court entered an order granting the First Walther Application for Compensation [Dkt. No. 197].

On October 13, 2014, Walther filed her *Attorneys' Second Interim Application for Payment of Fees and Costs* (the "Second Walther Application for Compensation") seeking the allowance of $2,570.00 in fees and $258.46 in costs for the period of April 22, 2014, through October 13, 2014 [Dkt. No. 231].  On December 11, 2014, the Bankruptcy Court entered an order granting the Second Walther Application for Compensation [Dkt. No. 250].

On March 23, 2015, Walther filed her *Attorneys' Third Interim Application for Payment of Fees and Costs* (the "Third Walther Application for Compensation") seeking the allowance of $11,775.00 in fees and $258.46 in costs for the period of October 14, 2014, through March 23, 2015 [Dkt. No. 278].  The Bankruptcy Court held a hearing on the Third Walther Application for Compensation on April 14, 2015, and approved the application.

#### 3.      *Mendelson & Mendelson, CPAs, P.C.*

On September 18, 2014, the Debtor filed its *First Interim Application for Allowance of Compensation and Expense Reimbursement of Debtor's Accountant* (the "First M&M Application for Compensation") seeking the allowance of compensation in the amount of $43,553.80 for the period of August 27, 2013, through August 15, 2014 [Dkt. No. 226].  On October 17, 2014, the Bankruptcy Court entered an order granting the First M&M Application for Compensation [Dkt. No. 234].

### E.      Cash Collateral and Financial Management

On August 16, 2013, the Debtor filed its *Motion to Approve Continued Use of (a) Cash Management Systems and (b) Existing Bank Accounts* (the "Cash Management Motion") [Dkt. No. 21] and *Motion of the Debtor for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a) and 366: (i) Approving Debtor's Adequate Assurance of Payment, (ii) Establishing*

*Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, and (iii) Scheduling a Hearing with Respect to Contested Adequate Assurance of Payment Requests* (the "Adequate Assurance Motion") [Dkt. No. 22]. On September 4, 2013, the Bankruptcy Court entered an order approving the Cash Management Motion [Dkt. No. 39]. On September 9, 2013, the Bankruptcy Court entered an order approving the Adequate Assurance Motion [Dkt. No. 48].

On August 16, 2013, the Debtor filed its *Motion to Authorize Use of Cash Collateral and Adequate Protection* (the "Cash Collateral Motion") seeking to use cash collateral belonging to the Pre-Petition Secured Lender and granting the Pre-Petition Secured Lender a replacement lien in certain post-petition assets [Dkt. No. 20]. On August 23, 2013, the Bankruptcy Court entered an *Interim Order Granting Motion to Approve Use of Cash Collateral* approving the Cash Collateral Motion on an interim basis [Dkt. No. 36]. On October 1, 2013, the Bankruptcy Court entered its *Second Interim Order Authorizing Use of Cash Collateral and Adequate Protection by Grand Centreville, LLC* further authorizing the Cash Collateral Motion on an interim basis through December 31, 2013 [Dkt. No. 56].

On February 11, 2014, the Bankruptcy Court entered its *Third Interim Order Authorizing Use of Cash Collateral and Adequate Protection by Grand Centreville, LLC* (the "Third Interim Order") further authorizing the Cash Collateral Motion on an interim basis through July 31, 2014 [Dkt. No. 113]. The Third Interim Order also permits that the use of cash collateral be authorized beyond the expiration date of the order by the agreement of the Debtor and Wells Fargo. The expiration date of the Third Interim Order has been extended through and including June 30, 2015, by agreement.

### F.    Motion to Dismiss Case

On October 25, 2013, Wells Fargo filed its *Secured Creditor's Motion to Dismiss Pursuant to 11 U.S.C. § 1112* (the "Wells Fargo Motion to Dismiss") seeking to dismiss the Chapter 11 Case on the grounds that the Receiver did not have the authority to file a bankruptcy case on behalf of the Debtor and that the Chapter 11 Case was filed in bad faith [Dkt. No. 66]. Objections to the Wells Fargo Motion to Dismiss were filed by Mr. Sohn, the Kang Trustee, and the Debtor [Dkt. Nos. 75, 76, 77].

On February 21, 2014, the Debtor filed its *Motion for Order Approving Settlement Agreement with Secured Lender* (the "Wells Fargo 9019 Motion") requesting that the Bankruptcy Court approve a settlement resolving the Wells Fargo Motion to Dismiss (the "Wells Fargo Settlement") [Dkt. No. 118]. Pursuant to the Wells Fargo Settlement, the Debtor would sell the Shopping Center for not less than $40,000,000.00 and distribute the proceeds as set forth in the settlement agreement. In conjunction with the Wells Fargo 9019 Motion, on February 21, 2014, the Debtor filed its *Motion of the Debtor for (i) an Order (a) Approving Bidding Procedures, (b) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (c) Approving Cure Procedures and the Form and Manner of Notice Thereof; and (ii) an Order Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims and Interests* [Dkt. No. 119] [the "Sale Procedures Motion"]. Mr. Sohn filed objections to the Wells Fargo 9019 Motion and Sale Procedures Motion [Dkt. Nos. 132, 133]. On March

13

24, 2014, the Bankruptcy Court entered an order denying the Wells Fargo 9019 Motion and Sale Procedures Motion [Dkt. No. 148].

On July 9, 2014, Wells Fargo withdrew its Wells Fargo Motion to Dismiss. [Dkt. No. 209].

### G.    Extensions of Exclusivity

On November 27, 2013, the Debtor filed its *Motion for an Order Under Bankruptcy Code Section 1121(d) Extending Exclusive Periods During Which Debtor May File and Solicit Acceptances of a Plan* (the "First Exclusivity Motion") seeking an extension of the Exclusive Period set forth in section 1121(c)(2) of the Bankruptcy Code by 75 days, through and including February 13, 2014, and an extension of the 180-day period referenced in section 1121(c)(3) of the Bankruptcy Code by 75 days through and including April 14, 2014 [Dkt. No. 80]. An objection to the First Exclusivity Motion was filed by Wells Fargo [Dkt. No. 84]. On January 22, 2014, the Bankruptcy Court entered an order granting the First Exclusivity Motion [Dkt. No. 108].

On January 21, 2014, the Debtor filed its *Second Motion for an Order Under Bankruptcy Code Section 1121(d) Extending Exclusive Periods During Which Debtor May File and Solicit Acceptances of a Plan* (the "Second Exclusivity Motion") seeking an extension of the Exclusive Period set forth in section 1121(c)(2) of the Bankruptcy Code through and including July 31, 2014, and an extension of the 180-day period referenced in section 1121(c)(3) of the Bankruptcy Code through and including September 29, 2014 [Dkt. No. 105]. An objection to the Second Exclusivity Motion was filed by Wells Fargo [Dkt. No. 112]. On February 14, 2014, the Bankruptcy Court entered an order granting the Second Exclusivity Motion [Dkt. No. 116].

On February 21, 2014, the Debtor filed its *Third Motion for an Order Under Bankruptcy Code Section 1121(d) Extending Exclusive Periods During Which Debtor May File and Solicit Acceptances of a Plan* (the "Third Exclusivity Motion") seeking an extension of the Exclusive Period set forth in section 1121(c)(2) of the Bankruptcy Code through and including July 31, 2014, and an extension of the 180-day period referenced in section 1121(c)(3) of the Bankruptcy Code through and including September 29, 2014 [Dkt. No. 120]. The Third Exclusivity Motion also provided that the exclusivity periods set forth in sections 1121(c)(2) and (3) would end upon the termination of the Wells Fargo Settlement. Objections to the Third Exclusivity Motion were filed by Mr. Sohn and Mrs. Han [Dkt. Nos. 134, 136]. On March 24, 2014, the Bankruptcy Court entered an order denying the Third Exclusivity Motion [Dkt. No. 148].

### H.    Adversary Proceedings

One adversary proceeding has been filed in the Chapter 11 Case. On July 1, 2014, Mr. Sohn filed a complaint (the "Sohn Complaint") against Mrs. Han and the Debtor initiating Adversary Proceeding No. 14-01123 (the "Sohn Adversary Proceeding"). The Sohn Complaint sought to declare invalid a deed of trust securing a note in the amount of $3,850,000.00 made by the Debtor in favor of Mr. Sohn and Mrs. Han (the "Sohn/Han Note"). The Sohn Complaint alleged that the Debtor did not receive good or valuable consideration in exchange for the Sohn/Han Note and that the deed of trust securing the Note was therefore invalid. The Sohn Adversary Proceeding was filed pursuant to a requirement of the Sohn Settlement that the deed of trust

securing the Sohn/Han Note be released.  On September 2, 2014, Mrs. Han filed an Answer to the Sohn Complaint denying, among other things, that no good and valuable consideration was given for the Sohn/Han Note [Case No. 14-01123, Dkt. No. 15].

On July 18, 2014, Mr. Sohn filed his Motion for Summary Judgment (the "Sohn Summary Judgment Motion") requesting that the Court grant summary judgment declaring that the Note did not constitute a valid obligation of the Debtor and that the deed of trust was not a valid lien on the property of the Debtor [Case No. 14-01123, Dkt. No. 7].  On September 2, 2014, Mrs. Han filed an objection challenging Mr. Sohn's standing to bring the Sohn Complaint and denying that sufficient consideration was not provided [Case No. 14-01123, Dkt. No. 16].  On September 12, 2014, the Bankruptcy Court entered an order granting the Sohn Summary Judgment Motion, finding the Sohn/Han Note to be unenforceable, and requiring Sohn and Mrs. Han to release the deed of trust securing the Sohn/Han Note [Case No. 14-01123, Dkt. No. 19].  The Sohn Adversary Proceeding was closed on September 30, 2014 [Case No. 14-01123, Dkt. No. 22].

## I.      Competing Plan and Disclosure Statement Filed by Wells Fargo

On March 6, 2015, creditor Wells Fargo filed its *Secured Creditor's Chapter 11 Plan of Reorganization* (the "Wells Fargo Plan") and accompanying disclosure statement (the "Wells Fargo Disclosure Statement") [Dkt. No. 268, 269].  The Wells Fargo Plan proposes to leave Wells Fargo's existing loan documents in place and bars Wells Fargo from exercising its remedies under the loan documents for a period of one year.  *Id.*  If the Shopping Center had not been sold prior to the one-year deadline, the Wells Fargo Plan provides that Wells Fargo will take immediate transfer of title to and ownership of the Shopping Center.  A hearing on its Wells Fargo Disclosure Statement is scheduled for April 28, 2015.

On April 7, 2015, the Kang Trustee filed his *Opposition to Disclosure Statement for Secured Creditor's Chapter 11 Plan of Reorganization* requesting that the Bankruptcy Court deny approval of the Wells Fargo Disclosure Statement [Dkt. No. 287].

## J.      Wells Fargo Claim

On March 13, 2015, Wells Fargo filed its *Secured Creditor's Motion to Allow Claim* (the "Motion to Allow Claim") requesting that the Bankruptcy Court determine and allow Wells Fargo's prepetition claim and Wells Fargo's asserted entitlement to post-petition interest, fees, costs and charges, including post-petition default interest and attorneys' fees and costs [Dkt. No. 275].  On March 30, 2015, the Kang Trustee filed an objection to the Motion to Allow Claim [Dkt. No. 281].  The Bankruptcy Court held a hearing on the Motion to Allow Claim on April 14, 2015.  The Court dismissed the Motion to Allow Claim without prejudice.

On March 30, 2015, the Kang Trustee filed his *Objection to Claim of Wells Fargo Bank, N.A.* requesting that the Court deny Wells Fargo its requested default interest [Dkt. No. 281].

On March 30, 2015, the Kang Trustee also filed its *Response to Wells Fargo Bank, N.A.'s Motion to Allow Claim* objecting on the grounds that the Motion to Allow Claim is an improper

attempt to preempt an objection to Wells Fargo's claim and that Wells Fargo is not entitled to the payment of default interest. [Dkt. No. 281].

On April 7, 2015, Sohn filed his *Opposition of James Y. Sohn to Secured Creditor's Motion to Allow Claim* objecting to Wells Fargo's request for default interest [Dkt. No. 286].

### ARTICLE IV.        SUMMARY OF PLAN

#### A.    Purpose of Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  The Proponent has filed the Plan as a means to maximize the value of its estate for the benefit of its creditors and equity holders.

The following is a summary of the significant provisions of the Plan.  The Plan contemplates the full payment on the Effective Date of all Allowed Administrative Claims, Allowed Tax Claims, Allowed Priority Claims, Allowed Secured Claims, and Allowed Unsecured Claims.

All statements made below are general in nature and are qualified in their entirety by reference to the complete terms of the Plan attached hereto.  Creditors and parties-in-interest are urged to read the entire Plan and consult with their respective counsel, accountants, and business advisors in order to fully understand the Plan.

The Plan, upon confirmation by the Bankruptcy Court, shall be legally binding upon the Debtor, its creditors, and other parties-in-interest designated by section 1141(a) of the Bankruptcy Code. It is essential that Creditors fully understand the Plan in order to make an informed decision with respect to the treatment of their respective Claims or Interests.  Unless otherwise defined herein, all capitalized terms shall have the respective meanings assigned in the Plan.  In the event that any disclosure herein provided appears to conflict with an express provision of the Plan, the explicit terms of the Plan are controlling.

The Proponent believes the Plan provides for the greatest and earliest feasible return to the holders of Allowed Claims in a fair and equitable manner.  The following is a summary of the Plan and a description of the treatment of the Classes of Claims and Interests.

#### B.    Claims Classification and Treatment

##### 1.    *Introduction*

The Plan places all Claims and Interests, except Administrative Claims and Priority Tax Claims in the Classes set forth below.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

### 2. *Classification and Impairment*

The following Classes are established are established under the Plan and are Impaired or Unimpaired, as indicated below:

| Class Number | Summary of Treatment | Status |
|---|---|---|
| Class 1 | Secured Claim of the Pre-Petition Secured Lender | Unimpaired – not entitled to vote |
| Class 2 | General Unsecured Claims | Unimpaired – not entitled to vote |
| Class 3 | Interests | Impaired – entitled to vote |

### 3. *Treatment of Claims and Interests*

#### a) *Class 1 – Allowed Secured Claim of Pre-Petition Secured Lender*

(a)    Payment of the Class 1 Secured Claim.  On the later of (1) the Effective Date or (2) five (5) business days after the Claims Order becomes a Final Order, the Debtor shall pay to the Pre-Petition Secured Lender the amount of the Class 1 Claim as determined by the Bankruptcy Court in the Claims Order.

Notwithstanding the foregoing, if the Effective Date occurs prior to the Claims Order becoming a Final Order, then on the Effective Date the Pre-Petition Secured Lender shall receive payment in full of that portion of its Secured Claim that is not in dispute, or that has been estimated by the Bankruptcy Court for purposes of distribution under the Plan.  In the event that the parties agree to the amount of a distribution on the Effective Date, or the Bankruptcy Court estimates an amount for distribution, that exceeds the amount that the Proponent or Plan Administrator believes is appropriately in dispute, the amounts paid by the Plan Administrator pursuant to such estimation order shall be deemed to be a payment under protest.  The Plan Administrator and the Debtor shall have the right to seek a refund if it is ultimately determined, by Final Order, that the amount paid to the Pre-Petition Secured Lender exceeds the amount of its Allowed Claim.

On the Effective Date, the Plan Administrator shall deposit into the Pre-Petition Secured Lender Reserve Account the full amount of any disputed portion of the Pre-Petition Secured Lender's Secured Claim.  The amount of the disputed portion of the Pre-Petition Secured Lender's Secured Claim to be deposited in the Pre-Petition Secured Lender Reserve Account shall be determined either by the agreement of the Plan Administrator and the Pre-Petition Secured Lender or, absent agreement, by the Bankruptcy Court.  Upon the payment in full of the Secured Claim of the Pre-Petition Secured Lender, any funds remaining in the Pre-Petition Secured Lender Reserve Account shall be distributed in accordance with the Plan.

(b)    Liens.  The Pre-Petition Secured Lender shall be granted a Lien in the funds deposited into the Pre-Petition  Secured Lender Reserve Account as substitute collateral for its Secured Claim.  If a closing of a sale of the Shopping Center occurs while disputes remain

17

pending regarding the allowance of any portion of the Secured Claim of the Pre-Petition Secured Lender, the Shopping Center and all associated Assets that are the subject of such sale shall be sold free and clear of all Liens and Claims of the Pre-Petition Secured Lender and the Pre-Petition Secured Lender's liens on the rents from the Shopping Center shall be released.  The Liens of the Pre-Petition Secured Lender shall attach to the proceeds of the sale of the Shopping Center that are deposited and held in the Pre-Petition Secured Lender Reserve Account.  On the Effective Date, the Pre-Petition Secured Lender shall be required to execute and deliver to the Plan Administrator a release of the Pre-Petition Deed of Trust in a form and substance satisfactory to the title agent or title insurer who is closing the sale of the Shopping Center.  Upon the payment to the Secured Lender of amounts due on the Effective Date, the Plan Administrator and title agent or insurer shall be authorized to file or record the release of the Pre-Petition Deed of Trust, and any UCC Financing Statement Amendments necessary to terminate and release any Uniform Commercial Code financing statements filed by the Pre-Petition Secured Lender against property of the Debtor.  The Pre-Petition Secured Lender further, upon the request of the Plan Administrator, shall execute and deliver such other and further documents as are necessary or appropriate to consummate the sale of the Shopping Center, free and clear of all Liens, Claims and Interests of the Pre-Petition Secured Lender.

(c)     Use of Funds in the Debtor's Accounts.  Notwithstanding anything to the contrary in the Pre-Petition Secured Lender's Loan Documents, on the Effective Date, the funds in the Debtor's deposit accounts, including without limitation, the ICS Accounts and any accounts held by the Receiver for the benefit of the Debtor, shall be released from any Lien or security interest of the Pre-Petition Secured Lender, and may be used or disbursed by the Plan Administrator pursuant to the Plan, including without limitation, in the sole and absolute discretion of the Plan Administrator, as a payment toward amounts due under the Pre-Petition Secured Lender's Loan Documents, and/or for payment of any other Allowed Claims or expenses under or in connection with the Plan.

(d)     Lender Reserves.  On the Effective Date, Lender, the Master Servicer, the Special Servicer and their agents shall deliver to the Debtor all Lender Reserves that they hold or control.

Class 1 is unimpaired under the Plan.  The Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

### b)     Class 2 – General Unsecured Claims

(a)     Allowed Class 2 Claims.  Allowed Class 2 Claims shall be paid in full on the Effective Date, with interest from the Petition Date at the Federal Judgment Rate.

(b)     Disputed Class 2 Claims.  On the Effective Date, the Plan Administrator may elect to pay any undisputed amount of a disputed Class 2 Claim on the Effective Date, in his absolute and sole discretion.  A Disputed Class 2 Claim that later becomes an Allowed Class 2 Claim shall be paid upon the entry of a Final Order allowing the Class 2 Claim.

Class 2 is unimpaired under the Plan.  The Holders of Allowed Claims in Class 2 are not entitled to vote to accept or reject the Plan.

*c)*     *Class 3 – Interests*

Pending the occurrence of the Final Distribution Date: (a) the Kang Trustee, as the successor beneficiary of dissolution estates of Grand Development, LLC, a Virginia limited liability company, and Grand Equity, LLC, a Virginia limited liability company, shall hold and retain the 99.5% Interest in the Debtor; and (b) the Kang Trustee, in his capacity as such, shall hold and retain 100% of the membership interests in Grand Formation, which in turn shall hold and retain its 0.5% Interest in the Debtor.  Following the Final Distribution Date, the Plan Administrator shall take all actions that are necessary and appropriate to terminate the Debtor as a limited liability company, and all Interests in the Debtor shall be terminated and cancelled.  Except to the extent expressly provided in the Plan, fifty percent (50%) of all Distributions on account of, or with respect to, any Interest in the Debtor shall be made to the Min Sik Kang bankruptcy estate, and fifty percent (50%) to the Man Sun Kang bankruptcy estate, to be further administered in the Kang Bankruptcy Case.  Pending the cancellation and termination of the Interests in the Debtor, the Plan Administrator shall exercise all management and corporate authority on behalf of the Debtor and Grand Formation.

Class 3 is impaired under the Plan.  The Holders of Interests in Class 3 are entitled to vote to accept or reject the Plan.

**C.**   **Treatment of Unclassified Claims and Expenses**

**1.**   *Professional Fee Claims*

The Plan provides for the filing of Final Fee Applications with respect to Professional Fee Claims no later than sixty (60) days after the Effective Date.   Unless otherwise agreed by the Plan Administrator and the affected Professional, Allowed Professional Fee Claims shall be paid on the Effective Date, or if later approved, within ten (10) Business Days following entry of an order approving such Claim (unless otherwise agreed in writing between the Plan Administrator and the affected Professional).  The foregoing procedures and deadlines shall not apply with respect to fees and expenses of the Plan Administrator, the Proponent, or their Professionals, all of which are subject to applications for approval in the Kang Bankruptcy Cases.

**2.**   *Other Administrative Claims*

All other requests for payment of an Administrative Claim arising from and after the Petition Date up to and through the Effective Date, other than Professional Fee Claims, must be filed with the Bankruptcy Court and served on counsel for the Debtor and counsel for the Proponent no later than the Administrative Claims Bar Date (i.e., the first Business Day that is thirty (30) days following the Confirmation Date).  Unless the Debtor, Proponent, or Plan Administrator, as may be applicable, objects to an Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that an objection to an Administrative Claim is filed, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

**The failure to file a motion seeking the allowance of any Administrative Claim by the Administrative Claims Bar Date shall constitute a bar against the assertion or collection of any such Administrative Claim, and shall relieve the Debtor and Plan Administrator from**

**any liability, responsibility or obligation with respect to such Administrative Claim. Without limiting the generality of the foregoing, no distribution shall be made pursuant to the Plan with respect to any Administrative Claim (other than Professional Fee Claims) that is not filed by the Administrative Claims Bar Date. The Debtor or Plan Administrator shall not be required to file any objection in order to confirm or determine the disallowance of any late-filed motion for the allowance or payment of any Administrative Claim (other than Professional Fee Claims).**

Provided that an Administrative Claim has not been paid prior to the Effective Date, on, or as soon as reasonably practicable after the Effective Date that an Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other treatment as to which such Holder and the Plan Administrator shall have agreed upon in writing.

The Proponent reserves the right to pay Administrative Claims that it incurs in the ordinary course of business during the Chapter 11 Case in accordance with the terms and conditions of any agreements relating thereto by the Debtor or the Proponent. However, in order to protect their rights, Holders of Administrative Claims should file a timely Administrative Claim.

Unless paid earlier, Administrative Claims for taxes shall be paid on the later of the Effective Date or the date when such taxes are due under applicable non-bankruptcy law. Holders of post-petition tax claims are not required to file an Administrative Claim.

Holders of Allowed Administrative Claims will be paid in full on account of their Claims and are not entitled to vote on the Plan.

### 3. *Priority Claims*

The Proponent is not aware of the existence of any Priority Tax Claims or other Non-Tax Priority Claims. In the event that a Priority Tax Claim or Non-Tax Priority Claim is determined to exist, the Plan Administrator shall pay such Claim in full at the later of (i) the Effective Date, or (ii) five (5) business days after the Claim becomes an Allowed Claim.

### D. **Means For Implementation Of Plan**

#### 1. *Revesting of Property*

On the Effective Date, all property of the Estate shall revest in the Debtor, subject to the Liens expressly preserved by the Plan, and to the terms and conditions of the Plan, but otherwise free and clear of all other liens, claims, interests and encumbrances.

#### 2. *Sale of Assets*

On the Effective Date, the Debtor shall sell the Shopping Center and other property and assets identified in the Purchase Agreement to Buyer, on the terms and conditions set forth in the

20

Purchase Agreement.  The sale of the Shopping Center shall be free and clear of all Liens, Claims and Encumbrances, pursuant to Sections 363(f) and 1141 of the Bankruptcy Code.  Any and all costs of liquidating the Estate chargeable to the Debtor shall be paid out of the sale proceeds, with any net proceeds being reserved for, and distributed to, Holders of Allowed Claims and Interests as set forth in the Plan.

The Plan Proponent will not market, solicit offers or competing bids or in any way engage in any further negotiations for a sale of the Shopping Center.

In the event an entity with standing to object to the Plan files an objection to the Plan on account of a binding irrevocable higher offer to purchase the Shopping Center , the Court may, in its discretion, (i) decline to consider the offer or (ii) hold an auction; provided   (a) the competing bidder at least 14 days  prior to the Confirmation Hearing, has deposited with the Escrow Agent (as such term is defined in the Purchase Agreement) a deposit equal to at least 5% of its proposed purchase price, and agree to supplement its deposit within three days following the Confirmation Hearing to an amount equal to 5% of such competing bidder's final bid; (b) the competing bid is at least $250,000.00 higher than the gross purchase price set forth in the Purchase Agreement attached hereto as Exhibit A; (c) the competing  bidder has provided evidence, satisfactory to the Proponent in his sole discretion, that such competing bidder has the ability to consummate its obligations under the Purchase Agreement; (d) the competing purchaser has executed and delivered to the Proponent a Purchase Agreement  in the form of the Purchase Agreement attached hereto as Exhibit A; and (e) the competing bidder shall have agreed to maintain its offer as a back-up offer in the event that it is not selected as the successful Buyer, on the same terms and conditions as set forth in the Purchase Agreement attached hereto as Exhibit A.  The Buyer identified in Exhibit A shall have the right to match any competing offer submitted in accordance with the Plan.  In the event that the Buyer identified in Exhibit A matches any competing offer, the Buyer identified in Exhibit A shall prevail at the auction and shall be the Buyer under the Plan.  Notwithstanding the procedures set forth herein, neither the Proponent nor the Debtor shall seek or solicit any bid other than that of the Buyer identified in Exhibit A hereto.

### 3. *Establishment of Administrative and Unsecured Claim Reserve*

Upon the sale of the Shopping Center, the Plan Administrator shall reserve sufficient funds to pay all known and anticipated Administrative Claims and Class 2 Unsecured Claims in full. Upon the payment in full of all Allowed Claims against the Debtor, the Plan Administrator shall distribute any remaining reserved funds in accordance with the Plan.

### 4. *Exemption From Transfer And Recordation Taxes*

Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to any Entity, including without limitation the sale of the Shopping Center, pursuant to the Plan in the United States shall not be subject to any stamp tax, transfer tax, or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

21

5.      *Releases of Record.*

Upon the request of the Plan Administrator, any Entity that is entitled to receive any Distribution under the Plan, or whose Lien is extinguished or modified pursuant to the Plan, shall execute and deliver such documents and instruments as are necessary to release, modify or preserve of record any Lien, to the extent such Lien is extinguished, modified or preserved pursuant to the Plan. Notwithstanding any provision in the Plan, neither the Debtor nor the Plan Administrator shall be required to make any Distribution, or deliver any document or instrument, to any Entity, unless and until such Entity has complied with this obligation.   The obligations set forth in this paragraph shall not be waived by any action or inaction of the Debtor or the Plan Administrator, including without limitation commencement of Distributions to the affected Entity.

6.      *Claims and Causes of Action Preserved*

All Causes of Action owned by the Debtor, including without limitation Avoidance Actions, shall be preserved.  The Proponent presently is investigating potential causes of action that may be pursued by the Debtor and/or Plan Administrator.  The Proponent reserves the right to file a supplement to this Disclosure Statement describing any potential Causes of Action.  The Plan Administrator is authorized to pursue any and all Causes of Action that the Plan Administrator in its sole and absolute discretion believes to be in the best interest of the Debtor's estate.  To the extent known by the Proponent, a summary of Causes of Action shall be filed as a Plan Supplement.

7.      *Preservation of Priority*

Notwithstanding the occurrence of the Confirmation Date or the Effective Date, all Claims, including without limitations Administrative Claims, shall retain their respective priority under the Bankruptcy Code and applicable non-bankruptcy law.

8.      *Appointment of Plan Administrator*

The Plan shall be administered by the Plan Administrator, Raymond A. Yancey, or such other Plan Administrator as the Bankruptcy Court may appoint in accordance with the Plan.  Mr. Yancey is the Chapter 11 Trustee for Min Sik Kang and Man Sun Kang in the Kang Bankruptcy Case.

In addition to the other rights and powers specified in the Plan, the Plan Administrator shall have all of the powers and rights of a Trustee or debtor-in-possession permitted under the Bankruptcy Code, and may exercise such powers and rights in the name of the Debtor as its representative upon the occurrence of the Effective Date.  The Plan Administrator shall serve until the earlier of his resignation, his death, the entry of an order by the Bankruptcy Court removing the Plan Administrator for cause, or the occurrence of the Final Distribution Date and subsequent dissolution and cancellation of the Debtor as a limited liability company.  In the case of such termination of service prior to full consummation of the Plan and cancellation of the Debtor as a limited liability company, the Bankruptcy Court shall appoint a replacement Plan Administrator.

### 9.    *Receiver*

Upon the Effective Date of the Plan and the appointment of the Plan Administrator: (a) the Receiver shall turn over all books and records, and Assets related to the Debtor or to Grand Formation that are in its possession, custody, or control to the Plan Administrator; (b) the Plan Administrator shall succeed to all of the powers of the Receiver under the Receiver Order; and (c) the Receiver shall be relieved of its duties and powers in this Chapter 11 Case and under the Receiver Order, and shall be deemed discharged.

### 10.    *Retention of Professionals*

(1)    Retention Arrangements.  From and after the occurrence of the Effective Date, the Plan Administrator may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist him in fulfilling his obligations under the Plan, and on whatever fee arrangement he deems appropriate, including, without limitation, hourly fee arrangements and contingency fee arrangements.  Contingent fees are due and payable to any counsel engaged on a contingent fee basis only upon actual receipt of litigation proceeds either through settlement or other recovery.  The provisions set forth in subpart (b) below shall not apply to contingent fees, but shall apply to reimbursement of contingent fee counsel's reasonable expenses.

(2)    Payment of Professionals.  Professionals engaged by the Plan Administrator shall not be required to file applications for compensation in order to receive the compensation provided for herein.  Rather, such professionals shall provide copies of monthly invoices to the Plan Administrator.  Upon submission of a monthly invoice by a professional engaged by the Plan Administrator, the Plan Administrator shall have thirty (30) Business Days to object in writing (sent to the professional) to the payment of such invoice.  Such objection shall state the amount of fees and/or disbursements which are disputed and the specific grounds therefor.  If no written objection is made to such invoice, the Plan Administrator shall proceed to pay such invoice.  If a written objection is timely made, the Plan Administrator shall proceed to pay any portion of such invoice as to which no objection has been made, and the affected professional and the Plan Administrator shall promptly meet and confer to attempt to resolve the objection.  If as a result of such meeting, the objection is withdrawn or resolved, the Plan Administrator shall proceed to pay the remainder of such invoice (subject to adjustment if the withdrawal or resolution of the objection was based upon a consensual reduction of the amount in dispute).  If the objection is not withdrawn or resolved, the parties may mutually agree to submit the dispute to binding arbitration or, if the parties do not mutually agree to arbitration, then they may file a motion with the Bankruptcy Court to decide the matter.  Notwithstanding anything to the contrary in this subsection, any counsel retained on a contingent fee basis shall be required to follow the foregoing procedure only with respect to reimbursement of expenses and not with respect to contingent fees earned.

### 11.    *Compensation of Plan Administrator and Kang Estate Professionals.*

The Plan Administrator, in his discretion, may use the services of his Professionals engaged in the Kang Bankruptcy Case, and may use the Professionals engaged by the Debtor and/or the Receiver in the Debtor's Bankruptcy Case, to assist him in the administration and consummation

23

of the Debtor's bankruptcy case.  The Debtor shall be responsible for the payment of the Plan Administrator, his agents, consultants and Professionals with respect to services rendered in connection with preparation, negotiation, confirmation, implementation and administration of the Plan and the affairs of the Debtor.  Compensation of the Plan Administrator, his agents, consultants and Professionals shall be allowed at their standard rates in effect from time to time.

As set forth in the Sohn Settlement, the "Expenses" to be paid in determining the "Net Proceeds" under the Sohn Settlement shall include, among other things, reasonable legal fees and expenses incurred by the Kang Trustee from and after June 30, 2014, in implementation of the Sohn Settlement.  To the extent that fees and expenses are subject to approval of the Bankruptcy Court under the Bankruptcy Code or the Bankruptcy Rules, the compensation of the Plan Administrator and his Professionals shall remain subject to the filing and allowance of applications in the Kang Bankruptcy Case, even if services are performed with respect to the Debtor.  Any application for compensation shall identify fees and expenses incurred directly on behalf of, or allocable to, the Debtor.

### 12.    *Dissolution of the Debtor*

Upon the full disposition and administration of the Assets of the Debtor, or upon the determination by the Plan Administrator in his sole and absolute judgment that the remaining assets of the Debtor lack sufficient value and should not be administered under the Plan, the Plan Administrator shall effectuate the dissolution and cancellation of the Debtor under applicable non-bankruptcy law.

### 13.    *Sohn Settlement*

The Sohn Settlement shall remain in effect under the Plan.  The Kang Trustee, upon receipt of funds on account of Class 3 Interests under the Plan, shall distribute any funds to Mr. Sohn and to the Kang Bankruptcy Estates to which they are entitled under the Sohn Settlement.

The estimated proceeds available for funding distributions under the Sohn Settlement is set forth in the projections contained in **Exhibit B** to this Disclosure Statement.

### 14.    *Adequate Protection of Mrs. Han's Asserted Interest in the Debtor*

At the Confirmation Hearing, the Bankruptcy Court shall estimate the value of Mrs. Han's asserted Interest in the Debtor.  Upon the closing of a sale of the Shopping Center (or earlier in the discretion of the Plan Administrator), the Plan Administrator shall establish a cash reserve equal to the value of Han's asserted Interest in the Debtor (the "Han Reserve").  The Plan Administrator shall maintain the Han Reserve until the first to occur of: (a) agreement between Mrs. Han and the Plan Administrator regarding the disposition of Mrs. Han's asserted Interests; (b) the entry of an order resolving disputes regarding Mrs. Han's asserted Interest in the Debtor, and such order becoming a Final Order; and (c) further order of the Bankruptcy Court.

The rights and interests of the MS Grand bankruptcy estate under the Charging Order shall be secured by the Han Reserve.  Absent agreement by Mrs. Han and the Plan Administrator, funds

24

in the Han Reserve shall be disbursed pursuant to the terms of a Final Order (subject to the Charging Order).

In the event, and to the extent, that it is determined by Final Order that Mrs. Han holds an Interest in the Debtor, some or all of the funds (as determined by the Bankruptcy Court) in the Han Reserve, shall be distributed to or for the benefit of Mrs. Han, subject to the satisfaction of all amounts due under the Charging Order.  In the event, and to the extent, that it is determined by Final Order that Mrs. Han does not hold an Interest in the Debtor, the funds in the Han Reserve shall be disbursed fifty percent (50%) to the Min Sik Kang bankruptcy estate, and fifty percent (50%) to the Man Sun Kang bankruptcy estate, and such funds shall be administered in the Kang Bankruptcy Case.

**MRS. HAN'S SOLE RIGHT AND REMEDY AS TO ANY ASSERTED INTEREST IN THE DEBTOR IS LIMITED TO THE FUNDS IN THE HAN RESERVE, AND MRS. HAN SHALL HAVE NO CLAIM OR CAUSE OF ACTION AGAINST ANY OTHER ASSETS OF THE DEBTOR, THE KANG ESTATES, THE KANG TRUSTEE (IN ANY CAPACITY), MR. SOHN, OR THEIR RESPECTIVE AGENTS, WITH RESPECT TO OR IN CONNECTION WITH HER ASSERTED INTEREST IN THE DEBTOR.**

### ARTICLE V. <u>DISTRIBUTIONS</u>

#### A.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

##### 1.    *Delivery of Distributions in General.*

Distributions to each Holder of an Allowed Claim shall be made by the Plan Administrator from funds of the Debtor (a) at the addresses set forth on the proofs of Claim filed by such Holder, (b) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Plan Administrator after the date of any related proof of Claim, (c) at the address reflected in the Schedules if no proof of Claim has been filed and the Plan Administrator has not received a written notice of a change of address, (d) at the address set forth in the other records of the Debtor at the time of the Distribution or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.  Distributions shall be made in accordance with the terms of the Plan.  In making Distributions under the Plan, the Plan Administrator may rely upon the accuracy of the Claims register maintained in the Chapter 11 Case, as modified by any Final Order of the Bankruptcy Court allowing or disallowing Claims in whole or in part.

##### 2.    *Undeliverable and Unclaimed Distributions.*

If the Distribution to any Holder of an Allowed Claim is made in accordance with the Plan and is returned to the Debtor or the Plan Administrator as undeliverable or is otherwise unclaimed within sixty (60) days following such Distribution, such Distribution may be cancelled and the Debtor and Plan Administrator shall be relieved of any and all obligations to make further Distributions to such Holder.  Any Holder of an Allowed Claim that does not negotiate any payment made pursuant to the Plan within such sixty (60) days shall be deemed to have forfeited its Claim and such payment shall be forever barred and enjoined from asserting any such Claim

25

for an undeliverable or unclaimed Distribution against the Debtor, its Estate, the Plan Administrator, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of their property. Nothing contained in the Plan shall require the Debtor or Plan Administrator to attempt to locate any Holder of an Allowed Claim; provided, however, that in its sole discretion, the Plan Administrator may take such other action as the Plan Administrator deems appropriate to locate the Holder of an Allowed Claim.

### B.    Prepayment

Except as otherwise expressly provided in the Plan or the Confirmation Order, the Plan Administrator shall have the right to prepay, without any fee, charge, premium or penalty, all or any portion of an Allowed Claim, at any time.

### C.    Means of Cash Payment

Cash payments made pursuant to the Plan shall be in U.S. dollars and shall be made, on and after the Effective Date, at the option and in the sole discretion of the Plan Administrator by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Plan Administrator. In the case of foreign creditors, Cash payments may be made, at the option of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular jurisdiction.

### D.    Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on any Claim, and no Holder of an Allowed Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### E.    Withholding and Reporting Requirements

In connection with the Plan and all Distributions under the Plan, the Plan Administrator shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements. The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder. All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. For example, with respect to any employee-related withholding, if the Debtor or Plan Administrator is obligated by law to withhold amounts from Distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Plan Administrator may withhold a portion of the Distributions allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions. Notwithstanding the foregoing or any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution

26

pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Article VI.A.2 of the Plan.

### F.      Setoffs

#### 1.       *By the Debtor*

Except as otherwise provided in the Plan, the Plan Administrator may, pursuant to Bankruptcy Code sections 553, 558 or applicable non-bankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim that the Debtor may have against such Holder.  Please note that to the extent allowed by law, a claimant may challenge such setoff in the Bankruptcy Court.

#### 2.       *By Non-Debtors*

Unless otherwise stipulated in writing by the Plan Administrator or asserted pursuant to a timely filed Proof of Claim or as expressly provided for by the terms of the agreement underlying any timely filed Proof of Claim, any party against whom a Claim or counterclaim is asserted by the Estate must assert or must have asserted any setoff rights, right of subrogation, or recoupment of any kind against such Claim at the time it answers such Claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred.  Notwithstanding the foregoing, nothing herein shall affect the setoff rights of any taxing authority.

### G.      Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims

#### 1.       *Objection Deadline; Prosecution of Objections*

Except as set forth in the Plan with respect to Administrative Claims, all objections to Claims must be filed and served on the Holders of such Claims by the Claims Objection Deadline. Notice of any motion for an order extending the Claims Objection Deadline shall be required to be given only to those Entities that have requested notice in the Chapter 11 Case, or to such Entities as the Bankruptcy Court shall order.  The filing by the Debtor or Plan Administrator of an objection, adversary proceeding or other legal action against the Holder of any Claim shall constitute a dispute as to such Claim for the purposes of distributions under the Plan.  The provisions of the Plan relating to the Claims Objection Deadline are intended solely to facilitate orderly distributions with respect to Claims.  Notwithstanding anything to the contrary herein,

27

the failure of the Debtor or Plan Administrator to file an objection to a Claim by the Claims Objection Deadline shall not constitute a determination of the validity of such Claim for purposes of res judicata, collateral estoppel or any other similar doctrine, shall not constitute an admission by the Debtor or the Plan Administrator with respect to any Claim, or otherwise constitute a bar against the Debtor or Plan Administrator from pursuing any action at law or in equity against the Holder of a Claim, or raising any defense against the assertion of any Claim.

### 2. *No Distributions on Disputed Claims*

Except as expressly provided elsewhere in the Plan or agreed by the Plan Administrator and the Holder of a Disputed Claim, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim may receive, at the sole and absolute discretion of the Plan Administrator, a Distribution on account of that portion of the Disputed Claim which the Plan Administrator does not dispute at the time and in the manner that the Plan Administrator makes Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan.

### 3. *Distributions on Allowed Claims*

Payments and Distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of the Plan that govern Distributions to such Holders.

### 4. *De Minimis Distributions*

Except as otherwise expressly provided in the Plan, neither the Debtor nor the Plan Administrator shall have any obligation to make a Distribution on account of an Allowed Claim if the amount to be distributed to the specific Holder of the Allowed Claim is less than $10.00.

### H.    Distributions to Holders of Interests

Upon the payment by the Plan Administrator of all Allowed Claims on the Effective Date and the establishment of a reserve account sufficient to pay all remaining actual and estimated claims and expenses of the Debtor, the Plan Administrator shall be authorized to distribute funds on account of Class 3 Interests, subject to the terms and conditions set forth in the Plan.

### I.    Fractional Dollars

Any other provision of the Plan notwithstanding, neither the Debtor nor the Plan Administrator shall be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### J.    Distribution Record Date

Neither the Debtor nor the Plan Administrator will have any obligation to recognize the transfer of or sale of any Claim or any participation in any Claim, that occurs after the Confirmation Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Confirmation Date, as stated on the official Claims register.

### ARTICLE VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejected Contracts and Leases

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, or order of the Bankruptcy Court, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 rejecting all pre-petition executory contracts and unexpired leases to which the Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtor, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, (d) is an insurance agreement of the Debtor; or (e) is designated in an exhibit to the Confirmation Order as a lease or contract that may be assumed or assigned in connection with a possible sale of the Shopping Center; provided, however, that the foregoing reference to insurance agreements shall not constitute an admission by the Debtor or the Plan Administrator that any insurance agreement is an executory contract or that the Debtor has any liability thereunder.  Except to the extent as the Debtor specifically has agreed, or may agree, in writing, the rejection of any executory contract or unexpired lease, shall not constitute a waiver or release of any property right, claim or cause of action belonging to the Debtor, all of which are expressly reserved.

### B.    Bar to Rejection Damages

**If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor or its Estate, the Plan Administrator, or their successors, assigns, or properties unless a proof of Claim is filed and served on the Debtor and the Plan Administrator within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.  The notice of the Effective Date, or if applicable the Confirmation Order, will include a notice regarding rejection of executory contracts and unexpired leases, and will set forth the date by which Claims for rejection damages must be filed.**

### C.    Assumed and Assigned Contracts and Leases

To the extent provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 assuming, as of the Effective Date, (a)

29

those executory contracts and unexpired leases identified in such documents as being assumed; and (b) all Tenant Leases.  Further, the Confirmation Order may include a list of executory contracts and unexpired leases that remain subject to future assumption and assignment in connection with a possible sale of the Shopping Center.  A list of the contracts and leases to be assumed by the Debtor may be filed as a Plan Document prior to the commencement of the Confirmation Hearing.  To the extent provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 assigning, as of the Effective Date, those executory contracts and unexpired leases identified in such documents as being assigned.  The Proponent reserves the right to seek an order of the Bankruptcy Court determining that any assigned contract or Tenant Lease is in full force and effect, that there is no default by the Debtor under such contract or Tenant Lease, and any other matter as may be necessary or appropriate to assure the effective assignment of such contract or Tenant Lease as may be required to comply with the Purchase Agreement.

### ARTICLE VII.          CONFIRMATION AND CONSUMMATION OF THE PLAN

#### A.          Conditions to Confirmation

In addition to any other condition to Confirmation as may be imposed by law, the following are conditions to the Confirmation of the Plan:

1.      A Final Order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code § 1125 shall have been entered by the Bankruptcy Court.

#### B.          Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing in accordance with Article VIII.C of the Plan:

1.      The Confirmation Order shall have been entered in this Chapter 11 Case and shall provide that the Proponent and the Plan Administrator are authorized to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan or effectuate, advance, or further the purposes thereof.

2.      All conditions to the closing of the sale of the Shopping Center set forth in the Sale Agreement have been met except for the occurrence of the Effective Date of the Plan.

3.      The Bankruptcy Court shall have estimated the value of Mrs. Han's asserted Interest in the Debtor.

4.      The Confirmation Order shall have become a Final Order.

5.      All Exhibits shall be, in form and substance, reasonably acceptable to the Proponent and Plan Administrator, and, to the extent applicable, shall have been executed and delivered by

all parties who are signatory thereto.

6.    All documents executed, entered into in connection with, or necessary for the consummation of the Plan have been reviewed, approved, and consented to by the Plan Administrator.

## C.    Waiver of Conditions

Each of the conditions set forth in Article VIII.A and/or VIII.B of the Plan, except for entry of the Confirmation Order, as set forth in Article VIII.A.1 of the Plan, may be waived in whole or in part by the Proponent or the Plan Administrator. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Proponent or the Plan Administrator as a basis to not consummate the Plan regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Proponent or the Plan Administrator to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## D.    Consequences of Non-Occurrence of Effective Date

In the event that the Effective Date does not occur, the Proponent reserves all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement or treatment of Claims provided for in the Plan be null and void. In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

## E.    Modifications and Amendments

The Proponent may alter, amend or modify the Plan or any Exhibits thereto under Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date. If any material amendments to the Plan are made after the solicitation package is sent out, but before the Confirmation Hearing, the Proponent reserves the right to file a motion to determine if re-solicitation is necessary.

After the Confirmation Date and prior to substantial consummation of the Plan as defined in Bankruptcy Code section 1101(2), the Proponent may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**ARTICLE VIII.**        **EFFECT OF PLAN CONFIRMATION**

### A.        Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor all present and former Holders of Claims and Interests, and their respective successors and assigns.

### B.        Discharge of the Debtor

Pursuant to Bankruptcy Code section 1141(d)(1), and subject to the occurrence of the Effective Date, Confirmation will discharge all Claims against the Debtor except for the obligations and Liens expressly created or preserved by the Plan.

### C.        Injunction

**Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Effective Date all entities who hold, have held, or may hold, or assert or have asserted, Claims against or Interests in the Debtor are permanently enjoined from taking any of the following actions against the Debtor, its Estate, any of their property or Assets, or against the Proponent or Plan Administrator, on account of any such actual or asserted Claims, Administrative Claims, or Interests that arose before the Effective Date, except for the obligations and Liens expressly created or preserved by the Plan: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, except as to those setoffs that were asserted prior to the Petition Date, or right of subrogation, of any kind against any debt, liability, or obligation due to the Debtor, except as set forth in Article VI.F of the Plan; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such entities from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.**

### D.        Exculpation and Limitation of Liability

**Except as otherwise specifically provided in the Plan, the Debtor, the Proponent, the Plan Administrator, the Receiver, and all of their respective attorneys, financial advisors, consultants, investment bankers, or other professionals engaged pursuant to order of the Bankruptcy Court (in this Chapter 11 Case or in the Kang Bankruptcy Case), and any of such person's successors and assigns, solely in their capacities as such, shall not have or incur any liability to any holder of a Claim, Administrative Claim or Interest for any act or omission originating or occurring on or after the Petition Date in connection with, relating to, or arising out of: the Debtor; the commencement or administration of the Chapter 11 Case; the management of the Debtor or its assets; the sale of assets of the Debtor; the negotiation, preparation or filing of the Plan, the Disclosure Statement or any prior plans or disclosure statements; the pursuit of Confirmation of the Plan or any prior plans; or the consummation of the Plan; except for their willful misconduct or gross negligence as**

32

**determined by a Final Order of a court of competent jurisdiction.**

### E.    Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect through and including the Effective Date.  Upon the Effective Date, the injunction provided in in section 1141 of the Bankruptcy Code and under Article X.C of the Plan shall apply.

### F.    Retention of Jurisdiction

Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order, substantial consummation of the Plan and occurrence of the Effective Date, and as more fully described in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to resolve disputes relating to property of the Debtor's Estate, to all Claims, professional fees, executory contracts, performance under the Plan, interpretation or implementation of the Plan, modifications to the Plan, taxes due under the Plan, Causes of Action belonging to the Debtor.  The Bankruptcy Court shall retain jurisdiction to dismiss the Chapter 11 case and enter a final decree closing the Chapter 11 Case.

### ARTICLE IX.    <u>CONFIRMATION ISSUES</u>

### A.    Compliance With the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code.  The Proponent and its Professionals have reviewed the applicable provisions of the Bankruptcy Code and believe that the Plan fully complies with the Bankruptcy Code.  Further, the Proponent has complied with all applicable provisions of the Bankruptcy Code in seeking confirmation of the Plan.

### B.    Good Faith

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law.  The Proponent has proposed the Plan in good faith.  The Plan contemplates and provides for the payment in full of all Allowed Claims on the Effective Date, where applicable with interest, and the orderly liquidation of the Debtor's assets.  The Plan seeks to maximize the value of the Debtor's assets and avoids the damage, disruption and losses that would arise in the event of an uncontrolled liquidation.  The Plan contemplates a return to the Holders of Interests in the Debtor.  The Plan does not rely on any means that are forbidden by law.  Thus, the Proponent believes that the Plan satisfies the requirements of Section 1129(a)(3).

### C.    Court Approval of Fees and Expenses

Section 1129(a)(4) of the Bankruptcy Code requires that any payments to be made by the Debtor for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, or are subject to approval by, the Court as being reasonable.  Each order approving the engagement of a Professional in the Chapter 11 Case has either required that the fees and expenses sought by any Professional be approved by subsequent order of the Court as being reasonable, or approved in advance the formulae for computing the fees of Professionals.  All applications for approval of such engagements were served in accordance with the Bankruptcy Code and Bankruptcy Rules.  The Plan preserves the obligation of Professionals to seek final approval of their fees and expenses.  The Plan, thus, complies with Section 1129(a)(4).

### D.    Disclosure of Management

Section 1129(a)(5) of the Bankruptcy Code requires the disclosure of the identity and affiliation of any individual who is proposed to serve as a director, officer or voting trustee of the Debtor following confirmation of the Plan.  Section 1129(a)(5) also requires disclosure of the compensation proposed to be paid to insiders of the Debtor following confirmation.  Article V.G of the Plan states that the Debtor shall be managed by the Plan Administrator sets forth the compensation to be paid to the Plan Administrator.  The Proponent believes that the foregoing disclosures satisfy the requirements of Section 1129(a)(5).

### E.    Governmental Approval of Rates

Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission with jurisdiction over the rates of the Debtor has approved any rate change provided for in a plan.  There is no governmental regulatory commission having with such jurisdiction over the Debtor.  Accordingly, Section 1129(a)(6) is inapplicable in this Case.

### F.    Best Interest of Creditors

Section 1129(a)(7) requires that, with respect to each impaired class of Claims or Interests, each Holder of a Claim or Interest in such Class either (i) has accepted the Plan, or (ii) will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code as of the Effective Date.  This test is known colloquially as the "best interest test."  Under the Plan, Classes 1 and 2 are unimpaired.  All Allowed Claims will be paid in full on the Effective Date.  Thus, the best interest test is inapplicable to Classes 1 and 2.

Class 3 Interests are impaired under the Plan.  The Proponent believes that the Plan will be accepted by each Holder of a Class 3 Interest, thus satisfying section 1129(a)(7)(A)(i).  The Liquidation Analysis shows that Holders of Interests will receive less in a Chapter 7 Liquidation than they will under the Plan.  In either a Chapter 7 liquidation or the Plan, the Debtor will incur certain costs of administering the bankruptcy estate, including the fees and expenses of professionals necessary to sell the assets of the Estate.  A Chapter 7 liquidation, however, would

34

involve the additional cost of the statutory fees owed to the Chapter 7 trustee and require the payment of transfer taxes upon the sale of the Debtor's assets that will be avoided under the Plan pursuant to section 1146 of the Bankruptcy Code. Additionally, liquidation under Chapter 7 generally involves shortened marketing periods for the assets of the estate that would reduce the value received for the assets. The Proponent submits that Holders of Class 3 Interests would receive or retain more under the Plan than a Chapter 7 liquidation. Section 1129(a)(7) is satisfied with respect to Interests.

The Plan satisfies the requirements of Section 1129(a)(7).

### G.    Acceptance by Impaired Classes

Section 1129(a)(8) of the Bankruptcy Code requires that with respect to each Class of Claims or Interests, either (a) such Class has accepted the Plan, or (b) such Class is not impaired under the Plan. As discussed above, Classes 1 and 2 are unimpaired under the Plan and are deemed to have accepted the Plan. The Proponent believes that the impaired Class 3 Interests will accept the Plan and that the Plan will therefore satisfy section 1129(a)(8).

### H.    Priority Claims

Section 1129(a)(9) imposes requirements for the treatment of priority Claims under Section 507 of the Bankruptcy Code. As theoretically applicable to this Case, there are three types of priority Claims that could be subject to Section 1129(a)(9): Administrative Claims; Non-Tax Priority Claims; and priority tax Claims. With respect to Administrative Claims, Section 1129(a)(9) requires that each Holder of an Allowed Administrative Claim be paid in cash in full on the Effective Date, except to the extent that the Holder of such a Claim and the Plan Administrator agree to different treatment. Article III.A.1 of the Plan specifically provides for such treatment with respect to Administrative Claims. All Administrative Claims shall be paid in full on or before the Effective date, except to the extent that the Plan Administrator and the Holder of an Administrative Claim agree otherwise.

Section 1129(a)(9) further provides that with respect to Non-Tax Priority Claims (i.e., Claims entitled to priority under Sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7)), the Plan must provide for the payment of deferred cash payments of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, if such Class accepts the Plan, or cash on the Effective Date equal to the Allowed Amount of such Claims, if the Class does not accept the Plan. As stated above, the Proponent does not believe that any Non-Tax Priority Claims exist in this Case. However, to the extent that such Claims are determined to exist, the Plan provides for payment of such Claims on the later of the Effective Date or five (5) business days after a Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim.

Section 1129(a)(9) finally provides that with respect to Tax Claims under Section 507(a)(8), the Plan must provide for "regular installment payments in cash – (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b))."

35

The Proponent does not believe that any such Tax Claims under Section 507(a)(8) exist. However, to the extent that Tax Claims are determined to exist, the Plan provides for payment of such Tax Claims on the later of the Effective Date or five (5) business days after a Priority Tax Claim becomes an Allowed Priority Tax Claim.

For the foregoing reasons, the Proponent believes that the Plan satisfies the requirements of Section 1129(a)(9).

## I.    Impaired Accepting Class

Section 1129(a)(10) of the Bankruptcy Code requires that if a Class of Claims is impaired under the Plan, at least one class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider. Classes 1 and 2 are unimpaired under the Plan and are deemed to have accepted the Plan. The Plan satisfies the requirements of Section 1129(a)(10).

## J.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan. This is known as the "feasibility" test.

The Proponent believes that the Plan is feasible. The Plan Projections attached hereto as **Exhibit B**, demonstrates that upon a sale of the Shopping Center, the Plan Administrator will be able to meet all financial obligations under the Plan. The Kang Trustee has solicited and received offers to purchase the Shopping Center. As set forth above, the Kang Trustee is seeking approval of an offer to purchase the Shopping Center sufficient to meet all obligations under the Plan. The Proponent believes that the Plan is feasible and that a need for further reorganization is not likely, thus satisfying the requirements of Section 1129(a)(11).

## K.    U.S. Trustee Fees.

Section 1129(a)(12) requires that all fees payable under 28 U.S.C. § 1930 have been paid, or that the Plan provides for the payment of such fees on the Effective Date. Article XII.D of the Plan so provides.

## L.    Inapplicable Confirmation Requirements

Sections 1129(a)(13)-(16) of the Bankruptcy Code are inapplicable to the Debtor.

## M.    Cram Down

The Class 3 Interests, which are impaired, will accept the Plan. But even if such Class were found to reject the Plan, the Plan could be confirmed because the Proponent has requested confirmation pursuant to the "cram down" provisions set forth in Section 1129(b) of the Bankruptcy Code. To satisfy the requirements of Section 1129(b), the Proponent must

demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class of Claims and Interests.

The Bankruptcy Code provides the following non-exclusive definitions of the phrase "fair and equitable," as it applies to Interests:  Either (i) each impaired holder of an equity interest receives or retains under the Plan on account of such interest, property of a value, as of the Effective Date of the Plan, equal to the greater of (A) the Allowed amount of any fixed liquidation preference to which such holder is entitled, (B) any fixed redemption price to which such holder is entitled, or (C) the value of such interest, or (ii) the holders of any equity interests that are junior to the interests of the rejecting class of equity holders will not receive or retain any property under the Plan.

The Proponent believes that the Plan satisfies the foregoing requirements for confirmation under the provisions of Section 1129(b).  First, the Plan does not discriminate unfairly.  Second, the Plan is fair and equitable under the standards set forth in Section 1129(b)(2).  With respect to Class 3 Interests, the Plan provides that all Holders of Interests receive property equal to the value of their Interests on the Effective Date of the Plan.  Neither the 2005 operating agreement nor the putative 2009 operating agreement of the Debtor provide for any fixed liquidation preference or redemption price.  These alternatives under Section 1129(b)(2)(C)(i) are therefore inapplicable.  The Kang Trustee, in his capacity as beneficiary for the dissolution estates of Grand Development, LLC and Grand Equity, LLC and as beneficiary for the dissolution estate of Grand Formation, Inc., is the Holder of the Interests in the Debtor.  The Plan proposes to sell the assets of the Debtor and distribute any funds after the payment of all creditors to the Kang Trustee.  Section 1129(b)(2)(C) is thus satisfied with respect to the treatment of the Kang Trustee.

The disputed Interests of Mr. Sohn and Mrs. Han are adequately protected in the event that Mr. Sohn and Mrs. Han are determined by a Final Order of a court of competent jurisdiction to have obtained an Interest in the Debtor through the Centreville Sale Agreement.  Mr. Sohn transferred his potential Interest in the Debtor to the Kang Trustee under the Sohn Settlement.  Mr. Sohn no longer holds a potential Interest in the Debtor.  With respect to Mrs. Han, the Plan states that the Bankruptcy Court shall estimate the value of Mrs. Han's asserted Interest in the Debtor as of the date of the Confirmation Hearing.  In the event that funds are available for distribution to Interests, the Plan Administrator shall place the value of Mrs. Han's asserted Interest as determined by the Bankruptcy Court, less the amount of any liens against Mrs. Han's asserted Interest in the Debtor, into an escrow account pending the entry of a Final Order determining that Mrs. Han holds an Interest in the Debtor.  Mrs. Han will therefore receive the value of her Interest in the Debtor.  Section 1129(b)(2)(C) is satisfied.

### N.    Risk Factors

The Proponent has identified various risk factors that could affect confirmation of the Plan.  The risk factors identified by the Proponent are:

(1)    Failure to Satisfy Requirements Set Forth In the Bankruptcy Code.  As discussed above, the Bankruptcy Code contains numerous requirements that must be satisfied in order to confirm a plan of reorganization.  Each of the material requirements is discussed above.  As

discussed, the Proponent believes that the Plan will satisfy each of these requirements. However, the risk exists, as in any litigation, that the Bankruptcy Court may disagree with the Proponent's views. To the extent that the Bankruptcy Court rules against the Proponent on one or more of the confirmation requirements, the Plan, as presently drafted, may be unconfirmable. In such event, the Proponent anticipates reviewing the Court's determinations, and reserves the right to modify the Plan as may be necessary to obtain confirmation.

(2)    <u>Unanticipated Low Value of Assets</u>. As discussed above, the Plan proposes to sell the assets of the Debtor for an amount sufficient to pay all claims in full. The Proponent cannot guarantee that its anticipated sale prices will be obtained. If the Proponent's estimate is incorrect, the Debtor's ability to pay Creditors in accordance with the Plan may be adversely affected.

### O.    Tax Consequences

The Debtor is organized as a pass through entity, which generally means that it is not responsible for the payment of state or federal income taxes. NEITHER THE PROPONENT NOR ITS UNDERSIGNED COUNSEL ARE PROVIDING TAX ADVICE OR OPINIONS IN CONNECTION WITH THE PLAN. EACH CREDITOR AND HOLDER OF AN INTEREST IS ENCOURAGED TO OBTAIN ITS OWN TAX ADVICE.

### ARTICLE X. <u>FURTHER INFORMATION</u>

### A.    Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents, please contact:

Bradford F. Englander
Whiteford Taylor Preston LLP
3190 Fairview Park Drive, Suite 300
Falls Church, Virginia  22042
Phone: (703) 280-9081
Fax: (703) 280-3370
benglander@wtplaw.com

### ARTICLE XI.        <u>RECOMMENDATION AND CONCLUSION</u>

For all of the reasons set forth in this Disclosure Statement, the Proponent believes that confirmation and consummation of the Plan is preferable to all other alternatives.

Dated:  April 14, 2015                          WHITEFORD TAYLOR PRESTON, LLP


                                                */s/ Bradford F. Englander*
                                                Bradford F. Englander, Esq.
                                                3190 Fairview Park Drive, Suite 300
                                                Falls Church, VA 22042
                                                Telephone: (703) 280-9081
                                                Facsimile:  (703) 280-3370
                                                Email: benglander@wtplaw.com

                                                *Special Counsel for Raymond A. Yancey, Chapter
                                                11 Trustee for the Estates of Min Sik Kang and Man
                                                Sun Kang, Plan Proponent*



                                                */s/ Raymond A. Yancey*
                                                *Raymond A. Yancey, Chapter 11 Trustee for the
                                                Estates of Min Sik Kang and Man Sun Kang, Plan
                                                Proponent*

### Schedule of Exhibits to Disclosure Statement

Exhibit A – Legal Description of the Shopping Center

Exhibit B – Plan Projections

Exhibit C – Liquidation Analysis

Exhibit D – Sale Agreement

# Exhibit A

EXHIBIT A

(Legal Description)

Beginning at a found spike, said spike lying on the northerly right of way line of Braddock Road (Route 7759), and also the southeasterly most corner of Parcel A-3, thence departing the said right of way and running with the line of Parcel A-3 and A-2 the following courses:

N.25°52'22"E., a distance of 232.50 feet to a found nail;

thence northeasterly, a distance of 94.00 feet along a non tangent curve to the right of which the radius point lies S.64°07'39"E. a radius of 435.91 feet, and having a central angle of 12°21'19" to a found nail;

thence N.51°46'31"W., a distance of 97.60 feet to an iron pipe found;

N.25°52'22"E., a distance of 48.34 feet to a found nail;

thence N.64°07'38"W., a distance of 147.13 feet to a found nail;

thence N.59°26'59"W., a distance of 174.12 feet to a found nail;

thence N.30°33'01"E., a distance of 5.50 feet to a found nail;

thence N.59°26'59"W., a distance of 160.00 feet to a found nail, said nail lying on the easterly right of way line of Old Centreville Road (Route 898);

thence running with the said right of way line the following courses:

N.30°33'01"E., a distance of 36.31 feet to an iron pipe found;

thence N.31°06'13"E., a distance of 241.33 feet to an iron pipe found;

thence leaving the easterly line of Old Centreville Road (Route 898) and continuing with the southerly line of Lee Highway (Rte 29 and 211)northeasterly, a distance of 196.08 feet along a curve to the right having a radius of 299.86 feet and a central angle of 37°28'00" to a point;

thence N.87°14'26"E., a distance of 190.80 feet to a point, thence departing the said right of way of Lee Highway and running with the southerly line of Outlot A, Old Centreville Crossing;

S.36°51'00"E., a distance of 115.94 feet; to an iron pipe found, thence

S.33°55'31"E., a distance of 122.29 feet; to an iron pipe found, thence departing the line of Outlot A, Old Centreville Crossing and running with the southerly line of Spindle Court the following courses:

113.72 feet along a non tangent curve to the left of which the radius point lies S.51°22'55"E. a radius of 50.00 feet, and having a central angle of 130°18'49" to an iron pipe found;

thence southeasterly, a distance of 25.21 feet along a reverse curve to the right having a radius of 25.00 feet and a central angle of 57°46'37" to an iron pipe found;

thence S.33°55'31"E., a distance of 268.79 feet to an iron pipe found;

thence S.41°02'43"E., a distance of 254.86 feet to an iron pipe found;

thence S.40°57'52"E., a distance of 63.95 feet to an iron pipe found;

thence S.48°51'53"E., a distance of 139.24 feet to an iron pipe found;

thence S.41°08'07"W., a distance of 10.00 feet to an iron pipe found;

thence southeasterly, a distance of 126.99 feet along a non tangent curve to the right of which the radius point lies S.41°08'16"W. a radius of 277.00 feet, and having a central angle of 26°16'04" to an iron pipe found;

thence, leaving the right of way and running with the northerly right of way of Braddock Road the following courses:

southerly, a distance of 62.89 feet along a compound curve to the right having a radius of 40.00 feet and a central angle of 90°05'00" to an iron pipe found;

thence southwesterly, a distance of 96.79 feet along a reverse curve to the left having a radius of 501.00 feet and a central angle of 11°04'09" to an iron pipe found;

thence S.56°25'11"W., a distance of 102.29 feet to an iron pipe found;

thence westerly, a distance of 447.23 feet along a non tangent curve to the right of which the radius point lies N.33°34'50"W. a radius of 431.00 feet, and having a central angle of 59°27'12" to a found spike;

thence N.64°07'38"W., a distance of 301.81 feet to the point of beginning.

Containing 692,074.64 square feet or 15.8878 acres, more or less.

Together with easements for ingress and egress and storm water management upon Parcels A-2 and A-3, property of William A. Moran, Trustee, as the same is duly platted, subdivided and recorded by Deed of Consolidation, Subdivision and Easement recorded in Deed Book 7095 at Page 1, and as corrected in Deed Book 7278 at page 1342 and as further corrected in Deed Book 7293 at page 1448, all among the land records of Fairfax County, Virginia.

# Exhibit B

**In re Grand Centreville, LLC**             **Projections - Exhibit B**

| Item | High Range | Mid Range | Low Range |
|---|---|---|---|
| **Assets** | | | |
| Gross Proceeds from Sale of Shopping Center | $55,500,000.00 | $50,000,000.00 | $47,000,000.00 |
| Less: Costs of Sale | | | |
| > Broker Commission (KLNB and participating broker, 1.25%) | $693,750.00 | $625,000.00 | $587,500.00 |
| > Other costs of sale (estimated at 2%) | $1,110,000.00 | $1,000,000.00 | $940,000.00 |
| > Transfer tenant security deposits to buyer | $337,000.00 | $337,000.00 | $337,000.00 |
| Net Proceeds from Sale of Shopping Center: | $53,359,250.00 | $48,038,000.00 | $45,135,500.00 |
| | | | |
| Operating Account (as of 12/31/2014) | $1,314,174.00 | $1,314,174.00 | $1,314,174.00 |
| ICS Account (as of 12/31/2014) | $1,102,692.00 | $1,102,692.00 | $1,102,692.00 |
| Lender Reserves (as of 12/31/2014) | $1,635,656.00 | $1,635,656.00 | $1,635,656.00 |
| | | | |
| Causes of Action (undetermined at this time) | $0.00 | $0.00 | $0.00 |
| | | | |
| **Total Assets:** | **$57,411,772.00** | **$52,090,522.00** | **$49,188,022.00** |
| **Expenses/Distributions** | | | |
| Loan Principal (note 1) | $23,435,000.00 | $24,455,000.00 | $24,455,000.00 |
| Default Interest (note 2) | $0.00 | $2,500,000.00 | $5,000,000.00 |
| Administrative Expenses | $200,000.00 | $250,000.00 | $300,000.00 |
| Wind Up Expenses/Legal Fees | $350,000.00 | $450,000.00 | $550,000.00 |
| General Unsecured Claims | $25,000.00 | $110,000.00 | $150,000.00 |
| | | | |
| Total Expenses/Distributions: | $24,010,000.00 | $27,765,000.00 | $30,455,000.00 |
| | | | |
| **Amount Available for Distribution Pursuant to Sohn Settlement Agreement:** | **$33,401,772.00** | **$24,325,522.00** | **$18,733,022.00** |

Notes/Assumptions

Note 1 - High Range loan principal assumes that adequate protection payments made during the Debtor's chapter 11 case are applied toward principal on the assumption that post-petition default interest will be disallowed.

Note 2 - High Range default interest assumes disallowance of all claims for default interest.  Low Range assumes allowance in full of pre-petition and post-petition default interest.  Mid Range represents an arbitrary mid point between High Range and Low Range default interest.

# Exhibit C

**In re Grand Centreville, LLC**     **Liquidation Analysis- Exhibit C**

| Item | High Range | Mid Range | Low Range |
|---|---|---|---|
| **Total Assets:** | **$57,411,772.00** | **$52,090,522.00** | **$49,188,022.00** |
| **Expenses/Distributions** | | | |
| Loan Principal (note 1) | $23,435,000.00 | $24,455,000.00 | $24,455,000.00 |
| Post-Conversion Interest (note2) | $351,525.00 | $1,100,475.00 | $4,401,900.00 |
| Default Interest (note 3) | $0.00 | $2,500,000.00 | $5,000,000.00 |
| Transfer Taxes | $184,815.00 | $166,500.00 | $156,510.00 |
| Administrative Expenses | $200,000.00 | $250,000.00 | $300,000.00 |
| Wind Up Expenses/Legal Fees | $350,000.00 | $450,000.00 | $550,000.00 |
| General Unsecured Claims | $25,000.00 | $110,000.00 | $150,000.00 |
| Total Expenses/Distributions: | $24,546,340.00 | $29,031,975.00 | $35,013,410.00 |
| Chapter 7 Trustee Commission (note 4) | $759,640.20 | $894,209.25 | $1,073,652.30 |
| **Amount Available for Distribution Pursuant to Sohn Settlement Agreement:** | **$32,105,791.80** | **$22,164,337.75** | **$13,100,959.70** |

Notes/Assumptions

Note 1 - High Range loan principal assumes that adequate protection payments
made during the Debtor's chapter 11 case are applied toward principal on the
assumption that post-petition default interest will be disallowed.

Note 2 - High Range post-conversion interest assumes interest at the rate of 3.0% per annum
for 6 months.  Mid Range post-conversion interest assumes a rate of 4.5% per annum for
one year.  Low Range post-conversion interest assumes a rate of 6.0% per annum for 3 years.

Note 3 - High Range default interest assumes disallowance of all claims for
default interest.  Low Range assumes allowance in full of pre-petition and
post-petition default interest.  Mid Range represents an arbitrary mid point
between High Range and Low Range default interest.

Note 4 - Assumes allowance and payment of Chapter 7 Trustee commissions
pursuant to the formula set forth in Section 326(a) of the Bankruptcy Code.

# Exhibit D

## AGREEMENT FOR PURCHASE AND SALE
## OF REAL PROPERTY

THIS AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY (this "**Agreement**") is made and entered into as of this 14th day of April, 2015, among GRAND CENTREVILLE, LLC, a Virginia limited liability company ("**Seller**"), JBG ASSOCIATES, L.L.C., a Delaware limited liability company ("**Buyer**") and Raymond A. Yancey, Trustee ("**Trustee**").

## RECITALS

A.      Seller owns certain real property located in Fairfax County, Virginia, commonly known as the Old Centreville Crossing Shopping Center, together with a 171,631 square foot building thereon, and more specifically described in **Exhibit A** attached hereto and incorporated herein (the "**Land**"), and such other assets, as the same are herein described.  Seller is a debtor and debtor in possession in a Chapter 11 Bankruptcy Case presently pending in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), Case No. 13-13590-RGM.

B.      Trustee is the trustee for the bankruptcy estates of Min Sik Kang and Man Sun Kang (Case No. 10-18839-RGM pending in the Bankruptcy Court) and, as provided for in the Bankruptcy Court's Order Granting Motion for Entry of Order to (A) Modify Receiver Authorization Order, (B) Authorize Procedures for Dismissal of Bankruptcy Case and (C) Provide Relief from the Automatic Stay (Doc. No. 226) (the "Receiver Modification Order"), has directed the Seller's marketing of the Property (as defined below) and the Seller's entry into this Agreement.

C.      Seller and Trustee desire to sell to Buyer and Buyer desires to purchase from Seller the Land and the associated assets on the terms set forth in this Agreement.

D.      The "**Effective Date**" of this Agreement shall be the date on which this Agreement has been fully executed by Seller, Buyer and Trustee and has been filed by Trustee with the Bankruptcy Court in connection with an amended plan of reorganization for the Seller ( the "Plan") or motion pursuant to Sections 363(f) and 365 of the Bankruptcy Code (the "**Motion**"), pursuant to which, *inter alia,* Trustee, as Plan proponent or movant, seeks authorization for the sale of the Property to Buyer on the terms set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, premises and agreements herein contained, the parties hereto do hereby agree as follows:

1.      Purchase and Sale.

1.1. The purchase and sale includes, and at the Closing Date (hereinafter defined) Seller shall sell and Trustee shall cause Seller to sell, transfer, grant and assign to Buyer, Seller's entire right and interest in and to all of the following (hereinafter sometimes collectively, the "**Property**"):

1

1.1.1. The Land, together with all structures, buildings, improvements, machinery, fixtures, and equipment affixed or attached to the Land and all easements, development rights, rights of way, and other rights appurtenant to the Land (all of the foregoing being collectively referred to herein as the "**Real Property**");

1.1.2. All leases (the "**Leases**"), including associated amendments, with all persons ("**Tenants**") leasing the Real Property or any part thereof or hereafter entered into in accordance with the terms hereof prior to the Closing Date, together with all security deposits, other deposits held in connection with the Leases, Lease guarantees and other similar credit enhancements providing additional security for such Leases;

1.1.3. All tangible and intangible personal property owned by Seller located on or used in connection with the Real Property, including, specifically, without limitation, equipment, furniture, tools and supplies, any website maintained by Seller and all related intangibles including Seller's interest in the common name of the Real Property (the "**Personal Property**");

1.1.4. All service contracts, agreements, warranties and guaranties relating to the operation, use or maintenance of the Real Property selected by Buyer and listed on a notice delivered to Seller, if any (the "**Designated Contracts**"); and

1.1.5. To the extent transferable, all building permits, certificates of occupancy and other certificates, permits, licenses and approvals relating to the Property (the "**Permits**").

2.    Purchase Price. The total Purchase Price of the Property shall be the sum of FIFTY FIVE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($55,500,000.00) (the "**Purchase Price**"), and payable as follows:

2.1.    Deposit/Further Payments.

2.1.1. Within three (3) business days following the Effective Date of this Agreement, Buyer shall deposit into Escrow (hereinafter defined) the amount of TWO MILLION SEVEN HUNDRED SEVENTY FIVE THOUSAND AND NO/100 DOLLARS ($2,775,000.00) (the "**Deposit**"), in the form of a wire transfer payable to Commonwealth Land Title Insurance Company, with an office located at 1015 15th Street N.W., Suite 300, Washington, D.C. 20005, Attn: Sarah Eckert Webb, Esq., Major Transactions Counsel, Telephone: (202) 312-5119, e-mail: swebb@fnf.com ("**Escrow Holder**"). Escrow Holder shall place the Deposit into an interest bearing money market account at a bank or other financial institution reasonably satisfactory to Buyer, and interest thereon shall be credited to Buyer's account and shall be the property of Buyer. Concurrently with the full execution and delivery of this Agreement, Seller, Buyer and Escrow Agent shall enter into an escrow agreement substantially in the form of **Exhibit B** attached hereto (the "**Escrow Agreement**").

2.1.2. On the Closing Date, Buyer shall deposit with Escrow Holder the balance of the Purchase Price, in immediately available funds by wire transfer made payable to Escrow Holder.

2.1.3. If this Agreement is terminated for any reason other than as expressly provided in Section 13.2 or if Closing has not occurred by the Closing Deadline (or such later date

as Buyer may agree in its sole discretion), the Deposit shall be immediately and automatically paid over to Buyer without the need for any further action by any party hereto.

3.    Due Diligence; AS-IS, WHERE IS.

3.1.1.  Except as expressly set forth in this Agreement, it is understood and agreed that the Property is being sold and conveyed hereunder "AS IS, WHERE IS" without any representation or warranty by Seller or Trustee. Buyer acknowledges (i) that Buyer has been given the opportunity to perform its own due diligence on the Property and that it is entering into this Agreement on the basis of its own independent investigation without relying upon any representations, warranties or statements of any kind made by or on behalf of the Seller except as contained in this Agreement, and (ii) that, except for the representations and warranties by Seller contained in this Agreement, Seller negates and disclaims all representations, warranties and statements of every kind or type (express or implied).

4.    Escrow.

4.1.    Closing Date.  Unless agreed in writing by the parties, the settlement ("Closing") shall occur at the offices of the Escrow Agent within ten (10) business days following the satisfaction or written waiver of all conditions precedent set forth in Paragraph 8 of this Agreement ("**Closing Date**") but not later than August 12, 2015 (the "**Closing Deadline**"), TIME BEING OF THE ESSENCE.  All documents and amounts delivered in Escrow to the Escrow Holder pursuant to this Agreement shall be released or delivered by Escrow Holder to or for the benefit of the applicable party at Closing.

4.2.    Buyer Required to Deliver.  Buyer shall deliver to Escrow Holder the following:

4.2.1.  In accordance with Paragraph 2, the Deposit;

4.2.2.  On or before the Closing Date, the balance of the Purchase Price;

4.2.3.  On or before the date which is one (1) business day prior to the Closing Date, a counterpart original of an assignment agreement, substantially in the form attached hereto as **Exhibit C,** duly executed by Buyer, assuming all of Seller's obligations in and under the Leases, Designated Contracts (if any) and Permits from and after the Closing Date (the "**Assignment Agreement**"); and

4.2.4.  On or before the date which is one (1) business day prior to the Closing Date, such other documents as Escrow Holder may reasonably require from Buyer in order to issue the Title Policy (as hereinafter defined), provided reasonable advance notice is given for such documents.

4.2.5.  On or before the date which is one (1) business day prior to the Closing Date, a closing and proration statement agreed to and executed by the parties which reflects all adjustments to the Purchase Price contemplated by the Agreement (the "**Closing Statement**").

4.3.    Seller Required to Deliver.  Seller shall deliver to Escrow Holder or Buyer, as applicable, the following:

3

4.3.1.  To Escrow Holder, on or before the date which is one (1) business prior to the Closing Date, a duly executed and acknowledged Special Warranty Deed, substantially in the form attached hereto as **Exhibit D**, (the "**Deed**"), conveying fee title to the Real Property in favor of Buyer;

4.3.2.  To Escrow Holder, on or before the date which is one (1) business day prior to the Closing Date, a bill of sale, substantially in the form attached hereto as **Exhibit E** (the "**Bill of Sale**"), for the Personal Property, in favor of Buyer and duly executed by Seller;

4.3.3.  To Escrow Holder, on or before the date which is one (1) business day prior to the Closing Date, such other documents as Escrow Holder may require from Seller in order to issue the Title Policy, provided reasonable advance notice is given;

4.3.4.  To Escrow Holder, on or before the date which is one (1) business day prior to the Closing Date, a counterpart original of the Assignment  Agreement duly executed by Seller, assigning all of Seller's right, title and interest in and to the Leases, Designated Contracts  and Permits to Buyer from and after the Closing Date;

4.3.5.  To Buyer at Closing, all keys to all buildings and other improvements located on the Real Property, combinations to any safes thereon, and security devices therein in Seller's possession;

4.3.6.  To Buyer at Closing, a letter from Seller addressed to each Tenant, substantially in the form attached hereto as **Exhibit F**, informing such Tenant of the change in ownership of the Real Property and the assignment of the Tenant's Lease to Buyer;

4.3.7.  To Buyer at Closing, the original Leases;

4.3.8.  To Escrow Holder , on or before the date which is one (1) business day prior to the Closing Date, the Closing Statement;

4.3.9.  To Escrow Holder, on or before the date which is one (1) business day prior to the Closing Date, a certificate executed by Seller, substantially in the form attached hereto as **Exhibit G**, reaffirming and updating to the Closing Date, the representations and warranties given by Seller under Section 5, which certificate will include an updated rent roll, list of  Contracts;

4.3.10. To Escrow Holder, on or before the date which is one (1) business day prior to the Closing Date, certifications and affidavits as required by the Foreign Investors Real Property Tax Act, substantially in the form attached hereto **as Exhibit H**;

4.3.11. To Buyer, on or before the date which is one (1) business day prior to the Closing Date, a certified copy of the Court Approval Order required as a condition precedent to the Buyer's obligation to close pursuant to Section 8.1.2 of this Agreement;

4.3.12. To Buyer at Closing, all records and files relating to the management or operation of the Real Property, including, without limitation, all insurance policies, all Designated Contracts, all tenant files (including correspondence), property tax bills, and all calculations used to

4

prepare statements of rental increases under the Leases and statements of common area charges, insurance, property taxes and other charges which are paid by Tenants of the Real Property.

4.3.13. To Escrow Holder, on or before the date which is one (1) business day prior to the Closing Date, an Owner's Affidavit in favor of Escrow Holder certifying the then most current rent roll for the Real Property and that none of the tenants have any options to purchase or rights of first refusal with respect to the Real Property, together with such other documents as Escrow Holder may require from Seller to satisfy the Schedule B, Section 1 Requirements contained in the title commitment to be issued by Escrow Holder and to otherwise induce Escrow Holder to issue the Title Policy in accordance with Exhibit I, provided reasonable advance notice is given.

4.4.    Buyer's Costs. Buyer shall pay the following:

4.4.1.    One-half (1/2) of Escrow Holder's fee, costs and expenses;

4.4.2.    The cost of recording the Deed, other than for the Virginia Grantor's Tax, the Virginia Recordation Tax (County and State) and the Virginia Regional Congestion Relief Fee;

4.4.3.    The premium for the Title Policy; and

4.4.4.    All other costs customarily borne by purchasers of real property in the County of Fairfax, Virginia, which costs are not being paid by Seller in accordance with the other provisions of this Agreement.

4.5.    Seller's Costs. Seller shall pay the following:

4.5.1.    One-half (1/2) of Escrow Holder's fees, costs and expenses;

4.5.2.    To the extent required, the Virginia Grantor's Tax on the Deed, the Virginia Recordation Tax (County and State) on the Deed and the Virginia Regional Congestion Relief Fee on the Deed; and

4.5.3.    All other costs customarily borne by sellers of real property in the County of Fairfax, Virginia, which costs are not being paid by Buyer in accordance with the other provisions of this Agreement, including, but not limited to, the costs of all diligence materials provided by Seller's Broker to the Buyer and other potential bidders for the Real Property.

4.6.    Prorations.

4.6.1.    Items to be Prorated. The following shall be prorated between Seller and Buyer as of the Closing Date with Buyer being deemed the owner of the Property as of the Closing Date:

(a)    Taxes and Assessments. All non-delinquent real property taxes, assessments and other governmental impositions of any kind or nature, including, without limitation, any special assessments or similar charges (collectively, "**Taxes**"), which relate to the tax year within which the Closing Date occurs based upon the actual number of days in the tax year.

5

With respect to any portion of the Taxes which are payable by any Tenant directly to the authorities, no proration or adjustment shall be made. The proration for Taxes shall be based upon the most recently issued tax bill for the Property. If the most recent tax bill is not for the current tax year, then the parties shall re-prorate within thirty (30) days of the receipt of the tax bill for the current tax year. Upon the Closing Date and subject to the adjustment provided above, Buyer shall be responsible for all Taxes on the Property payable from and after the Closing Date.

(b)     Rents. Buyer will receive a credit at the Closing Date for all rents collected by Seller prior to the Closing Date and allocable to the period from and after the Closing Date based upon the actual number of days in the month. No credit shall be given Seller for accrued and unpaid rent or any other non-current sums due from Tenants as of the Closing Date. Seller shall retain the right to collect any such delinquent rent for the period prior to the Closing Date; provided however, Seller shall not have the right to sue to evict any tenants or terminate any Tenant Leases. Buyer shall reasonably cooperate with Seller after the Closing Date to collect any rent under the Tenant Leases which has accrued for the period prior to the Closing Date; provided, however, Buyer shall not be obligated to sue any Tenants or exercise any legal remedies under the Tenant Leases or to incur any expense over and above its own regular collection expenses. All payments collected from Tenants after the Closing Date shall first be applied to any rent then due to Buyer for the period after the Closing Date, and any excess thereof shall next be applied to any rent due to Seller for the period prior to the Closing Date.

(c)     Operating Expenses. All operating expenses (including all charges under the Designated Contracts assumed by Buyer) shall be prorated, and as to each service provider, operating expenses payable or paid to such service provider in respect to the billing period of such service provider in which the Closing Date occurs (the "Current Billing Period"), shall be prorated on a per diem basis based upon the number of days in the Current Billing Period prior to the Closing Date and the number of days in the Current Billing Period from and after the Closing Date, and assuming that all charges are incurred uniformly during the Current Billing Period. If actual bills for the Current Billing Period are unavailable as of the Closing Date, then such proration shall be made on an estimated basis based upon the most recently issued bills, subject to readjustment upon receipt of actual bills.

(d)     Security Deposits; Prepaid Rents. Prepaid rentals and other tenant charges and security deposits (including any portion thereof which may be designated as prepaid rent) under Tenant Leases, if and to the extent that such deposits are in Seller's actual possession or control and have not been otherwise applied by Seller to any obligations of any Tenants under the Tenant Leases, shall be credited against the Purchase Price, and upon the Closing Date, Buyer shall assume full responsibility for all security deposits to be refunded to the Tenants under the Tenant Leases (to the extent the same are required to be refunded by the terms of such Tenant Leases or applicable). If any security deposits are in the form of letters of credit or other financial instruments (the "Non-Cash Security Deposits"), Seller will, at the Closing Date cause Buyer to be named as beneficiary under the Non-Cash Security Deposits. Buyer will not receive a credit against the Purchase Price for such security deposits. If Buyer cannot be named the beneficiary under the Non-Cash Security Deposits as of the Closing Date, an escrow shall be established at the Closing Date in an amount equal to all Non-Cash Security Deposits under which Buyer is not the beneficiary as of the Closing Date, until such time as Buyer can be named as the beneficiary thereunder.

(e)      Leasing Costs. Seller shall receive a credit at the Closing Date for all leasing costs, including tenant improvement costs and allowances, and its pro-rata leasing commissions, previously paid by Seller in connection with any Lease or modification to any existing Lease which was entered into after the Effective Date and which is approved or deemed approved by Buyer pursuant to this Agreement, which approval included approval of the tenant improvement costs. Seller's pro-rata share shall be equal to a fraction which has as its numerator the number of months left in the base term of the Lease after the Closing Date and which has as its denominator the number of months in the base term of the Lease. Buyer shall receive a credit at the Closing Date in an amount equal to all rent concessions, tenant improvement allowances and leasing commissions with respect to the current terms of Leases in effect as of the Effective Date, to the extent that they have not been fully satisfied as of the Closing Date.

(f)      Percentage Rent. Any percentage rents due or paid under any of the Leases ("**Percentage Rent**") shall be prorated between Buyer and Seller outside of the Closing Date as of the Closing Date on a Lease-by-Lease basis, as follows; (a) Seller shall be entitled to receive the portion of the Percentage Rent under each Lease for the Lease Year in which the Closing Date occurs, which portion shall be the ratio of the number of days of said Lease Year in which Seller was Landlord under the Lease to the total number of days in the Lease Year, and (b) Buyer shall receive the balance of Percentage Rent paid under each Lease for the Lease Year. As used herein, the term "**Lease Year**" means the twelve (12) month period as to which annual Percentage Rent is owed under each Lease. Upon receipt by either Buyer or Seller of any gross sales reports ("**Gross Sales Reports**") and any full or partial payment of Percentage Rent from any Tenant of the Property, the party receiving the same shall provide to the other party a copy of the Gross Sales Report and a check for the other party's prorata share of the Percentage Rent within five (5) days of the receipt thereof. If Tenant only remits a partial payment, then the amount to be remitted to the other party shall be its prorata share of the partial payment. Nothing contained herein shall be deemed or construed to require either Buyer or Seller to pay to the other party its prorata share of the Percentage Rent prior to receiving the Percentage Rent from the Tenant, and the acceptance or negotiation of any check for Percentage Rent by either party shall not be deemed a waiver of that party's right to contest the accuracy or amount of the Percentage Rent paid by the Tenant.

(g)      To the extent that Tenants are reimbursing the Seller for common area maintenance and other operating expenses (collectively, "**CAM Charges**"), CAM Charges shall be prorated at the Closing Date (with respect to CAM charges received by Seller prior to the Closing Date, as applicable) and again subsequent to the Closing Date, as of the date of the Closing Date (with respect to CAM charges received by Buyer after the Closing Date, as applicable), on a Lease-by-Lease basis with each party being entitled to receive a portion of the CAM Charges payable under each Lease for the CAM Lease Year in which the Closing Date occurs, which portion shall be equal to the actual CAM Charges incurred during the party's respective periods of ownership of the Property during the CAM Lease Year. As used herein, the term "**CAM Lease Year**" means the twelve (12) month period as to which annual CAM Charges are owed under each Lease.

(h)      Calculations; Survival. All items of income and expense which accrue for the period prior to the Closing Date will be for the account of Seller and all items of income and expense which accrue for the period on and after the Closing Date will be for the account of Buyer. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing Date and based upon the actual number of days in the month and a three hundred sixty five (365) day year. The amount of such apportionments and

adjustments shall be initially performed on the Closing Date but shall be subject to adjustment in cash after the Closing Date as and when complete and accurate information becomes available, if such information is not available as of the Closing Date. Seller and Buyer agree to cooperate and use commercially reasonable efforts to make such adjustments no later than sixty (60) days after the Closing Date (or as soon thereafter as may be practicable with respect to common area maintenance and other additional rent charges (including pass-throughs for real estate and personal property taxes and special assessments) payable by tenants under Leases) and any payment required in connection therewith shall be made with ten (10) days after such adjustments.

      4.6.2. <u>Items Not Prorated</u>. Seller and Buyer agree that (a) on the Closing Date, the Property will not be subject to any financing arranged by Seller; (b) none of the insurance policies relating to the Property will be assigned to Buyer and Buyer shall be responsible for arranging for its own insurance as of the Closing Date; and (c) utilities, including telephone, electricity, water and gas, shall be read on the Closing Date and Buyer shall be responsible for all the necessary actions needed to arrange for utilities to be transferred to the name of Buyer on the Closing Date, including the posting of any required deposits and Seller shall be entitled to recover and retain from the providers of such utilities any refunds or overpayments to the extent applicable to the period prior to the Closing Date, and any utility deposits which it or its predecessors may have posted. Accordingly, there will be no prorations for debt service, insurance or utilities. If a meter reading is unavailable for any particular utility, then proration for such utility shall be made on an estimated basis based upon the most recently issued bills, subject to readjustment upon receipt of actual bills.

      4.6.3. <u>Indemnification</u>. Buyer shall indemnify, protect, defend and hold Seller harmless from and against any claim in any way arising from Buyer's failure to pay money to any third party with respect to any of the matters for which Buyer receives a credit and otherwise assumes responsibility pursuant to this Paragraph.

      4.6.4. <u>Survival</u>. This Paragraph 4.6 shall survive the Closing.

5.    <u>Representations and Warranties of Seller</u>

      5.1.1. <u>Authority</u>. Seller is a limited liability company validly existing and in good standing under the laws of the Commonwealth of Virginia and qualified to do business in the jurisdiction in which the Real Property is located, and, Seller has all limited liability company requisite power and authority to enter into this Agreement and all documents now or hereafter to be executed and delivered by Seller pursuant to this Agreement and to perform its obligations under this Agreement and under such documents. Other than the approval of the Bankruptcy Court (which Seller shall obtain prior to Closing), Seller has obtained all consents necessary for it to enter into and perform this Agreement.

      5.1.2. <u>Leases</u>. Seller has delivered to Buyer true, correct and complete copies of all of the Leases for the tenants listed on the rent roll attached hereto as Exhibit L. There are no other Leases affecting the Real Property except as set forth in Exhibit L. The Leases are in full force and effect and there exists no default under any of the Leases by any of the Tenants or by Seller. The foregoing representation and warranty shall be updated at Closing to reflect any Leases entered into, modified, renewed, extended or terminated after the Effective Date.

5.1.3. <u>Rent Roll</u>. The rent roll attached as Exhibit L to this Agreement is a true, correct and complete copy of the rent roll used in connection with the operation and management of the Real Property.

5.1.4. <u>Contracts</u>. Seller has delivered to Buyer true, correct and complete copies of all of the service contracts, agreements, warranties and guaranties relating to the operation, use or maintenance of the Real Property (the "**Contracts**"). There are no other Contracts affecting the Real Property other than for the Contracts provided by Seller to Buyer. The Contracts are in full force and effect and there exists no default under any of the Contracts by Seller or by any of the service providers thereunder.

5.1.5. <u>Survival</u>. Seller's representations and warranties set forth this Agreement, as well as the right and ability of Buyer to enforce the same and/or to seek damages for their breach, shall survive the Closing for a period of three (3) months (the "**Survival Period**") and shall not merge into any document executed in conjunction with Closing but instead shall be independently enforceable during the Survival Period solely against the Holdback. Any claim by Buyer with respect to a breach of Seller's representations or warranties under this Agreement shall be asserted in writing within said Survival Period or shall be forever barred and waived.

5.1.6. <u>Holdback</u>. In order to provide Buyer with a means to obtain reimbursement for a breach of the Seller's representations and warranties under this Agreement, Escrow Holder shall withhold an amount equal to $500,000 from Seller's closing proceeds (the "**Holdback**") which amount shall be held by Escrow Holder during the Survival Period and disbursed by the Escrow Holder pursuant to a mutually agreeable form of escrow agreement to be entered into in conjunction with the Closing, which form of escrow agreement shall specify that the Holdback shall be fully released to the Seller in the event that the Buyer does not make any claims against the Seller during the Survival Period for a breach of the Seller's representations and warranties under this Agreement. If Buyer timely makes a claim for breach of Seller's representations or warranties during the Survival Period, the amount asserted by Buyer as damages associated with such breach shall continue to be held by Escrow Agent until the claim asserted by Buyer is either resolved by a final order of a court of competent jurisdiction or by mutual agreement of the parties. In such event, Escrow Holder shall disburse the Holdback then held by Escrow Holder pursuant to the terms of such order or as directed by the mutual agreement of the parties, as applicable.

6.    <u>Covenants of Seller</u>. Seller hereby covenants from and after the Effective Date as follows:

6.1.1. To cause to be in force fire and extended coverage insurance upon the Real Property, and public liability insurance with respect to damage or injury to persons or property occurring on the Real Property in at least such amounts, and with the same deductibles, as are maintained by Seller on the date hereof.

6.1.2. To maintain any building constituting an improvement on the Real Property in the same physical condition as it was at the date of Buyer's inspection, reasonable wear and tear excepted, and to perform all normal maintenance from and after the Effective Date in the same fashion as prior to the Effective Date.

9

6.1.3.  To not enter into any new lease with respect to the Real Property, without Buyer's prior written consent, which consent may be withheld in Buyer's sole discretion. Exercise of a mandatory renewal option shall not be considered a new lease. To the extent specifically disclosed to Buyer in connection with any request for approval, any brokerage commission and the cost of Tenant improvements or other allowances payable with respect to a new Lease shall be prorated between Buyer and Seller in accordance with their respective periods of ownership as it bears to the primary term of the new Lease. Further, Seller will not modify or cancel any existing Lease covering space in the Real Property without first obtaining the written consent of Buyer which consent may be withheld in Buyer's sole discretion. Buyer shall have [ten (10)] business days following receipt of a request for any consent pursuant to this paragraph in which to approve or disapprove of any new Lease or any modification or cancellation of any existing Lease. Failure to respond in writing within said time period shall be deemed to be an election not to consent to such new Lease, modification or cancellation. Seller's execution of a new lease or modification or cancellation of an existing Lease following Buyer's refusal to consent thereto shall constitute a material default hereunder.

6.1.4.  To not sell, assign, or convey any right, title, or interest whatsoever in or to the Real Property, or create or permit to attach any lien, security interest, easement, encumbrance, charge, or condition affecting the Real Property (other than the Permitted Exceptions).

6.1.5.  To not, without Buyer's written consent, which may be withheld in Buyer's sole discretion, (a) amend or waive any right under any Contract, or (b) enter into any service, operating or maintenance agreement affecting the Real Property that would survive the Closing.

6.1.6.  To fully and timely comply with all obligations to be performed by it under the Leases and Contracts, and all Permits, licenses, approvals and laws, regulations and orders applicable to the Real Property.

6.1.7.  To provide Buyer with monthly rent rolls on the Leases.

6.1.8.  To provide Buyer with copies of (a) any default letters sent to or received from Tenants, (b) any copies of correspondence received from a Tenant that it is discontinuing operations at the Property or seeking to re-negotiate its lease, and (c) notices of bankruptcy filings received with respect to any Tenant.

6.1.9.  To operate the Real Property from and after the Effective Date through the Closing Date in substantially the same manner as the Real Property is presently being operated and managed.

6.1.10. To deliver to Buyer copies of Tenant insurance certificates, prior to the Closing Date.

6.1.11. To cease marketing the Property or soliciting or considering offers or otherwise engaging in discussions or negotiations with persons or entities other than Buyer for the purchase of the Property; provided, however, Seller is not required to close the data room to those entities who obtained access prior to the Effective Date.

7.    Covenants of Trustee.  Trustee hereby covenants from and after the Effective Date as follows:

7.1.1 To cease marketing the Property or soliciting or considering offers or otherwise engaging in discussions or negotiations with persons or entities other than Buyer for the purchase of the Property; provided, however, Seller is not required to close the data room to those entities who obtained access prior to the Effective Date.

7.1.2  To use his best efforts to promptly obtain Bankruptcy Court approval of this Agreement and the consummation of the sale to Buyer on or before the Closing Date.

7.1.3.  To use his best efforts to cause the Bankruptcy Court to hold a hearing on confirmation of the Plan and/or approval of the Motion on or before June 10, 2015; and set a deadline for objections to the Plan or the Motion at least 14 days before either hearing.

7.1.4. To require that an objection to the Motion or to the confirmation of the Plan relating to an alternative offer to purchase the Property, if standing to make such an objection is established, be accompanied by an executed purchase and sale agreement in the form of this Agreement but with a purchase price that is at least $250,000 higher than the Purchase Price, a non-refundable deposit in the amount of 5% of the increased Purchase Price, and evidence of ability to consummate the transaction in cash on or before the Closing Date.

7.1.5. In the event the Bankruptcy Court considers an objection to the Motion or the confirmation of the Plan related to an alternative offer, that Buyer, in its sole discretion, may match any such alternative offer and be the approved purchaser of the Property.

8.    Conditions Precedent to the Closing.

8.1.    Buyer's Conditions Precedent. The obligations of Buyer to purchase the Property pursuant to this Agreement shall, at the option of Buyer, be subject to the following conditions precedent,:

8.1.1. All of the representations, warranties, covenants and agreements of Seller and Trustee set forth in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date, and Seller and Trustee shall not have on or prior to the Closing Date, failed to meet, comply with or perform in any material respect any covenants or agreements on Seller's or Trustee's part as required by the terms of this Agreement.

8.1.2. This Agreement and the transactions contemplated hereunder shall have been approved by a final, non-appealable order of the Bankruptcy Court confirming the Plan or granting the Motion (either such order, as applicable, is herein referred to as a "**Court Approval Order**"), and the transactions authorized by the Court Approval Order shall not have been enjoined or stayed by any court of competent jurisdiction. Said Court Approval Order shall be subject to Buyer's commercially reasonable approval as to form and substance and shall include, without limitation, (a) that the Property will be conveyed to Buyer free and clear of all liens, deeds of trust, mechanics' and materialmen's liens, judgment liens, security interests, creditor claims, encumbrances and interests (collectively, the "**Liens**"), (b) Liens will be released of record at Closing, (c) Seller has cured defaults, if any, under Leases, Designated Contracts and Permits, (d) Leases, Designated Contracts and Permits will be assumed by Seller and assigned to Buyer; (e) any

11

Contract that has not been terminated in accordance with its terms has been rejected, (f) Buyer is a "good faith" purchaser under §363(m) of the Bankruptcy Code and entitled to all of the protections of a good faith purchaser; (g) that notice to creditors, Tenants, and parties in interest was proper; and (h) otherwise be in form and substance acceptable to Buyer in Buyer's commercially reasonable discretion.

8.1.3.   The Escrow Holder shall have committed unconditionally to issue to Buyer, at standard rates, and ALTA 2006 Form owner's title insurance policy covering the Real Property, in an amount at least equal to the Purchase Price, insuring that title to the Real Property is marketable, free and clear of all liens, encumbrances, easements, conditions and other matters affecting title other than solely those specific exceptions which appear on the mark up of the commitment (or pro forma owner's policy) attached as **Exhibit I** to this Agreement (the "**Title Policy**"). The Title Policy shall afford "extended coverage" over standard printed exceptions together with a 3.1 zoning endorsement with parking) and all other title endorsements reasonably required by Buyer to the extent permitted under applicable law.

8.1.4.   Buyer shall have received Tenant estoppel certificates substantially in the form attached hereto as **Exhibit J,** from all Tenants of the Real Property identified on **Exhibit K** attached hereto, and from such other Tenants who in the aggregate occupy 80% of the remaining leasable square footage at the Real Property which estoppels shall (a) confirm the amounts indicated on the Rent Roll, (b) contain no deviations from the terms of the Leases, (c) provide for no other exceptions or other changes to the forms attached as Exhibit J.  By no later than April 30, 2015, Seller shall prepare the forms of estoppel for each Tenant, including the applicable lease terms, and shall deliver the same to Buyer for Buyer's review.  Buyer shall review such prepared estoppels and provide its consent or proposed changes within five (5) business days of Buyer's receipt.  Seller shall incorporate any changes requested by Buyer to conform the draft estoppels to the terms of the Leases.  Seller shall deliver the agreed upon forms of estoppel to each tenant by no later than May 15, 2015, and shall use its good faith efforts to cause each Tenant to execute and deliver its estoppel in the form prepared.

8.2.   Seller's Conditions Precedent. The obligations of Seller to sell the Property pursuant to this Agreement shall, at the option of Seller, be subject to the following conditions precedent ("**Seller's Closing Conditions**"):

8.2.1.   This Agreement and the transaction contemplated hereunder will have been approved by a Court Approval Order Court that has not been reversed or modified on appeal, and that is not subject to any stay.  Said Court Approval Order will include, without limitation, (a) that the Property will be conveyed to Buyer free and clear of all liens, deeds of trust, mechanics' and materialmen's liens, judgment liens, security interests, creditor claims, encumbrances and interests (collectively, the "**Liens**"), (b) Liens shall be released of record at Closing, (c) Seller has cured defaults, if any, under Leases, Designated Contracts and Permits, (d) Leases, Designated Contracts and Permits will be assumed by Seller and assigned to Buyer; (e) any Contract that has not been terminated in accordance with its terms has been rejected, (f) Buyer is a "good faith" purchaser under §363(m) of the Bankruptcy Code and entitled to all of the protections of a good faith purchaser; and (f) that notice to creditors, Tenants, and parties in interest was proper.

8.3   Bankruptcy Court Action. If the Bankruptcy Court does not enter the Court Approval Order by the date that is at least fourteen (14) days prior to the Closing Deadline, then Buyer shall

12

have the right to terminate this Agreement by written notice to Seller and Trustee, and the Deposit shall be returned to the Buyer without any further action required from Buyer, Seller or Trustee. If the Bankruptcy Court for any reason enters an order that contains provisions materially inconsistent with this Agreement, then this Agreement may be terminated at the option of the party adversely affected by such order by written notice to the party not adversely affected, and in any event, the Deposit shall be immediately refunded to Buyer without any further action required from Buyer, Seller or Trustee.

9.      Back Up Contract. Notwithstanding anything in this Agreement to the contrary, in the event that the Bankruptcy Court approves another agreement with respect to the sale of the Property in connection with the confirmation of the Plan or the approval of the Motion, and approves this Agreement as a back up contract, unless terminated by Seller in its sole discretion, or by Buyer on account of a default by Seller that is unrelated to the approval of such other agreement, this Agreement shall remain in effect until the first to occur of (a) the occurrence of a closing under such other approved agreement, or (b) the Closing Deadline, and in either such event, this Agreement shall terminate and the Deposit shall be immediately returned to Buyer without any further action required from Buyer, Seller or Trustee.

10.     Damage or Destruction Prior to the Closing. In the event that the Real Property should be damaged by any casualty prior to the Closing, then Seller shall promptly provide Buyer with written notice of such casualty. If the cost of repairing such damage, as estimated by an architect or contractor retained pursuant to the mutual agreement of the parties (the "**Cost of Repairs**"), is (a) less than Five Hundred Thousand Dollars ($500,000), the Closing shall proceed as scheduled and any insurance proceeds, plus the cash amount of any associated deductible, shall be paid *over* to Buyer; or (b) greater than Five Hundred Thousand Dollars ($500,000), then Buyer may in its discretion either (i) elect to terminate this Agreement, in which case the Deposit shall be returned to Buyer without any further action required from either party and neither party shall have any further obligation to the other or (ii) proceed to the Closing in which event any insurance proceeds, plus the cash amount of any associated deductible, shall be paid over to Buyer. If the casualty is uninsured, Buyer may terminate this Agreement unless Buyer receives a credit against the Purchase Price equal to the Cost of Repairs. The foregoing notwithstanding, if any casualty results in the right of cancellation of, or rental abatement under, any Lease, Buyer shall have the option to terminate this Agreement without regard to the cost of repairs. Any notice required to terminate this Agreement pursuant to this Paragraph shall be delivered no later than thirty (30) days following Buyer's receipt of Seller's notice of such casualty.

11.     Eminent Domain. If, before the Closing Date, proceedings are commenced for the taking by exercise of the power of eminent domain of all or a material part of the Real Property which, as reasonably determined by Buyer, would render the Real Property unacceptable to Buyer or unsuitable for Buyer's intended use, Buyer shall have the right, by giving written notice to Seller within thirty (30) days after Seller gives notice of the commencement of such proceedings to Buyer, to terminate this Agreement, in which event this Agreement shall automatically terminate, the Deposit shall be returned to Buyer without any further action required from either party and neither party shall have any continuing obligations hereunder. If, before the Closing Date, proceedings are commenced for the taking by exercise of the power of eminent domain of less than a material part of the Real Property, or if Buyer has the right to terminate this Agreement pursuant to the preceding sentence but Buyer does not exercise such right, then this Agreement shall remain in full force and effect and, on the Closing Date, the condemnation award (or, if not theretofore received, the right to

13

receive such portion of the award) payable on account of the taking shall be assigned, or paid to, Buyer. Seller shall give written notice to Buyer within three (3) business days after Seller's receiving notice of the commencement of any proceedings for the taking by exercise of the power of eminent domain of all or any part of the Real Property. The foregoing notwithstanding, if the taking results in the right of cancellation of, or rent abatement under, any Lease, Buyer shall have the option to terminate this Agreement.

12.    <u>Notices</u>. All notices, demands, or other communications of any type given by any party hereunder, whether required by this Agreement or in any way related to the transaction contracted for herein, shall be void and of no effect unless given in accordance with the provisions of this Paragraph. All notices shall be in writing and delivered to the person to whom the notice is directed, either (a) in person, (b) by telecopy, or (e) by a nationally recognized overnight delivery courier. Notices delivered in person shall be deemed received upon delivery or refusal thereof; notices delivered by telecopy shall be deemed received upon receipt of confirmation of transmission; and notices delivered by overnight courier shall be deemed received on the business day following transmission.  Notices shall be given to the following addresses (or at such other address, or addresses, as the party entitled to receive such notice may provide in writing to the other party):

| For Seller: | Grand Centreville, LLC |
| | c/o Black Creek Consulting, Ltd. |
| | 745 Herald Harbor Road |
| | Crownsville, MD 21032 |
| | Attn: Michael Schuett, President |
| | Fax: (410) 923-1586 |
| | |
| And a copy to: | Lizabeth Lee Walther, Esq. |
| | 105 N. Main Street, Suite 241F |
| | Culpeper, VA  22701 |
| | Fax: 540-825-6921 |
| | |
| For Buyer: | c/o The JBG Companies |
| | 4445 Willard Avenue, Suite 400 |
| | Chevy Chase, MD 20815 |
| | Attn: Michael Majestic and Legal Department |
| | Fax: (240) 333-3610 |
| | |
| And a copy to: | Arent Fox LLP |
| | 1717 K Street NW |
| | Washington, DC 20006-5344 |
| | Attn: David Martin, Esq. |
| | Fax: (202) 857-6395 |
| | |
| For Trustee: | Raymond A. Yancey |
| | 1205 Tulane Drive |
| | Alexandria, Virginia  22307 |

14

and

Raymond A. Yancey
1412 Colville Court
St. Augustine, Florida  32095

And a copy to:

Whiteford Taylor & Preston, LLP
3190 Fairview Park Drive, Suite 300
Falls Church, Virginia  22042
Attn: Bradford F. Englander, Esq.
Fax:  (703) 280-3370

13.    Remedies.

13.1.    Defaults by Seller. If there is any material default by Seller or Trustee under this Agreement, following written notice to Seller and Trustee and seven (7) days thereafter during which period Seller or Trustee, as applicable, may cure the default, Buyer may at its option, either (a) declare this Agreement terminated in which case the Deposit shall be returned to Buyer without any further action required from Buyer, Seller or Trustee, or (b) treat the Agreement as being in full force and effect and bring an action against Seller and Trustee for specific performance. The foregoing notwithstanding, no right to cure shall extend the Closing Date.

13.2.    Defaults by Buyer. If there is a material default by Buyer of its obligation to close under this Agreement, following written notice to Buyer and seven (7) days thereafter during which period Buyer may cure the default, Seller may, as its sole remedy, declare this Agreement terminated, in which case the Deposit shall be paid to Seller as liquidated damages and each party shall thereupon be relieved of all further obligations and liabilities, except any which survive termination; provided, however, Seller and Trustee shall have no right to terminate this Agreement or retain the Deposit pursuant to this provision unless all of the conditions precedent to Buyer's obligation to close have been fully satisfied and the Seller and Trustee are otherwise ready, willing and able to close.

14.    Assignment. Except as set forth in this Paragraph, neither party may assign its rights or obligations under this Agreement to any person or entity without the written consent of the other party.  Buyer may, without the consent of Seller, (i) direct that the Deed be granted to an entity controlled by, controlling or under common control with Buyer (a "**Buyer Affiliate**") by notice to Seller or (ii) assign its rights under this Agreement to a Buyer Affiliate.  No assignment or transfer by Buyer will release Buyer of its obligations under this Agreement through Closing, but the assigning Buyer shall be released of all liabilities hereunder accruing from and after Closing. The Seller may assign its rights to any person or entity that is a successor of the Seller pursuant to a plan or order of the Bankruptcy Court.

15.    Interpretation and Applicable Law. This Agreement shall be construed and interpreted in accordance with the laws of the state where the Real Property is located. Where required for proper interpretation, words in the singular shall include the plural; the masculine gender shall include the neuter and the feminine, and vice versa. The terms "successors and assigns" shall include the heirs, administrators, executors, successors, and assigns, as applicable, of any party hereto.

15

16.    Amendment. This Agreement may not be modified or amended, except by an agreement in writing signed by the parties. The parties may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions and obligations.

17.    Entire Agreement; Survival. This Agreement (and the items to be furnished in accordance herewith) constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No representation, warranty, covenant, agreement, or condition not expressed in this Agreement shall be binding upon the parties hereto nor shall affect or be effective to interpret, change, or restrict the provisions of this Agreement. The obligations of the parties hereunder and all other provisions of this Agreement shall survive the Closing or earlier termination of this Agreement, except as expressly limited herein.

18.    Counterparts; PDF. This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute the entire agreement of the parties. Signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures. Each party intends to be bound by such party's facsimile or "PDF" format signature on this Agreement, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Agreement based upon the form of signature.

19.    Acceptance. Time is of the essence of this Agreement. If the final date of any period falls upon a Saturday, Sunday, or legal holiday under the Federal law or laws of the state where the Real Property is located, then in such event the expiration date of such period shall be extended to the next day which is not a Saturday, Sunday, or legal holiday under Federal law or the laws of the state where the Real Property is located.

20.    Real Estate Commission. Except for KLNB, LLC who Seller has engaged to serve as its broker for this transaction **("Seller's Broker")**; each of the parties represent and warrant to the other that neither Seller nor Buyer has contacted or entered into any agreement with any real estate broker, agent, finder or any other party in connection with this transaction, and that neither party has taken any action which would result in any real estate broker's, finder's or other fees or commissions being due and payable to any party with respect to the transaction contemplated hereby. Each party hereby indemnifies and agrees to hold the other party harmless from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) resulting to the other party by reason of a breach of the representation and warranty made by such party in this Paragraph.

*21.*    Further Assurances.  Seller, Trustee and Buyer agree to (i) perform such other acts, and to execute, acknowledge and deliver, such other instruments, documents and other materials as the other party may reasonably request or as shall otherwise be necessary in order to effect the consummation of the transactions contemplated by this Agreement, and (ii) to provide further assurances of any transfer, conveyance or assignment made pursuant to this Agreement after the Closing.  The provision of this Paragraph 21 shall survive the Closing for a period of one year.

16

## SIGNATURE PAGE FOR AGREEMENT FOR PURCHASE
## AND SALE OF REAL PROPERTY

WITNESS THE FOLLOWING SIGNATURES & SEALS:

**SELLER:**  GRAND CENTREVILLE, LLC, a Virginia limited
liability company

By:  GRAND FORMATION INC., Its Manager

By:  BLACK   CREEK   CONSULTING,
LTD., Its Court-Appointed Receiver

By:  _____ (SEAL)
Michael Schuett, President

Date: _____

**BUYER:**  JBG ASSOCIATES, L.L.C.,
a Delaware limited liability company

By:  JBG/Company Manager IV, L.L.C.,
its Managing Member

By:  _____ (SEAL)
Name: _____
Title: _____

Date: _____

**TRUSTEE:**

_____ (SEAL)
Raymond A. Yancey, Trustee

Date: _April 14, 2015_____

S-1

## SIGNATURE PAGE FOR AGREEMENT FOR PURCHASE
## AND SALE OF REAL PROPERTY

WITNESS THE FOLLOWING SIGNATURES & SEALS:

**SELLER:**        GRAND CENTREVILLE, LLC, a Virginia limited liability company

By:    GRAND FORMATION INC., Its Manager

       By:    BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver

          By:    _____ (SEAL)
                 Michael Schuett, President

Date: _____

**BUYER:**        JBG ASSOCIATES, L.L.C.,
a Delaware limited liability company

By:    JBG/Company Manager IV, L.L.C.,
its Managing Member

By: _____ (SEAL)
Name: _JAY KLUG_
Title: _Authorized Signatory_
Date: _4/14/15_

**TRUSTEE:**

_____ (SEAL)
Raymond A. Yancey, Trustee

Date:_____

## SIGNATURE PAGE FOR AGREEMENT FOR PURCHASE
## AND SALE OF REAL PROPERTY

WITNESS THE FOLLOWING SIGNATURES & SEALS.

**SELLER:**  GRAND CENTREVILLE, LLC, a Virginia limited
liability company

By:  GRAND FORMATION INC., Its Manager

By:  BLACK  CREEK  CONSULTING,
LTD., Its Court-Appointed Receiver

By:  _____ (SEAL)
Michael Schuett, President

Date: ___April 14, 2015___

**BUYER:**  JBG ASSOCIATES, L.L.C.,
a Delaware limited liability company

By:  JBG/Company Manager IV, L.L.C.,
its Managing Member

By: _____ (SEAL)
Name: _____
Title: _____

Date: _____

**TRUSTEE:**

_____ (SEAL)
Raymond A. Yancey, Trustee

Date: _____

S-1

## List of Exhibits

| | | |
|---|---|---|
| Exhibit A | - | Legal Description |
| Exhibit B | - | Escrow Agreement |
| Exhibit C | - | Assignment and Assumption Agreement |
| Exhibit D | - | Special Warranty Deed |
| Exhibit E | - | Bill of Sale |
| Exhibit F | - | Tenant Notice Letters |
| Exhibit G | - | Seller Certification |
| Exhibit H | - | FIRPTA |
| Exhibit I | - | Mark up of Title Commitment |
| Exhibit J | - | Tenant Estoppel Certificate |
| Exhibit K | - | Major Tenant List |
| Exhibit L | - | Rent Roll |

## EXHIBIT A

### Legal Description of the Real Property

All that certain land situate in the County of Fairfax, Virginia, and more particularly described as follows:

Beginning at a found spike, said spike lying on the northerly right of way line of Braddock Road (Route 7759), and also the southeasterly most corner of Parcel A-3 , thence departing the said right of way and running with the line of Parcel A-3 and A-2 the following courses:

N. 25° 52' 22" E., a distance of 232.50 feet to a found nail;

thence northeasterly, a distance of 94.00 feet along a non tangent curve to the right of which the radius point lies S. 64° 07` 39" E. a radius of 435.91 feet, and having a central angle of 12° 21' 19" to a found nail;

thence N. 51° 46' 31" W., a distance of 97.60 feet to an iron pipe found;

N. 25° 52' 22" E., a distance of 48.34 feet to a found nail;

thence N. 64° 07' 38" W ., a distance of 147.13 feet to a found nail;

thence N. 59° 26' 59" W., a distance of 174.12 feet to a found nail;

thence N. 30° 33' 01" E., a distance of 5.50 feet to a found nail;

thence N. 59° 26' 59" W., a distance of 160.00 feet to a found nail, said nail lying on the easterly right of way line of Old Centreville Road (Route 898);

thence running with the said right of way line the following courses:

N. 30° 33' 01" E., a distance of 36.31 feet to an iron pipe found;

thence N. 31° 06' 13" E., a distance of 241.33 feet to an iron pipe found;

thence leaving the easterly line of Old Centreville Road (Route 898) and continuing with the southerly line of Lee Highway (Rte 29 and 2ll) northeasterly, a distance of 196.08 feet along a curve to the right having a radius of 299.86 feet and a central angle of 37° 28' 00" to a point;

thence N. 87°14' 26" E., a distance of 190.80 feet to a point, thence departing the said right of way of Lee Highway and running with the southerly line of Outlot A, Old Centreville Crossing;

S. 36° 51' 00" E., a distance of 115.94 feet, to an iron pipe found, thence

S. 33°55' 31" E., a distance of 122.29 feet, to an iron pipe found, thence departing the line of Outlot A, Old Centreville Crossing and running with the southerly line of Spindle Court the following courses:

A-1

113.72 feet along a non tangent curve to the left of which the radius point lies S. 51°22'55"E. a radius of 50 .00 feet, and having a central angle of 130° 18' 49" to an iron pipe found;

thence southeasterly, a distance of 25.21 feet along a reverse curve to the right having a radius of 25.00 feet and a central angle of 57° 46' 37" to an iron pipe found;

thence S. 33° 55' 31" E., a distance of 268.79 feet to an iron pipe found;

thence S. 41° 02' 43" E., a distance of 254.86 feet to an iron pipe found;

thence S. 40° 57' 52" E., a distance of 63.95 feet to an iron pipe found;

thence S. 48° 51' 53" E., a distance of 139.24 feet to an iron pipe found;

thence S. 41° 08' 07" W., a distance of 10.00 feet to an iron pipe found;

thence southeasterly, a distance of 126.99 feet along a non tangent curve to the right of which the radius point lies S. 41° 08' 16" W. a radius of 277.00 feet, and having a central angle of 26° 16' 04" to an iron pipe found;

thence, leaving the right of way and running with the northerly right of way of Braddock Road the following courses:

southerly, a distance of 62.89 feet along a compound curve to the right having a radius of 40.00 feet and a central angle of 90° 05' 00" to an iron pipe found;

thence southwesterly, a distance of 96.79 feet along a reverse curve to the left having a radius of 501.00 feet and a central angle of 11° 04' 09" to an iron pipe found;

thence S. 56° 25' 11" W., a distance of 102.29 feet to an iron pipe found;

thence westerly, a distance of 447.23 feet along a non tangent curve to the right of which the radius point lies N.33° 34' 50" W. a radius of 431.00 feet, and having a central angle of 59° 27' 12" to a found spike;

thence N. 64° 07' 38" W., a distance of 301.81 feet to the point of beginning.

Containing 692,074.64 square feet or 15.8878 acres, more or less.

Together with easements for ingress and egress, parking and storm water management upon Parcels A-2 and A-3, property of William A. Moran, Trustee, as the same is duly platted, subdivided and recorded by Deed of Consolidation, Subdivision and Easement recorded in Deed Book 7095 at Page 1, and as corrected in Deed Book 7278 at page 1342 and as further corrected in Deed Book 7293 at page 1448, all among the land records of Fairfax County Virginia.

A-2

## EXHIBIT B

## ESCROW AGREEMENT

**GRAND CENTREVILLE, LLC**, a Virginia limited liability company ("**Seller**"), **JBG Associates, L.L.C.**, a Delaware limited liability company ("**Purchaser**"), and **COMMONWEALTH LAND TITLE INSURANCE COMPANY**, a Nebraska corporation ("**Escrow Agent**"), hereby enter into this ESCROW AGREEMENT (this "**Agreement**") as of April _14_, 2015.  Reference is made to that certain Agreement for Purchase and Sale of Real Property dated as of April _14_, 2015 (the "**Purchase Agreement**") between Seller and Purchaser.  The defined terms used in this Agreement but not defined in this Agreement shall have the meanings set forth in the Purchase Agreement.

Purchaser and Seller have agreed to select Escrow Agent to serve as escrow agent with respect to the Deposit to be made by Purchaser pursuant to the Purchase Agreement.  The purpose of this Agreement is to prescribe instructions governing the services of Escrow Agent with respect to the Deposit and the Closing.

Seller and Purchaser hereby engage Escrow Agent to serve as escrow agent with respect to the Deposit made by Purchaser pursuant to the terms of the Purchase Agreement.  A copy of the Purchase Agreement has been delivered to Escrow Agent.  Escrow Agent hereby accepts such engagement.

Upon receipt of the Deposit, to the extent the Deposit is in the form of cash, Escrow Agent agrees to place the Deposit into an interest-bearing escrow account and to notify Purchaser and Seller of the location and number of such interest-bearing account or otherwise invest the Deposit in a manner approved by the Purchaser.  Interest shall be maintained in the escrow account as a part of the Deposit and credited to Purchaser for tax purposes.  Purchaser's Federal Taxpayer Identification Number is _14-1880506_

Escrow Agent shall disburse the Deposit and any interest earned on the Deposit in accordance with the terms and conditions of the Purchase Agreement.

If there is a dispute regarding the disbursement or disposition of the Deposit or the interest earned on the Deposit, or if Escrow Agent shall receive conflicting written demands or instructions with respect to the Deposit, then Escrow Agent shall withhold such disbursement or disposition until notified by Purchaser and Seller that such dispute is resolved, or Escrow Agent may file a suit of interpleader, and the cost and expense of filing such interpleader action shall be divided equally between Seller and Purchaser.

Escrow Agent shall not be liable for any damage, liability or loss arising out of or in connection with the services rendered by Escrow Agent pursuant to this Agreement unless the same results from the gross negligence, or willful misconduct of Escrow Agent.

Copies of all notices given by any party under this Agreement shall be delivered in accordance with the provisions of <u>Article 11</u> of the Purchase Agreement to all other parties to this Agreement, to the following addresses:

If to Purchaser:                        c/o The JBG Companies
                                        4445 Willard Avenue
                                        Suite 400
                                        Chevy Chase, MD 20815
                                        Attn:  Michael Majestic <u>and</u> Legal
                                        Department
                                        Phone:  (240) 333-3602
                                        Facsimile:  (240) 333-3610

with a copy to:                         Arent Fox LLP
                                        1717 K Street NW
                                        Washington, DC 20006-5344
                                        Attn:   David Martin, Esq.
                                        Phone:  (202) 857 6109
                                        Facsimile:  (202) 857-6395

If to Seller:                           Grand Centreville, LLC
                                        c/o Black Creek Consulting, Ltd.
                                        745 Herald Harbor Road
                                        Crownsville, MD 21032
                                        Attn:  Michael Schuett, President
                                        Phone:  _____
                                        Facsimile:  (410) 923-1586

with a copy to:                         Lizabeth Lee Walther, Esq.
                                        105 N. Main Street, Suite 241F
                                        Culpeper, VA  22701
                                        Phone:  (540) 825-6787
                                        Facsimile:  (540) 825-6921

If to Escrow Agent:                     Commonwealth Land Title Insurance
                                        Company
                                        1015 15th Street, N.W., Suite 300
                                        Washington, D.C. 20005
                                        Attn:  Sarah Eckert Webb, Esq.
                                        Phone:  (202) 312-5119
                                        Facsimile  (202) 737-4108

Notice given by counsel to a party to this Agreement shall be considered notice given by such party.  Any party to this Agreement, its counsel or the Escrow Agent may designate a different address for itself by notice given in the manner set forth above.  Any notice or demand shall be deemed to have been given upon actual delivery (or refusal of delivery).

The instructions contained in this Agreement may not be modified, amended or altered in any way except by a writing (which may be in counterpart copies) signed by Seller, Purchaser and Escrow Agent.

Purchaser and Seller reserve the right, at any time and from time to time, to substitute a new escrow agent in place of Escrow Agent.

This Agreement is intended solely to supplement and implement the provisions of the Purchase Agreement and is not intended to modify, amend or vary any of the rights or obligations of Purchaser or Seller under the Purchase Agreement.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; provided, however, in no event shall this Agreement be effective unless and until signed by all parties to this Agreement.  Facsimile signatures shall be deemed to be the equivalent of original signatures for purposes of this Agreement.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of the date first written above.


SELLER:

GRAND CENTREVILLE, LLC,
a Virginia limited liability company

By:    GRAND FORMATION INC., Its Manager

       By:    BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver


          By:    _____
                Michael Schuett, President



PURCHASER:

JBG ASSOCIATES, L.L.C.,
a Delaware limited liability company

By:    JBG/Company Manager IV, L.L.C.,
       its Managing Member

       By:    _____
          Name: _JAY KLUG_
          Title: _Authorized Signatory_



*[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]*



B-4

<u>ESCROW AGENT</u>:

**COMMONWEALTH    LAND    TITLE
INSURANCE    COMPANY**, a    Nebraska
corporation


By: _____
Name: _____
Title: _____

## EXHIBIT C

### SSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement"), dated effective as of _____, 2015, by and between GRAND CENTREVILLE, LLC, a Virginia limited liability company ("Assignor"), and [JBG ASSOCIATES, L.L.C.], a Delaware limited liability company ("Assignee") .

WHEREAS, Assignor, as seller, and JBG ASSOCIATES, L.L.C., a Delaware limited liability company, as buyer ("Buyer"), entered into that certain Agreement For Purchase and Sale of Real Property dated April __, 2015 ( the "Agreement") for the sale and purchase of the Property (as defined in the Agreement); and

WHEREAS, Buyer assigned its rights under the agreement to Assignee pursuant to that certain Assignment of Agreement For Purchase and Sale of Real Property dated _____, 2015;

WHEREAS, Assignor desires to grant, transfer and assign unto Assignee all of Assignor's right, title and interest in and to the Leases, the Tenant Security Collateral and the Designated Contracts, as hereinafter provided; and

WHEREAS, Assignee desires to assume the duties and obligations of Assignor with respect to the Leases, Tenant Security Collateral, Designated Contracts and Permits with respect to the period on and following the date hereof.

NOW, THEREFORE, in accordance with the Agreement and in consideration of the sum of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the parties do hereby covenant and agree as follows and take the following actions:

1.    All capitalized terms not defined herein shall be as defined in the Agreement.

2.    Assignor does hereby grant, transfer and assign with special warranty unto Assignee all of the Assignor's right, title and interest in and to the following property, free and clear of liens, claims and encumbrances:

(a)    any and all leases, licenses, or other agreements pursuant to which a person or entity (collectively, "Tenants") has a right to occupy part of the Real Property (collectively, "Leases"), as described in the Rent Roll ("Rent Roll") attached hereto as **Exhibit A**, together with all cash or letter of credit security deposits (the "Security Deposits"), guaranties or other security collateral securing the obligations of the Tenants

C-1

under the Leases (the "Security Deposits, guaranties, and other security collateral collectively, the "Tenant Security Collateral"); and

(b)      the maintenance and service contracts which relate to the Property listed on **Exhibit B** attached hereto ("Designated Contracts"); and

(c)      to the extent transferable, any and all building permits, certificates of occupancy and other certificates, permits, licenses and approvals relating to the Property (the "Permits").

3.      Assignee hereby assumes, and agrees to be bound by, all of the covenants, agreements and obligations of Assignor arising with respect to the period on and after Closing Date under (a) the Leases, (b) the Tenant Security Collateral, (c) the Designated Contracts, and (d) the Permits; and Assignee further assumes all liability of Assignor for the proper refund or return of the Security Deposits if, when, and as required by, the Leases or otherwise by law.

5.      This Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Agreement and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the Commonwealth of Virginia.

[end of text; signature page follows]

C-2

**ASSIGNOR:**  GRAND CENTREVILLE, LLC, a Virginia limited liability company

By:  GRAND FORMATION INC., Its Manager

By:  BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver

By:  _____
Michael Schuett, President

Date: _____

**ASSIGNEE:**  [JBG ASSOCIATES, L.L.C.], a Delaware limited liability company

By:  JBG/Company Manager IV, L.L.C., its Managing Member

By:  _____
Name: _____
Title: _____

Date: _____

C-3

Exhibit A
Rent Roll

Exhibit B
Designated Contracts

## EXHIBIT D

### SPECIAL WARRANTY DEED

Prepared in the Commonwealth of Virginia by:

L.L. Walther, Esq. (VSB No. 23880)                          Consideration: $55,500,000.00
105 N. Main St, Suite 241F, Culpeper, VA 22701

Tax Map No. 0544-01-0087H                                    Assessed Value: $41,443,410.00

Exemption claimed: THIS INSTRUMENT IS EXEMPT FROM TAXATION UNDER TITLE 11 OF THE UNITED STATES CODE SECTION 1146, AS AN INSTRUMENT EXECUTED PURSUANT TO A BANKRUPTCY COURT ORDER TO EFFECUTATE A PLAN OF REORGANIZATION.

THIS DEED, made effective as of the ___ day of _____, 2015, by and between **GRAND CENTREVILLE, LLC**, a Virginia limited liability company ("**Grantor**"); and [**JBG ASSOCIATES, L.L.C.**], , a Delaware limited liability company ("**Grantee**"), whose mailing address is c/o The JBG Companies, 4445 Willard Road, Chevy Chase, Maryland 20815.

WHEREAS, on or about August 2, 2013, the Grantor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code, in the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division ("Bankruptcy Court"), being Case No._____; and

WHEREAS, [Insert recitals about PSA, Bankruptcy Plan Approval and tax exemption; attach copy of Court Order].

NOW, THEREFORE, WITNESSETH THAT for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt of which are hereby acknowledged, the Grantor does hereby grant and convey unto the Grantee, with Special Warranty, all right, title and interest of the Grantor in and to that certain real property located in the County of Fairfax, Virginia, and more particularly described on Exhibit A attached hereto, together with all improvements thereon and all rights and appurtenances pertaining to such real property, including, without limitation, all of Grantor's right, title and interest in and to (i) all minerals, oil,

gas and other hydrocarbon substances thereon, (ii) all easements, privileges and hereditaments, whether or record or not, and (iii) all access, air, water, riparian, development, utility and solar rights (collectively, the "**Property**").

TO HAVE AND TO HOLD the Property in fee simple, for the use, benefit and behoof of Grantee, its successors and assigns.

This conveyance is made subject to easements, conditions and restrictions of record insofar as they may lawfully affect the Property conveyed hereby.

Grantor agrees to warrant specially the title to the Property conveyed hereby, and to grant such further assurances of such grant as may be necessary or appropriate.

[Add free and clear provisions from Confirmation Order.]

IN WITNESS WHEREOF, the undersigned Grantor has caused this Special Warranty Deed to be executed as of the date first written above:

GRAND CENTREVILLE, LLC, a Virginia limited liability company

By:    GRAND FORMATION INC., Its Manager

By:    BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver

By:    _____
_____(SEAL)
Michael Schuett, President

STATE/COMMONWEALTH OF _____
CITY/COUNTY OF _____ to wit:

I HEREBY CERTIFY that on this the ____ day of _____, 20__, before me, the Subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared MICHAEL SCHUETT, personally well known to me (or proven satisfactorily) to be the person who executed the foregoing instrument, and acknowledged himself to be the PRESIDENT of BLACK CREEK CONSULTING, LTD., a Maryland corporation, itself the Court-Appointed Receiver for GRAND FORMATION INC., a Virginia corporation, the MANAGER of GRAND CENTREVILLE, LLC, a Virginia limited liability company, and acknowledged that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

[Seal]

_____
Notary Public
Name: _____

Notary Registration Number: _____
My Commission Expires: _____

D-3

# EXHIBIT E

## ASSIGNMENT AND BILL OF SALE

KNOW ALL MEN BY THE PRESENTS that GRAND CENTREVILLE, LLC, a Virginia limited liability company (referred to herein as "Seller"), in consideration of the sum of Ten Dollars ($10.00) paid in hand, and for other good and valuable consideration paid by [JBG ASSOCIATES, L.L.C.], a Delaware limited liability company (hereinafter referred to as "Buyer"), the receipt and sufficiency of which is hereby acknowledged, has hereby granted, bargained, assigned, sold, conveyed, transferred, and delivered and by these presents does confirm the bargain, assignment, sale, grant, conveyance, transfer, and delivery (collectively the "Transfer") unto Buyer, the following assets now located at or applicable to certain real property situated in Centreville, Virginia, located at 13810 – 13860 Braddock Road and commonly known as the Old Centreville Crossing Shopping Center (the "Real Property"), consisting of the following (collectively, the following is hereinafter referred to as the "Personal Property"):

All tangible and intangible personal property owned by Seller located on or used in connection with the Real Property, including, specifically, without limitation, the equipment, furniture, tools and supplies listed on **Exhibit A** attached hereto, and any website maintained by Seller and all related intangibles including Seller's interest in the common name of the Real Property;

TO HAVE AND TO HOLD unto Buyer, its successors, administrators and assigns forever;

ALL ITEMS OF PERSONAL PROPERTY BEING TRANSFERRED HEREUNDER ARE BEING SOLD "AS IS," AND WITHOUT ANY REPRESENTATION, PROMISE OR WARRANTY (EXPRESSED OR IMPLIED AND WHETHER DEALING WITH MERCHANTABILITY, FITNESS FOR USE OR OTHERWISE) BY SELLER WHATSOEVER, EXCEPT THAT SELLER OWNS THE SAME FREE AND CLEAR OF ANY LIENS, CLAIMS AND ENCUMBRANCES AND HAS FULL POWER AND AUTHORITY TO CONVEY THE SAME TO BUYER;

E-1

AND THE SELLER DOES FOR ITSELF, its executors, administrators, and assigns covenant and agree with Buyer, its successors, administrators and assigns to warrant and defend the title to the Personal Property, against all and every person and persons whomsoever; and

THE SELLER DOES agree to execute such further assurances of the Transfer as may be requisite.

IN WITNESS WHEREOF, we have hereunto set our hand and seal effective as of the __ day of _____, 2015.

SELLER:

GRAND CENTREVILLE, LLC, a Virginia limited liability company

By:   GRAND FORMATION INC., Its Manager

     By:   BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver

         By:   _____
              Michael Schuett, President

STATE/COMMONWEALTH OF _____
CITY/COUNTY OF _____ to wit:

I HEREBY CERTIFY that on this the ___ day of _____, 20__, before me, the Subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared MICHAEL SCHUETT, personally well known to me (or proven satisfactorily) to be the person who executed the foregoing instrument, and acknowledged himself to be the PRESIDENT of BLACK CREEK CONSULTING, LTD., a Maryland corporation, itself the Court-Appointed Receiver for GRAND FORMATION INC., a Virginia corporation, the MANAGER of GRAND CENTREVILLE, LLC, a Virginia limited liability company, and acknowledged that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

[Seal]

          _____
          Notary Public
          Name: _____

Notary Registration Number: _____
My Commission Expires: _____

EXHIBIT A
List of Equipment, Furniture, Tools and Supplies

## EXHIBIT F

## FORM OF TENANT NOTICE LETTER

_____, 2015

[Tenant]

_____

**Re:    Old Centreville Crossing Shopping Center, 13810 -13860 Braddock Road, Centreville, VA (the "Property")**

Ladies and Gentlemen:

As of _____, 2015, Grand Centreville, LLC, a Virginia limited liability company ("**Former Owner**"), has transferred all of its interest in and to the Property to _____, a _____ ("**New Owner**"). Consequently, New Owner is now the "landlord" or "lessor" ("**Landlord**") under your lease with respect to the Property. New Owner has assumed all obligations of the Landlord under your lease arising on or after _____, 2015, and has selected _____ ("**Manager**") to manage the Property.

Future rental payments with respect to your leased premises in the Property should be made payable to "_____" and should be mailed to _____ Attention: _____.

**[INSERT IF THERE IS A SECURITY DEPOSIT BEING TRANSFERRED:** Please be advised that the security deposit under your lease in the amount of $_____ and the accrued interest thereon, if any, in the amount of $_____, and prepaid rent, if any, in the amount of $_____, have been transferred to New Owner, who acknowledges receipt of the same.]

By this letter, and in accordance with the terms of your Lease, Former Owner and New Owner are hereby notifying you, as of the date of this letter, that all notices and any other correspondence of any kind should be sent to the following addresses:

Please provide New Owner, within ten (10) business days, a copy of your Certificate of Insurance showing all coverage presently in effect. The certificate must be revised to reflect that New Owner [and Manager] are named as additional insureds under your policy. The additional insured designation should appear in the block on the certificate for "Description of Operations/Location/Vehicles/Restrictions Special Items." The address shown on the certificate should be the address set forth above for receipt of notices. In addition, the certificate should provide that the insurance company will

F-1

provide thirty (30) days' written notice of any cancellation, termination, or modification of such coverage directly to New Owner as an additional insured.  If you have questions regarding this change to your insurance policy, please send a copy of these paragraphs to your insurance agent or call [New Owner or Manager].]

Sincerely yours,

**FORMER OWNER:**

GRAND CENTREVILLE, LLC,
a Virginia limited liability company

By:  Grand Formation Inc., Its Manager

By:  BLACK CREEK CONSULTING, LTD., Its
Court-Appointed Receiver

By: _____
Michael Schuett, President

**NEW OWNER:**

[To be determined]

F-2

## Exhibit G

## SELLER CERTIFICATION

THIS SELLER CERTIFICATION ("Certification"), dated effective as of
_____, 2015 ("Effective Date"), given by GRAND CENTREVILLE, LLC,
a Virginia limited liability company ("Seller") to JBG ASSOCIATES, L.L.C., a
Delaware        limited        liability        company        ("Buyer")        and
_____, a Delaware limited liability company
("Assignee").

Seller and Buyer entered into that certain Agreement For Purchase and Sale of
Real Property dated April __, 2015, (the "PSA"). Capitalized terms not otherwise defined
herein shall have the meanings ascribed to them in the PSA. Buyer assigned its rights
under the PSA to Assignee pursuant to that certain Assignment of Agreement For
Purchase and Sale of Real Property dated _____, 2015.

As of the Effective Date, Seller certifies to Buyer and Assignee as follows:

1.      Attached hereto as **Exhibit A** is a true, correct and complete copy of the
Rent Roll for the Property.

2.      Seller hereby makes the following representations and warranties to Buyer
as of the date hereof:

[Insert Contract Representations]

3.      This Certification shall be (a) binding upon, and inure to the benefit of, the
parties to this Certification and their respective heirs, legal representatives, successors
and assigns, and (b) construed in accordance with the laws of the Commonwealth of
Virginia.

IN WITNESS WHEREOF, Seller has signed and delivered this Certification to be effective as of the date first set forth above.

GRAND CENTREVILLE, LLC, a Virginia limited liability company

By:   GRAND FORMATION INC., Its Manager

By:   BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver

By:   _____
Michael Schuett, President

**Exhibit A**
**Rent Roll**

## EXHIBIT H

### CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform [JBG ASSOCIATES, L.L.C.], that withholding of tax is not required upon the disposition of a U.S. real property interest by GRAND CENTREVILLE, LLC ("Transferor"), the undersigned hereby certifies the following on behalf of the Transferor:

1.    The Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.    The U.S. employer identification number of the Transferor is 20 0836022; and

3.    The    office    address    of    the    Transferor    is
_____.

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury the undersigned declares that he has examined this certification and to the best of his knowledge and belief it is true, correct and complete, and further declares that he has authority to sign this document on behalf of the Transferor in the representative capacity indicated below.

GRAND CENTREVILLE, LLC, a Virginia limited liability company

By:    GRAND FORMATION INC., Its Manager

By:    BLACK CREEK CONSULTING, LTD., Its Court-Appointed Receiver

By:    _____
       Michael Schuett, President
       Date: _____

H-1

# EXHIBIT I

## Mark up of Title Commitment

### SCHEDULE A

Revised - February 4, 2015

1.  Effective Date: **January 6, 2015**
    at 8:00 am

    Commitment No. A1400103-SG

2.  Policy or Policies to be issued:

    Amount

    (a)  ALTA Owner's
         Policy: ALTA 2006
         Policy Form ~~Proposed
         Insured:~~

    $ 5 5 , 5 0 0 , 0 0 0 . 0 0 ~~T B~~

    ~~D~~

    **JBG Associates, L.L.C., a Delaware limited
    liability company (or its permitted assigns)**~~TBD~~

    (b)  ALTA Loan Policy:
         ALTA 2006 Policy Form
         Proposed Insured:

3.  The estate or interest in the land described in this Commitment and covered herein is **Fee Simple**,
    and title hereto is at the effective date hereof vested in:

    **Grand Centreville, LLC, a Virginia limited liability company**

    **And being the same property acquired by virtue of instrument recorded in Deed Book 15792, at
    Page 1282.**

*(continued)*

*Countersigned:*

Walker Title, LLC
Phone (703) 591-2325, Fax (703) 591-2328
11781 Lee Jackson Memorial Hwy., Suite 300
Fairfax, Virginia 22033

By: _____ *(~sg)*
    Authorized Officer or Agent

*This commitment is invalid unless Insuring Provisions and Schedules A and B are attached.*

SCHEDULE A
*(continued)*

Commitment No. A1400103-SG

4.    The land referred to in this Commitment is described as follows:

All that certain land situate in the County of Fairfax, Virginia, and more particularly described as follows:

Beginning at a found spike, said spike lying on the northerly right of way line of Braddock Road (Route 7759), and also the southeasterly most corner of Parcel A-3 , thence departing the said right of way and running with the line of Parcel A-3 and A-2 the following courses:

N. 25° 52' 22" E., a distance of 232.50 feet to a found nail;

thence northeasterly, a distance of 94.00 feet along a non tangent curve to the right of which the radius point lies S. 64° 07' 39" E. a radius of 435.91 feet, and having a central angle of 12° 21' 19" to a found nail;

thence N. 51° 46' 31" W., a distance of 97.60 feet to an iron pipe

found; N. 25° 52' 22" E., a distance of 48.34 feet to a found nail;

thence N. 64° 07' 38" W ., a distance of 147.13 feet to a found nail;

thence N. 59° 26' 59" W., a distance of 174.12 feet to a found nail;

thence N. 30° 33' 0l" E., a distance of 5.50 feet to a found nail;

thence N. 59° 26' 59" W., a distance of 160.00 feet to a found nail, said nail lying on the easterly right of way line of Old Centreville Road (Route 898);

thence running with the said right of way line the following courses:

N. 30° 33' 0l" E., a distance of 36.31 feet to an iron pipe found;

thence N. 31° 06' 13" E., a distance of 241.33 feet to an iron pipe found;

thence leaving the easterly line of Old Centreville Road (Route 898) and continuing with the southerly line of Lee Highway (Rte 29 and 2ll)northeasterly, a distance of 196.08 feet along a curve to the right having a radius of 299.86 feet and a central angle of 37° 28' 00" to a point;

thence N. 87°14' 26" E., a distance of 190.80 feet to a point, thence departing the said right of way of Lee Highway and running with the southerly line of Outlot A, Old Centreville Crossing;

S. 36° 51' 00" E., a distance of 115 .94 feet; to an iron pipe found, thence

S. 33°55' 31" E., a distance of 122 .29 feet; to an iron pipe found, thence departing the line of Outlot A, Old Centreville Crossing and running with the southerly line of Spindle Court the following courses:

I-3

SCHEDULE A
*(continued)*

Commitment No. A1400103-SG

113.72 feet along a non tangent curve to the left of which the radius point lies S.51°22'55"E. a radius of 50 .00 feet, and having a central angle of 130° 18' 49" to an iron pipe found;

thence southeasterly, a distance of 25.21 feet along a reverse curve to the right having a radius of 25.00 feet and a central angle of 57° 46' 37" to an iron pipe found;

thence S. 33° 55' 3l" E., a distance of 268.79 feet to an iron pipe found;

thence S. 41° 02' 43" E., a distance of 254.86 feet to an iron pipe found;

thence S. 40° 57' 52" E., a distance of 63.95 feet to an iron pipe found;
thence S. 48° 51' 53" E., a distance of 139 .24 feet to an iron pipe found;

thence S. 41° 08' 07" W., a distance of 10.00 feet to an iron pipe found;

thence southeasterly, a distance of 126.99 feet along a non tangent curve to the right of which the radius point lies S. 41° 08' 16" W. a radius of 277.00 feet, and having a central angle of 26° 16' 04" to an iron pipe found;

thence, leaving the right of way and running with the northerly right of way of Braddock Road the following courses:

southerly, a distance of 62.89 feet along a compound curve to the right having a radius of 40.00 feet and a central angle of 90° 05' 00" to an iron pipe found;

thence southwesterly, a distance of 96.79 feet along a reverse curve to the left having a radius of 501.00 feet and a central angle of 11° 04' 09" to an iron pipe found;

thence S. 56° 25' 11" W., a distance of 102.29 feet to an iron pipe found;

thence westerly, a distance of 447.23 feet along a non tangent curve to the right of which the radius point lies N.33° 34' 50" W. a radius of 431.00 feet, and having a central angle of 59° 27' 12" to a found spike;

thence N. 64° 07' 38" W., a distance of 301.81 feet to the point of beginning.

Containing 692,074.64 square feet or 15.8878 acres, more or less.

Together with easements for ingress and egress, parking and storm water management upon Parcels A-2 and A-3, property of William A. Moran, Trustee, as the same is duly platted, subdivided and recorded by Deed of Consolidation, Subdivision and Easement recorded in Deed Book 7095 at Page 1, and as corrected in Deed Book 7278 at page 1342 and as further corrected in Deed Book 7293 at page 1448, all among the land records of Fairfax County Virginia.



**SCHEDULE B - SECTION 1**
**REQUIREMENTS**

Commitment No. **A1400103-SG**

[ALL REQUIREMENTS TO BE SATISFIED BY SELLER [GRAND CENTREVILLE, LLC]~~The following are~~
~~requirements to be complied with:~~

~~1.    Payment to or for the account of the grantors or mortgagors of the full consideration for the estate or~~
~~interest to be insured.~~

~~2.    Pay us the premium, fees and charges for the policy.~~

~~3.    Proper instrument(s) creating the estate or interest to be insured must be executed and duly filed for~~
~~record, to wit:~~

~~a.    Recordation of Deed from Grand Centreville, LLC, a Virginia limited liability~~
~~company to TBD.~~

~~4.    Receipt of satisfactory Owner/Seller Affidavit as to Mechanics' Liens and Possession stating that no~~
~~improvements have been made to or contracted for on captioned premises within the 120 days prior to~~
~~closing, and identifying parties entitled to possession of the property, if any.~~

~~5.    Payment and release of Deed of Trust from Grand Centreville, LLC, to Susan Longstreet, Trustee(s),~~
~~dated June 1, 2005, recorded in Deed Book 17368, page 271, securing of record CIBC Inc. the original~~
~~sum of $27,000,000.00.~~

~~Assignment of Leases and Rents recorded in Deed Book 17368, page 339.~~

~~Subordination, NonDisturbance and Attornment Agreement recorded in Deed Book 17368, page 350.~~

~~Assignment of Deed of Trust, Assignment of Leases and Rents and Security Agreement recorded in Deed~~
~~Book 19602, page 2141.~~

~~6.    Payment and release of Deed of Trust from Grand Centreville, LLC, to Washington Settlement Group,~~
~~LLC, Trustee(s), dated March 16, 2009, recorded in Deed Book 20347, page 664, securing of record~~
~~James V. Sohn and Yeon Han the original sum of $3,850,000.00.~~

~~7.    Termination of Financing Statement No. 05-000703, filed on June 7, 2005, among the financing statement~~
~~records of the jurisdiction in which insured property is located, showing Grand Centreville, LLC, as~~
~~debtor(s), and CIBC Inc., as secured party as it effects caption property.~~

~~Assignment filed October 16, 2007 as No. 07-000904.~~

~~Continuation filed December 18, 2009 as No. 09-001023.~~

~~Continuation filed January 9, 2015 as No. 2015-000029.~~

~~8.    Receipt of satisfactory evidence of issuance of proper Certificate of Organization for limited liability~~
~~company issued by the State Corporation Commission and Receipt of satisfactory evidence that the transaction,~~
~~including execution and delivery of instruments, is pursuant to and in accordance with valid operative terms and~~
~~provisions of Articles of Organization.~~

**SCHEDULE B - SECTION 2**
**EXCEPTIONS**

Commitment No. **A1400103-SG**

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

1.  Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this commitment.

2.  Taxes for the year 2015, a lien, but not yet due and payable.

3.  Covenants, conditions, restrictions (deleting any restrictions indicating any preference, limitation or discrimination based on race, color, sex, religion, handicap, familial status or national origin) as set forth in instrument recorded in Deed Book 7095, page 1, corrected in Deed Book 7278, page 1342, further corrected in Deed Book 7293, page 1448.

4.  Covenant as set forth in Permit to Fairfax County, Virginia recorded in Deed Book 8987, page 1838.

5.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 518, page 96.

6.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 519, page 52.

7.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 540, page 41.

8.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 1843, page 411.

9.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 2448, page 494.

10.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 2612, page 434.

11.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 816, page 325.

12.  Intentionally omitted.*Easement(s) to Virginia Electric and Power Company recorded in Deed Book 6768, page 1453.

13.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book 6891, page 1114.

14.  Easement(s) to American Telephone and Telegraph Company recorded in Deed Book H-8, page 232.

15.  Easement(s) to Virginia Electric and Power Company recorded in Deed Book P-12, page 372.

16.  Easement(s) to The Chesapeake and Potomac Telephone Company recorded in Deed Book H-9, page 498.

17.  Easement(s) to Fairfax County Water Authority recorded in Deed Book 2736, page 323.

18.  Easement(s) to Fairfax County Water Authority recorded in Deed Book 6825, page 449.

19.  Intentionally omitted.*Easement(s) to Fairfax County Water Authority recorded in Deed Book 9348, page 1153.

20.  Intentionally omitted.*Easement(s) to Fairfax County Water Authority recorded in Deed Book 9532, page 1120.

21.  Easement(s) to The Board of Supervisors of Fairfax County, Virginia, recorded in Deed Book 6839, page 1378.

22.  Easement(s) to The Board of Supervisors of Fairfax County, Virginia, recorded in Deed Book 7165, page 665.

23.  Easement for Public Street Dedication recorded in Deed Book 6908, page 740.

24._____Subject to Ingress-Egress Easement recorded in Deed Book 7095, page 1, corrected in Deed Book 7278, page 1342 and further corrected in Deed Book 7293, page 1448.

   **\*Does not affect property per survey prepared by Christopher Consultants and dated February 23, 2015.**

24.

**SCHEDULE B - SECTION 2**
*(continued)*

Commitment No. A1400103-SG

25. Non-Exclusive Parking Easement recorded in Deed Book 7095, page 1, corrected in Deed Book 7278, page 1342 and further corrected in Deed Book 7293, page 1448.

26. Subject to Ingress-Egress and Parking Easement Rights recorded in Deed Book 7285, page 1050.

27. Plat recorded in Deed Book 7095, page 1 shows the following:

   a) Note #4, Stormwater management pond

28. Intentionally omitted.** ~~Subject to Terms and Conditions of Memorandum of Lease between Old Centreville Crossing Limited Partnership, a Virginia limited partnership and William A. Moran, Trustee (Landlord) and Hechinger Company, a Delaware corporation (Tenant) as recorded November 20, 1987, in Deed Book 6900 at page 59. Assignment of Ground Lease between Hechinger Company, a Delaware corporation (Assignor) and Fidelity Exchange 1988 Limited Partnership, a Delaware limited partnership (Assignee), as recorded December 22, 1988, in Deed Book 7227 at page 1271. Deed of Memorandum of Lease between Fidelity Exchange 1988 Limited Partnership, a Delaware limited partnership (Landlord) and Hechinger Company, a Delaware corporation (Tenant), as recorded December 22, 1988, in Deed Book 7227 at page 1280. NOTE: During the term of the Lease title to the buildings and improvements located on the land demised under the Lease are vested in the Lessee and recorded in Deed Book 7227, page 1275.~~

29. Intentionally omitted.** ~~Subject to Terms and Conditions of Memorandum of Lease between Old Centreville Crossing Limited Partnership (Landlord) and Weis Markets, Inc. (Tenant) recorded in Deed Book 7301, page 766.~~

30. Easement(s) to Commonwealth of Virginia recorded in Deed Book 10949, page 1826, amended in Deed Book 12026, page 1989, further amended in Deed Book 12317, page 430 and final order in Deed Book 12301, page 1719.

31. Covenants as set forth in Deed recorded in Deed Book 15792, page 1282.

32. Intentionally omitted.** ~~Lease between FAI Old Centreville, LLC (Landlord) and the United States Post Office recorded in Deed Book 11178, page 164.~~

33. Rights of tenant, as tenant only, under Lease between Grande Centreville, LLC (Landlord) and Sake, Inc. recorded in Deed Book 17739, page 1722.

34. Rights of parties in possession, as tenants only, under unrecorded leases.

35. Subject to those matters shown on Survey by Brent E. Evans, LLS No. 2843, of Christopher Consultants, dated February 23, 2015, entitled "2011 ATLA/ACSM Land Title Survey on the land of Grand Centreville, LLC (Deed Book 23075, Page 1448)," including the following:

   [None]

~~35.~~ ~~Easements or claims of easements not shown by the public records, boundary line disputes, overlaps, encroachments, and any matters not of record which would be disclosed by an accurate survey and inspection of the premises. The coverage afforded by Covered Risk 2(c) is hereby deleted~~

All recorded documents referred to herein are recorded among the Land Records of the County of Fairfax, Virginia.

**\*\*These parties are no longer tenants at the property.**

## EXHIBIT J

## TENANT ESTOPPEL CERTIFICATE

[JBG Associates, LLC]
c/o The JBG Companies
44445 Willard Road, Suite 400
Chevy Chase, Maryland 20815

       Re:    Lease dated _____, 200___(the "Lease") between _____or its predecessor in interest ("Landlord") and _____("Tenant") for leased premises containing _____square feet (Suite No.　) (the "Leased Premises") located at Old Centreville Crossing Shopping Center, _____Braddock Road, Centreville, VA (the "Premises")

Ladies and Gentlemen:

       The undersigned, the Tenant under the referenced Lease, hereby certifies and confirms to and agrees with JBG ASSOCIATES, LLC, a Delaware limited liability company, its successors, assigns or nominee ("Buyer"), any lender providing financing to Buyer in connection with Buyer's purchase of the Premises ("Lender"), and Landlord, and their respective successors and assigns as follows:

       1.    The Lease is presently in full force and effect and has not been changed, altered, amended or modified except as follows: _____; the term "Lease" as used herein means the original Lease together with all amendments and other agreements referred to above. The Lease represents the entire agreement between Landlord and Tenant. A complete copy of the Lease is attached to this certificate, as Exhibit A.

       2.    The term of the Lease commenced on _____, ____, and shall expire on _____, 20__.

       3.    The Landlord has fulfilled all of its obligations under the Lease to date, including without limitation (i) completion of the improvements and the space required to be completed by Landlord to date according to the Lease in accordance with the plans and specifications therefor approved by Tenant and (ii) all Tenant finish and other construction costs or allowances payable by Landlord have been paid and no such costs are payable hereafter under the Lease. Landlord has satisfied all commitments, arrangements and understandings made to induce Tenant to enter into the Lease.

       4.    There are no existing defenses which Tenant has against enforcement of the Lease by Landlord. Tenant has not advanced any funds by or on behalf of Landlord, and Tenant is not entitled to any credit, offset or reduction in rent. There exists no default under the Lease by Tenant or, to Tenant's best knowledge, by Landlord. No controversy or dispute exists between Landlord and Tenant

       5.    Tenant's interest under the Lease has not been assigned, by operation of law or otherwise, and no sublease, concession agreement or license covering the Leased Premises or any portion thereof has been entered into by Tenant.

6.      The number of rentable square feet included within the Premises is _____.

7.      No monetary obligations of Tenant under the Lease, including, without limitation, rent have been prepaid.

8.      Tenant has delivered to Landlord a cash security deposit of $_____ which has not been returned to Tenant or any other party for the benefit of Tenant.

10.     The current fixed monthly rent under the Lease is $_____.

11.     Tenant is obligated to pay to landlord

[__]    its pro rata share of the common area operating expenses, including real estate taxes and insurance, for the Premises as set forth in the Lease.

[__]    its pro rata share of the common area operating expenses, including real estate taxes and insurance,

[__]    its pro rata share of real estate tax and insurance expenses less a base amount for the base year of ____.

12.     Tenant is in occupancy and is actually using the Leased Premises for the following purposes: _____.  Tenant has not given Landlord notice of its intention to vacate the Leased Premises prior to the end of the term of the Lease.

13.     Landlord has not granted to Tenant any free rent periods or tenant improvement contributions under the Lease, and Landlord is not reimbursing Tenant or paying Tenant's rent obligations under any other lease, except:_____.

14.     Tenant has no options to expand, or extend the term of the Lease, or an option or preferred right or right of first refusal to purchase any portion of the Premises except:_____.  Tenant has no right to terminate the Lease prior to its stated expiration other than as specifically set forth in the Lease with respect to casualty and condemnation.

16.     Tenant has paid rent under the Lease through and including _____, _____.

17.     Tenant has received no notice claiming any violation of law with respect to the Leased Premises or the Premises.

18.     There are no actions, whether voluntary or otherwise, pending against Tenant under the bankruptcy laws of the United States or any state thereof.

19.     The person executing this estoppel certificate on behalf of Tenant hereby certifies that he/she has knowledge of the matters stated herein and has the authority to execute this estoppel certificate on behalf of Tenant.

20.    Tenant acknowledges that, if Buyer or its assigns acquire the Premises, the Landlord's interest in the Lease will be assigned to _____, or such other lender, as security for a mortgage loan to be made by _____, or such other lender, encumbering the Premises, and confirms that said assignment does not constitute a default under the Lease. Tenant hereby agrees that the subordination and attornment provisions of the Lease shall apply for the benefit of _____, or such other lender, and their respective successors and assigns, with respect to the mortgage loan, and all extensions, renewals, increases and modifications thereof.

The undersigned understands that Buyer or its assigns is acquiring the Premises and its Lender will be making a mortgage loan secured by the Premises, each in reliance upon the certifications and agreements set forth herein, and agrees that Buyer and its Lender, and their respective successors and assigns may rely upon such certification and agreements for that purpose. The undersigned agrees that the Lender may assign this estoppel and any of Lender's rights hereunder to any assignee of Lender's note and mortgage or to any purchaser of the Premises at a foreclosure sale or to any purchaser of the Premises from Lender.

Tenant hereby acknowledges and agrees that Buyer and its successors and assigns shall be entitled to rely upon this estoppel certificate in consummating the purchase of the Premises, and that Buyer and successors and assigns shall not be bound by any term or condition of the Lease which is inconsistent with this estoppel certificate.

[Signature on Following Page]

J-3

IN WITNESS WHEREOF, the undersigned Tenant has executed and delivered this Estoppel Certificate as of the _____ day of _____, 2015.


By: _____

Name: _____

Title: _____


EXHIBIT A
Complete Copy of Lease

[DELETE WHERE NO GUARANTY EXISTS: The undersigned Guarantor(s) of the Lease hereby certify to Buyer, Lender and their respective successors and assigns as of the date hereof that their guaranty of the Lease (the "Guaranty") is in full force and effect and has not been amended or modified and that the undersigned Guarantor(s) have no claims or defenses under the Guaranty or otherwise with respect to their performance in full of all terms, covenants and conditions of the guaranty.  Further, Guarantor(s) agrees that in the event _____ or its designee, or a purchaser at any foreclosure sale shall succeed to the interest of Landlord under the Lease, _____, its designee or a purchaser at foreclosure sale shall have the same rights and remedies as Landlord under the Guaranty; provided, however, that _____, its designee or a purchaser at foreclosure sale shall not be subject to any offsets, defenses or any other claims which Guarantor(s) may then have (whether known or unknown) as a result of the acts or omissions to act of any prior landlord (including Landlord), Tenant or any other party Guarantor(s) agrees that, if _____ makes a mortgage loan secured by the Premises, the Guaranty will not be amended, modified or terminated without _____'s prior written consent.]


By: _____
Name: _____
Title: _____

## EXHIBIT K

**Major Tenant List**

1.      **H Mart**

2.      **Spa World**

3.      **IHOP**

4.      **Coco Housewares**

## EXHIBIT L

### Rent Roll

**RENT ROLL**

| # | Suite / Tenant | SF | Lease Start | Lease End | Rent (Annual) | Rent (Monthly) | Rate ($/SF) | Increases | CAM | Pro Rata | Options | Assumptions | Market Rate |
|---|----|----|----|----|----|----|----|----|----|----|----|----|----|
| 1 | 13010-A Wendi's, Ltd-Japanese Rest | 2,947 | 3/1/11 | 2/28/21 | 84,453.24 | 7,004.44 | 28.64 | 3%/yr | CAM+15% WTR +1% admin | Pro rata +1% admin | [?]5-year | Market Assumptions | 29.00 |
| 2 | 13010-B Song & Pak (Music) | 1,600 | 7/1/12 | 6/30/17 | 50,922.20 | 4,243.60 | 31.83 | 3%/yr | CAM+15% WTR | Pro rata | [1]5-year Rent TBN | Market Assumptions | 32.00 |
| 3 | 13010-C Hyung Hawn Lee-Hair Salon | 1,424 | 7/1/19 | 12/31/19 | 49,524.00 | 4,127.00 | 34.78 | 3%/yr | CAM+15% WTR | Pro rata | [2]5-year | Market Assumptions | 35.00 |
| 4 | 13010-E SAKE INC t/a IHOP | 6,320 | 2/1/06 | 1/31/26 (Option 1 2/16, Option 2 2/31) | 189,754.00 / 198,342.50 / 207,204.00 / 219,444.00 / 228,447.00 | 15,812.83 / 16,603.37 / 17,433.67 / 18,305.33 / 19,220.64 | Fixed | | CAM+15% W | Pro rata | Exercise Option(s) | Exercise Option(s) | 37.00 |
| 5 | 13010-A&B Jang Won Restaurant | 3,200 | 6/1/10 | 5/31/20 | 111,260.31 | 9,276.69 | 34.78 | 3%/yr | CAM+15% WTR | Pro rata | [1]5-year | Market Assumptions | 35.00 |
| 6 | 13010-C Chongqig Chicken Inc-Rest | 1,200 | 9/0/03 | 8/31/15 | 44,836.20 | 3,736.35 | 37.36 | 3%/yr | CAM+15% WTR | Pro rata | [1]5-year Rent TBN | Market Assumptions | 38.00 |
| 7 | 13010-D VACANT | 1,200 | 7/1/16 Projected | 6/30/23 | 43,200.00 | 3,600.00 | 36.00 | 3%/yr | CAM+15% WTR | Pro rata | None | Market Assumptions | 36.00 |
| 8 | 13018 H-Mart International Market | 65,478 | 11/1/09 | 10/31/19 | 590,722.23 | 49,226.85 | 13.99 | 3%/yr | CAM+15% | Pro rata | [1]17-yr & [2]5-yr | Exercise Option(s) | 13.00 |
| 9 | 13019 H-Mart Cooler | | 11/1/09 | 10/31/19 | 18,727.20 | 1,560.60 | 18,727.20 | 3%/yr | CAM+15% | None | None | 18,728.00 | |
| 10 | 13018-A Honey Pig Seed | 1,600 | 7/1/12 | 7/1/15 | 7,867.63 | 655.64 | 7,867.63 | 3%/yr | None | None | [2]5-year Rent TBN | Exercise Option(s) | 7,868.00 |
| 11 | 13022-A Clifton-Centreville Animal Clinic | 3,200 | 12/1/98 | 5/31/19 (6/15, 6/16, 6/17, 6/18) | 65,600.94 / 67,200.00 / 68,799.96 / 70,400.04 | 5,466.67 / 5,600.00 / 5,733.33 / 5,866.67 | 78.50 / 20.50 / 21.00 / 21.50 / 22.00 | $0.50/44/yr | CAM+15% WTR | Pro rata | [2]5-year assume rents at 3%/yr Inc. | Market Assumptions | 27.00 |
| 12 | 13022-C Korean Gin-Seng | 1,200 | 5/1/13 | 4/30/18 | 41,375.10 | 3,447.93 | 34.48 | 3%/yr | CAM+15% WTR | Pro rata | [2]5-year Rent TBN for 2nd | Market Assumptions | 35.00 |
| 13 | 13022-A Amore Cosmetics | 1,354 | 12/1/12 | 11/30/17 | 50,276.16 | 4,189.64 | 37.13 | 3%/yr | CAM+15% W | Pro rata | [1]5-year Rent TBN | Market Assumptions | 38.00 |
| 14 | 13022-B Rice & Noodle-Woo Sung Lee | 1,530 | 4/30/18 | 5/15 | 49,980.66 | 4,165.00 | 32.89 | 3%/yr | CAM+15% WTR | Pro rata | [2]5-year Rent TBN | Market Assumptions | 33.00 |
| 15 | 13026-C Cocova/Clothing | 1,600 | 5/31/18 | | 50,123.20 | 4,283.60 | 31.33 | 3%/yr | CAM+15% WTR | Pro rata | [1]5-year Rent TBN | Market Assumptions | 32.00 |
| 16 | 13026-D The Bike Shop (income Haven't pays $3/sf until 6/2015 then rolls to market) | 1,600 | 11/15/07 – 11/25/12 MTM | | 49,599.96 | 4,133.33 | 31.00 | 3%/yr | CAM+15% WTR | Pro rata | [1]5-year Rent TBN | Market Assumptions | 31.00 |

19

L-2

# RENT ROLL

20

| # | Number | Tenant | GLA | Lease Start | Lease End | Date | Rent | Monthly | $/SF | CAM | Pro rata | Options | Market Rent Assumptions | Mkt Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 13826-E | Papa Johns Pizza | 1,600 | 5/1/05 | 4/30/20 | 5/15 | 64,506.08 | 5,375.67 | 40.32 | $/yr | CM-W | Pro rata | [15]-year | Exercise Option assumes rents at 2%/yr inc. | 41.00 |
| 18 | 13826-G | GNR Inc. t/a OCC Barber Shop | 800 | 11/1/96 | 11/29/16 | 12/14 | 30,603.56 | 2,553.63 | 38.00 | $/yr | CM-15% WTR | Pro rata | None | Market Assumptions | 39.00 |
| 19 | 13826-H | Plaza Laundry Inc | 3,700 | 6/1/09 | 5/31/19 | 6/15 | 110,649.70 | 9,204.14 | 29.85 | $/yr | CM-15% | Pro rata | [15]-year | Market Assumptions | 30.00 |
| 20 | 13830 | RK SPA WORLD LLC | 27,315 | 5/1/05 | 4/30/25 | 5/15 | 614,665.38 | 51,238.78 | 22.51 | $/yr | CM-15% | Pro rata | [10]-year | Exercise Option(s) | 23.00 |
| 21 | 13932 | Woori American Bank | 3,085 | 4/1/07 | 3/31/25 | 4/15 | 117,259.54 | 9,767.96 | 38.00 | $/yr | CM-15% WTR | None | None | Market Assumptions | 39.00 |
| 22 | 13936 | Coco Housewares | 14,443 | 8/7/12 | 5/31/27 | 6/15 | 242,544.13 | 20,212.68 | 14.75 | $/yr | CM-15% Plaza-CW | Pro rata | None | Market Assumptions Plaza Tenant | 15.00 |
| 23 | 13826-100 | Tous Les Jours (Café/Bakery) | 3,503 | 6/1/12 | 5/31/22 | 6/15 | 105,090.00 | 8,757.50 | 30.00 | $/yr | CM-15% Plaza-CW | Pro rata | [15]-year Rent TBN | Market Assumptions Plaza Tenant | 30.00 |
| 24 | 200-300A | Pacific Realty | 2,184 | 6/1/13 | M14 | 4/15 | 40,980.20 | 3,408.35 | 18.72 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year Rent TBN | Market Assumptions Plaza Tenant | 19.00 |
| 25 | 300B | Elizabeth Cosmetics | 1,973 | 12/1/12 | 11/30/22 | 12/14 | 25,143.76 | 2,095.90 | 23.34 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year Rent TBN | Market Assumptions Plaza Tenant | 24.00 |
| 26 | 400 | VACANT | 841 Projected | 11/1/16 | 10/31/23 | 11/16 | 21,025.00 | 1,752.08 | 25.00 | $/yr | CM-15% Plaza-CWG | Pro rata | None | Market Assumptions Plaza Tenant | 25.00 |
| 27 | 500 | State Farm Insurance - Total Financial | 841 | 10/1/14 | 9/30/17 | 10/14 | 16,156.08 | 1,346.34 | 19.21 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year Rent (TBN) | Market Assumptions Plaza Tenant | 20.00 |
| 28 | 600 | Airjoog Kim dba AT&T Wireless | 831 | 12/1/12 | 11/30/17 | 12/14 | 22,040.28 | 1,836.69 | 26.52 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year Rent TBN | Market Assumptions Plaza Tenant | 27.00 |
| 29 | 700 | YLux Inc. t/a Skin Care | 831 | 12/1/12 | 11/30/22 | 12/14 | 22,040.28 | 1,836.69 | 26.52 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year Rent TBN | Market Assumptions Plaza Tenant | 27.00 |
| 30 | 13938 | Lu La Karaoke & Bar Inc - Rest | 3,100 | 3/1/05 | 2/28/15 | 3/15 | 124,066.32 | 10,415.36 | 40.02 | $/yr | CM-15% Plaza-CWG | Pro rata | [20] 10-year | Market Assumptions Plaza Tenant | 41.00 |
| 31 | 13826-A | Centerville Brick Cleaners | 1,700 | 8/15/01 | 12/31/16 | 1/16 | 72,107.82 | 6,008.99 | 42.77 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year | Market Assumptions Plaza Tenant | 43.00 |
| 32 | 13840-B | Lucy Hair Salon | 1,600 | 6/1/08 | 5/31/18 | 6/15 | 61,001.67 | 5,083.47 | 38.13 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year | Market Assumptions Plaza Tenant | 39.00 |
| 33 | 13840-C | Daisy Cleaners/CHMAII LTD | 1,200 | 3/1/07 | 2/28/17 | 3/15 | 45,403.70 | 3,800.31 | 38.00 | $/yr | CM-15% Plaza-CWG | Pro rata | None | Market Assumptions Plaza Tenant | 29.00 |
| 34 | 13840-D | Lee Tree Reupholstered | 1,200 | 7/1/10 | 6/30/15 | 7/15 | 41,733.91 | 3,477.83 | 34.78 | $/yr | CM-15% Plaza-CWG | Pro rata | None | Market Assumptions Plaza Tenant | 35.00 |
| 35 | 13840-E | Forever 1469 | 1,600 | 4/4/14 | 4/20/19 | 5/15 | 62,969.75 | 5,247.48 | 39.36 | $/yr | CM-15% Plaza-CWG | Pro rata | [15]-year Rent TBN | Market Assumptions Plaza Tenant | 40.00 |

# RENT ROLL

| # | Unit | Tenant | Area | Commence | Expiration | Rent: Date | Rent: Annual | Rent: Monthly | Rent: PSF | Rent: Increases | Recoveries: CAM Ins | Recoveries: RE Tax | Options | Notes | Market Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 13840-FGH | Dragonfly Bistro-Rest (Sweet Potato, Inc.) | 3,980 | 5/1/11 | 4/30/21 | 5/15 | 125,426.81 | 10,452.23 | 31.51 | 3%/yr | CMI+15% Plaza-CWG | Pro rata | [2] 5-year Rent FMV | Market Assumptions Plaza Tenant | 32.00 |
| 37 | 13850-A | Glory Days Grill-Rest | 4,000 | 7/5/99 | 7/31/19 | 8/14<br>8/17 | 84,000.00<br>94,000.00 | 7,000.00<br>7,833.33 | 21.00<br>23.50 | Fixed | CMI+5% WTR | Pro rata | None | Market Assumptions | 21.00 |
| 38 | 13850-C | Top Travel | 680 | 3/1/13 | 2/28/16 | 3/13 | 25,839.96 | 2,153.33 | 38.00 | None | CMI+15% WTR | Pro rata | [1] 3-year | Market Assumptions | 38.00 |
| 39 | 13850-E | Little Italy Deli-Rest | 1,928 | 4/1/09 | 3/31/19 | 4/15 | 64,776.66 | 5,398.05 | 33.60 | 3%/yr | CMI+5% 67% Water/San 85% Trash | Pro rata | [1] 5-year | Market Assumptions Tenant disputing certain CAM billings | 34.00 |
| 40 | 13850-F | Red Rocks Cafe-Rest | 3,200 | 2/1/05 | 1/31/15 | 2/15 | 120,416.06 | 10,034.67 | 37.63 | 3%/yr | CMI+5% 67% Water/San 85% Trash | Pro rata | [1] 5-year | Exercise Option(s) Tenant disputing certain CAM billings | 38.00 |
| 41 | 13860-A | Pojangmacha | 1,600 | 2/1/15 | 1/31/20 | 2/15 | 54,400.00 | 4,533.33 | 34.00 | 3%/yr | CMI+15% WTR | Pro rata | [1] 5-year Rent TBN | Market Assumptions | 34.00 |
| 42 | 13860-B | Evergreen | 2,000 | 12/11/03 | 11/30/18 | 12/14 | 73,792.56 | 6,149.38 | 36.90 | 3%/yr | CMI+15% WTR | Pro rata | [1] 5-year + 5 mo | Market Assumptions | 37.00 |
| 43 | 13860-C | Amazing Nails | 1,200 | 5/9/99 | 9/30/19 | 10/14 | 39,338.16 | 3,278.18 | 32.78 | 3%/yr | CMI+15% WTR | Pro rata | [1] 5-year Rent FMV | Market Assumptions | 33.00 |
| 44 | 13860-D | VACANT | 1,919 | 3/1/17 Projected | 2/28/24 | 3/17 | 65,246.00 | 5,437.17 | 34.00 | 3%/yr | CMI+15% WTR | Pro rata | None | Market Assumptions | 34.00 |
| 45 | 13860-E | Chiropractor-Matthew Shin | 1,120 | 11/1/11 | 1/31/17 | 2/15 | 29,372.55 | 2,447.71 | 26.23 | 3%/yr | CMI+15% WTR | Pro rata | [1] 5-year Rent TBN | Market Assumptions | 27.00 |
| 46 | 13860-F | Dental Office - Dr. Cha | 2,400 | 3/1/10 | 2/28/20 | 3/15 | 58,427.33 | 4,868.94 | 24.34 | 3%/yr | CMI+15% WTR | Pro rata | [1] 10-year | Market Assumptions | 25.00 |
| 47 | 13880 | Plaza Hallway (Common Area) | 334 | | | | | | | | | | | | |

L-4